United States District Court
Southern District of Texas
FILED

DEC 15 2000

Michael N. Milby, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| CATRINA VALADEZ, | § | |
| ALMA AVILA AND | § | |
| ESMERALDA CARRIZALES | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-101 |
| | § | |
| CITY OF SAN DIEGO | § | |
| OFFICER BRENDA DE LEON & | § | |
| OFFICER ANDREW DE LEON | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW, Defendants in the above entitled and numbered cause, and file this their Motion for Summary Judgment and respectfully request that this Court grant such Motion in their favor as to each of Plaintiffs' causes of action.

## I. Statement of the Case

Plaintiffs Catrina Valadez, Alma Avila, and Esmeralda Carrizales filed suit against Defendants City of San Diego, Officer Brenda De Leon, and Officer Andrew De Leon alleging Defendants violated 42 U.S.C. §1983 in connection with the arrest of Catrina Valadez on November 4, 1999. Plaintiffs claim the arrest was illegal and that Officers Brenda De Leon and Andrew De Leon used excessive force. Plaintiffs' also assert claims under the Texas Tort Claim Act for personal injury caused by the use of personal property.

For the reasons set forth below, Plaintiffs' claims against Defendants are meritless and summary judgment that Plaintiffs take nothing is appropriate.

## II. <u>Factual Summary</u>

On November 4, 1999, Defendant Brenda De Leon, a police officer with the San Diego Police Department responded to a domestic disturbance call placed by Ruben James Valadez, Plaintiff Catrina Valadez' husband. See page 15 of the deposition of Brenda De Leon attached hereto as Exhibit <u>A</u>. Mr. Valadez told Officer Brenda De Leon that his "soon to be ex-wife" had ransacked his home. See page 15 of the deposition of Brenda De Leon attached hereto as Exhibit <u>A</u>. Officer Brenda De Leon entered the residence and observed the damage of which Mr. Valadez spoke. See page 15 of the deposition of Brenda De Leon attached hereto as Exhibit <u>A</u>. Officer Brenda De Leon also noticed scratch marks on Mr. Valadez's neck and asked if those scratches were caused by Catrina Valadez, to which he nodded affirmatively but would not admit verbally. See the Affidavit of Brenda De Leon attached hereto as Exhibit <u>B</u>. After taking the information from Mr. Valadez, Officer Brenda De Leon left Mr. Valadez' residence to go speak with his wife, Plaintiff Catrina Valadez. See page 16 of the deposition of Brenda De Leon attached hereto as Exhibit <u>A</u>. Officer Brenda De Leon desired to have another officer back her up when she met with Catrina Valadez due to the volatile nature of domestic disturbance calls. See the Affidavit of Brenda De Leon attached hereto as Exhibit <u>B</u>. No other on-duty officers were then available, so she requested Officer Andrew De Leon, who was off-duty at the time, accompany her as back up. See Affidavit of Brenda De Leon attached hereto as Exhibit <u>B</u>.

Officer Andrew De Leon then accompanied Officer Brenda De Leon to 702 Palacios, which is Esmeralda Carrizales', Catrina Valadez' mother, residence in an attempt to obtain basic information from Catrina Valadez to complete the report about the domestic disturbance call placed by her husband. Officer Brenda De Leon had been told by Mr. Valadez that Catrina Valadez was in a

2

violent state of mind at the time.  See page 18 of the deposition of Brenda De Leon attached hereto as Exhibit A.  However, Officer Brenda De Leon did not intend to arrest Catrina Valadez at that time.  See the Affidavit of Brenda De Leon attached hereto as Exhibit B.  Officer Andrew De Leon was dressed in blue jeans and a black and white police "specialist" t-shirt.  See the Affidavit of Brenda De Leon attached hereto as Exhibit B and the Affidavit of Andrew De Leon attached hereto as Exhibit B.  Andrew De Leon was wearing his badge and his gun, which were both visible.  See the Affidavit of Brenda De Leon attached hereto as Exhibit B and the Affidavit of Andrew De Leon attached hereto as Exhibit C.

Upon arrival at 702 Palacios, Officers Andrew De Leon and Brenda De Leon identified themselves as police officers from the San Diego Police Department.  See page 22 of the deposition of Brenda De Leon attached hereto as Exhibit A, the Affidavit of Brenda De Leon attached hereto as Exhibit B, and the Affidavit of Andrew De Leon attached hereto as Exhibit C.  Plaintiff Alma Avila, Plaintiff Catrina Valadez' sister, was outside the residence when Officers Andrew De Leon and Brenda De Leon arrived.  See page 22 of the deposition of Brenda De Leon attached hereto as Exhibit A.  The officers then asked that Alma Avila ask her sister Catrina Valadez to step outside of the residence so that the officers could obtain some basic information from her regarding the domestic disturbance complaint of her husband James Valadez.  See page 22 of the deposition of Brenda De Leon attached hereto as Exhibit A.

When Catrina Valadez emerged from the residence, Officer Brenda De Leon told Catrina Valadez that she wanted to ask her a few questions.  See page 22 of the deposition of Brenda De Leon attached hereto as Exhibit A.  Catrina Valadez came outside to the front yard of the residence, near the street.  See the Affidavit of Brenda De Leon attached hereto as Exhibit B.  Catrina Valadez

3

refused to answer any questions and told Officer Brenda De Leon "I don't have to tell yall shit." See page 22 of the deposition of Brenda De Leon attached hereto as Exhibit A and the Affidavit of Brenda De Leon attached hereto as Exhibit B. Catrina Valadez then told Officers Andrew De Leon and Brenda De Leon "Fuck yall. I'm not going to tell yall anything. You're not going to believe me. You're going to believe my fucking husband because yall fucking work with him." See page 25 of the deposition of Brenda De Leon attached hereto as Exhibit A. Plaintiff Alma Avila was also screaming at Officers Brenda De Leon and Andrew De Leon. See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Catrina Valadez was making these statements in a very loud manner, which was also causing people in the neighborhood to stop their activities and watch. See page 29 of the deposition of Brenda De Leon attached hereto as Exhibit A, and also see page 22 of the deposition of Andrew De Leon attached hereto as Exhibit D. In fact, there were people across the street who were saying something in the direction of the officers, which could not be fully understood by the officers, and a car that had driven by had come around again. See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Officer Brenda De Leon became concerned about possible action that could be taken by Catrina Valadez' family, as well as the people observing the scene. See page 29 of the deposition of Brenda De Leon attached hereto as Exhibit A, the Affidavit of Brenda De Leon, and the Affidavit of Andrew De Leon attached hereto as Exhibits B & C, respectively. Accordingly, the officers believed that Catrina Valadez had caused a breach of the peace and that further domestic violence could occur. See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Officer Andrew De Leon then placed Catrina Valadez under arrest for disorderly conduct-vulgar language in a public place. See page 22 of the deposition of Andrew De Leon attached hereto as Exhibit D and the Affidavit of Andrew De Leon attached hereto as Exhibit C.

4

Catrina Valadez then stated that she was not under arrest, and ran toward the residence. See page 25 of the deposition of Andrew De Leon attached hereto as Exhibit D, the Affidavit of Brenda De Leon attached hereto as Exhibit B, and the Affidavit of Andrew De Leon attached hereto as Exhibit C. Neither officer had touched Valadez or otherwise attempted to physically restrain her. Andrew De Leon was able to catch Catrina Valadez just as she entered the residence. See page 26 of the deposition of Andrew De Leon attached hereto as Exhibit D, the Affidavit of Brenda De Leon attached hereto as Exhibit B, and the Affidavit of Andrew De Leon attached hereto as Exhibit C. Officer Brenda De Leon never entered the residence. See the Affidavit of Brenda De Leon attached hereto as Exhibit B and page 18 to the Deposition of Alma Avila attached hereto as Exhibit E Esmeralda Carrizales, Catrina Valadez' mother, started pulling on Valadez' arm in an attempt to prevent Officer Andrew De Leon and Brenda De Leon from placing handcuffs on her. See page 26 of the deposition of Andrew De Leon attached hereto as Exhibit D, the Affidavit of Brenda De Leon attached hereto as Exhibit B, and the Affidavit of Andrew De Leon attached hereto as Exhibit C. After telling Esmeralda Carrizales several times that he would arrest her for interfering with peace officer's public duties, Carrizales finally let go of Valadez' other arm. See page 27 of the deposition of Andrew De Leon attached hereto as Exhibit D.

After having handcuffs placed on her, Catrina Valadez was escorted to the police unit. See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Officer Brenda De Leon then attempted to obtain Catrina Valadez' complete name and birth date, to which Valadez told Brenda De Leon "I don't have to tell you a fucking thing, you can find it yourself." See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Officer Brenda De Leon then informed Catrina Valadez that she was also now being charged with failure to identify to a peace officer. See the

5

Affidavit of Brenda De Leon attached hereto as Exhibit B. Officer Brenda De Leon then transported Catrina Valadez to the Duval County Jail, where Valadez was issued citation for disorderly conduct-vulgar language in a public place and failure to identify to a peace officer and released.

At no time did Defendant Brenda De Leon have any physical contact with any of the Plaintiffs. See the Affidavit of Brenda De Leon attached hereto as Exhibit B. Additionally, at no time did Defendant Andrew De Leon have any physical contact with Esmeralda Carrizales or Alma Avila. See page 11 to the Deposition of Esmeralda Carrizales attached hereto as Exhibit F and the Affidavit of Andrew De Leon attached hereto as Exhibit C. Plaintiffs Alma Avila and Esmeralda Carrizales were never arrested. See the Affidavit of Brenda De Leon attached hereto as Exhibit B and the Affidavit of Andrew De Leon attached hereto as Exhibit C.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), the movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the summary judgment record] which it believes demonstrates the 'absence of a genuine issue of material fact.'" Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this burden is satisfied, the burden shifts to the non-movant to establish the existence of a genuine issue of material fact for trial. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825. Whether the record supports a genuine issue of material fact is a question of law for the Court to decide.

In support of this Motion for Summary Judgment , Defendants rely on the following exhibits:

- Excerpts from Deposition of Brenda De Leon attached hereto as **Exhibit A**;

- Affidavit of Brenda De Leon attached hereto as **Exhibit B**;

- Affidavit of Andrew De Leon attached hereto as **Exhibit C**;

- Excerpts from Deposition of Andrew De Leon attached hereto as **Exhibit D**;

- Excerpts from the deposition of Alma Avila attached hereto as **Exhibit E**;

- Excerpts from the deposition of Esmeralda Carrizales attached hereto as **Exhibit F**;

- Excerpts from Deposition of Catrina Valadez attached hereto as **Exhibit G**;

- Affidavit of David J. Klein attached hereto as **Exhibit H**.

## IV. **Arguments and Authorities in Support of Summary Judgment**

### A.   **Defendants Entitled to Summary Judgment on Plaintiffs' § 1983 Claim**

To support their § 1983 claim against Officers Andrew De Leon and Brenda De Leon, Plaintiffs must plead and prove facts that demonstrate that: (1) each Defendant intentionally committed acts that violated their Fourth Amendment right to be free from excessive force; (2) Defendants "acted under color" of the authority of the State of Texas; and, (3) Defendants' acts were the legal cause of Plaintiffs' damages. West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254 (1988). As Plaintiffs Esmeralda Carrizales and Alma Avila were not arrested or even touched by any Defendant, none of their constitutional rights were violated by any Defendant. Plaintiffs Esmeralda Carrizales and Alma Avila have therefore failed to allege any constitutional violation. Accordingly, their claims must fail.

### B.   **Probable Cause Existed**

At the time that Catrina Valadez was cursing at officers Brenda De Leon and Andrew De Leon, she was outside her mother's residence by the curb. See the Affidavit of Brenda De Leon attached as Exhibit B. The volume, tone, and language used by Valadez at this location was causing a commotion, and the officers reasonably believed that a breach of the peace was imminent as

7

neighbors and passers by appeared to be gathering.  See the Affidavit of Brenda De Leon attached hereto as Exhibit <u>B</u>.  The curbline in this instance is a public place as it is a place to which the public or a substantial group of the public has access.  See Tex. Penal Code § 107 (a) (40).  Whether a place is public is determined by the circumstances.  <u>Nixon v. State</u>, 928 S.W. 2d 208, at 212 (Tex.App. Beaumont 1996, vacated on other grounds at 942 S.W. 2d 625).  In Nixon, the defendant was arrested for disorderly conduct in a residential backyard, which was found to be a public place because of the access of many people to the backyard.  Similar circumstances exist here. Additionally, Valadez' flight from arrest could also have suggested probable cause.  <u>Pfannstiel v. City of Marion,</u> 918 F.2d.2d 1178, at 1184 (5th Cir. 1990).  Accordingly, a officer in  the same circumstances would have reasonably believed Valadez had committed the offense of disorderly conduct, thus satisfying the requirement of probable cause for the arrest.  <u>Harper v. Harris County</u>, 21 F.3d 597, at 601 (5th Cir. 1994).  Furthermore, there was probable cause to arrest Ms. Valadez on the related offense of her assault on her husband.  <u>Pfannstiel</u>, 918 F.2d at 1183.

**C.**     <u>**Officer Andrew De Leon is Entitled to Summary Judgment on Plaintiffs' § 1983 Claims**</u>

Defendant, Officer Andrew De Leon, is entitled to summary judgment on Plaintiffs' § 1983 claim on the basis that he did not violate any Plaintiffs', particularly Catrina Valadez, Fourth Amendment right to be free from excessive force.  Alternatively, Officer Andrew De Leon is entitled to summary judgment because he is entitled to qualified immunity.

**(1.)     No Violation of Fourth Amendment**

Officer Andrew De Leon cannot be held liable on Plaintiffs' 1983 claim because he did not violate Catrina Valadez' Fourth Amendment right.  Specifically, Plaintiff cannot establish that Officer Andrew De Leon intentionally committed an act that violated her Fourth Amendment right.  The available summary judgment evidence demonstrates that Officer Andrew De Leon held a good faith belief that he had probable cause to arrest Catrina Valadez for disorderly conduct and did not intend

to cause any injury to Catrina Valadez.  See the Affidavit of Andrew De Leon attached hereto as Exhibit C.  Officer Andrew De Leon acted only in a manner sufficient to ensure that Catrina Valadez was properly subdued.  Moreover, Valadez cannot establish that Officer Andrew De Leon was the legal cause of any bruises on her arms.

### (2.)   Qualified Immunity Bars Plaintiffs' Claims Against Officer Andrew De Leon

Even assuming arguendo that Officer Andrew De Leon's actions raise a question as to whether he violated Valadez' Fourth Amendment right, Officer Andrew De Leon is entitled to qualified immunity.  Accordingly, Officer Andrew De Leon asserts qualified immunity.

The court conducts a two-step process to determine whether a police officer is entitled to qualified immunity.  First, the court determines whether the plaintiff has alleged a violation of a clearly established constitutional right under currently applicable constitutional standards.  Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 1792-93 (1991); *Lampkin v. City of Nacogdoches,* 7 F.3d 430, 434 (5th Cir. 1994); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992).  Defendant is entitled to qualified immunity if the court determines that the plaintiff has not alleged a violation of a clearly established constitutional right.  Baker v. Putnal, 75 F.3d 190, 198 (5th Cir. 1996); Burns-Toole v. Burne, 11 F.3d 1270 (5th Cir. 1994).  Second, if the plaintiff has demonstrated that the defendant violated a clearly established constitutional right, the court considers whether the plaintiff can demonstrate that the defendant's conduct was not objectively reasonable under the circumstances. Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3040 (1987); Burns, 11 F.3d at 1274. Absent evidence that qualified immunity does not apply, the Supreme Court has held that a presumption of qualified immunity applies.  Harlow v. Fitzgerald, 474 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  In light of the presumption established by the Supreme Court, the Fifth Circuit has held that the burden is on the plaintiff to overcome a governmental defendant's claim of qualified immunity

and that the plaintiff must show that the defendant's conduct was not objectively reasonable and that the defendant violated clearly established law.

In the context of an excessive force claim the Fifth Circuit has set forth a test for qualified immunity. A claim for excessive force in violation of the Constitution requires a showing of (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need; and (3) the force was used was objectively unreasonable. Johnson v. Morel, 876 F.2d 477, 480 (5th Cir.1989), abrogated on other grounds, Harper v. Harris County, Tex., 21 F.3d 597 (5th Cir. 1994).

The summary judgment record establishes that Officer De Leon is entitled to qualified immunity. Although Plaintiff claims to have sustained bruises on her arms, there is no evidence to support, or even suggest, that such injury resulted directly and only from the use of excessive force by Officer De Leon. In fact, the available summary judgment evidence demonstrates that Officer De Leon exercised only that level of force he believed necessary under the circumstances. He used only the amount of force he believed necessary to apprehend and handcuff Plaintiff Catrina Valadez after she had fled. See the Affidavit of Andrew De Leon attached hereto as Exhibit C. See also the deposition testimony of Alma Avila and Esmeralda Carrizales attached hereto as Exhibits E & F, respectively.

A police officer has the right to use such force as is reasonably necessary under the circumstances. Any injury to Catrina Valadez that occurred during her arrest were a result of her own resistant and combative behavior as Officer Andrew De Leon was attempting to handcuff her.

In summary, whether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances. See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989). Officer Andrew De Leon used only that force that

10

a reasonable and prudent officer would have used. Officer Andrew De Leon is, therefore, entitled to summary judgment.

**D.**    **Officer Brenda De Leon is Entitled to Summary Judgment on Plaintiffs' § 1983 Claims**

   (1.)    No Violation of Fourth Amendment

Defendant Officer Brenda De Leon cannot be held liable on Plaintiffs' § 1983 claim because she did not violate Catrina Valadez' Fourth Amendment right. Catrina Valadez cannot establish such a claim as she cannot establish that Officer Brenda De Leon exerted any force at all on her. Valadez also cannot plead and prove facts that demonstrate that Officer Brenda De Leon committed any act that violated her Fourth Amendment rights. The available summary judgment evidence demonstrates that Officer Brenda De Leon had no contact with Valadez. See Affidavit of Brenda De Leon attached as Exhibit B. Accordingly, Valadez cannot establish that Officer Brenda De Leon intentionally committed an act that violated her Fourth Amendment right to be free from excessive force.

Valadez cannot prevail on her § 1983 claim against Officer Brenda De Leon. To establish her claim, Valadez must allege a violation of a clearly established right under currently applicable standards. Under currently applicable standards, Valadez must show proof of injury to prevail on an excessive force claim under § 1983.

   Officer Brenda De Leon is entitled to summary judgment because she can disprove, as a matter of law, that she caused Valadez any injury. Officer Brenda De Leon had no contact with Valadez. Specifically, Officer Brenda De Leon did not participate in handcuffing Valadez. See the Affidavits of Officer Andrew De Leon and Officer Brenda De Leon. Officer Andrew De Leon was the only officer that participated in handcuffing Valadez. Because Officer Brenda De Leon had no contact with Valadez, Valadez cannot establish any causal connection between her alleged injury and Officer Brenda De Leon.

There is no evidence of any injury inflicted by Officer Brenda De Leon upon Valadez. In fact, Valadez complains only of arm bruises. She has made no complaint of an injury caused by any act by Officer Brenda De Leon. See page 22 of the Deposition of Catrina Valadez attached hereto as Exhibit G . Accordingly, Defendant Brenda De Leon is entitled to summary judgment on Valadez' claim because Valadez cannot establish that Officer Brenda De Leon's act, if any, was the legal cause of any damages.

**E.     City of San Diego is Entitled to Summary Judgment on State and Federal Claims**

The City of San Diego is likewise entitled to summary judgment that plaintiffs take nothing. At the outset, the City cannot be liable to plaintiffs on their Federal civil rights claims since none of the plaintiffs actually suffered a violation of Federally protected rights. As argued above, neither of the officers used excessive force against any of the plaintiffs, and the only arrest that was made – that of Catarina Valadez – was supported by probable cause. Plaintiffs do not allege that their civil rights were violated in any other way. Thus, the evidence conclusively demonstrates that the City did not violate the plaintiffs' Federal civil rights.

Furthermore, even if a fact question remained about the individual officers' compliance with Federal law in their treatment of the plaintiffs, the plaintiffs cannot demonstrate that any violation of their civil rights was caused by an official custom or policy of the City. There is absolutely no evidence that the City of San Diego has a policy that encourages the making of arrests without probable cause, or the use of excessive force. Monell v. Dept. of Social Services, 98 S.Ct. 2018, 2037 (1978). To the extent that the plaintiffs might seek to fulfill the *Monell* requirement by alleging inadequate training, that claim likewise has no support in the evidence. Both of the individual officers in question are licensed peace officers, certified by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE"). Texas Occupation Code, § 1701.001 et. seq, (West 2001). Each has received the training program prescribed by TCLEOSE, as well as additional

12

training on a variety of subjects. (See deposition of Andrew DeLeon at p. 9, and the deposition of Brenda DeLeon at p. 8-9). Even if the officers' conduct had violated the plaintiffs' civil rights, this single incident would not be sufficient to prove that the City had a policy of encouraging civil rights violation through deliberate indifference to a need for better training. City of Canton v. Harris, 109 S.Ct. 1197, 1205 (1989).

Similar considerations would require the rejection of any claim by the plaintiffs that the Monell requirement of a city policy could be satisfied by "negligent hiring" or by any supposed deficiency in the City's hiring policies. There is absolutely no evidence of anything in the background or qualifications of either Andrew or Brenda De Leon that would support a claim that the City was wrong to hire them as officers, much less that there existed a widespread or established pattern of deliberate indifference to a likelihood that civil rights violations might occur because of inadequate hiring practices. Texas Occupation Code, § 1701.001 et. seq, (West 2001).

It is not clear what claims the plaintiffs assert against the City under state law. However, a brief review of the possible claims they might assert demonstrates that those claims either lack any support whatsoever in the evidence, or they are otherwise barred as a matter of Texas law.

At the outset, any intentional state law tort that the plaintiffs might claim against the City is barred by governmental immunity. Police protection is a governmental function of Texas municipalities Tex. Civ. Prac. and Rem. Code § 101.0215(1) (West 2000 Supp.) and therefore governmental immunity applies unless it has been waived. The Texas Tort Claims Act waives the governmental immunity of Texas cities to certain categories of tort claims, but expressly excludes from that waiver "any intentional tort." Tex. Civ. Prac. and Rem. Code, § 101.057(2) (West 1997). Thus, the Tort Claims Act's waiver of governmental immunity does not extend to any claim that the plaintiffs might assert for false arrest, assault and battery, or intentional infliction of emotional distress. Therefore, those claims would be barred by governmental immunity as a matter of law.

13

It is unclear whether Plaintiffs have pleaded a negligence claim against the City, but even if such a claim were properly before the Court, there is no evidence of any negligent act by the City or either of the officers involved in this case that would fall within the Tort Claims Act's waiver of immunity. A personal injury claim arising out of a governmental function, such as police protection, can proceed against a city only if it arises from the use or operation of a motor vehicle, or some use or condition of tangible personal or real property Tex. Civ. & Prac. Rem. Code, § 101.021 (West 1997). Plaintiffs have not suggested how any of them sustained an injury from the use or operation of a motor vehicle by the City or any of its employees. Nor have they identified any real or personal property whose use or condition hurt them. The bruises on Catrina Valadez's arm cannot be attributed to the use or condition of any item of property. And although there is some mention in her deposition of bruising to her wrists from the handcuffs, there is no suggestion in the record that the handcuffs were placed on her in a negligent manner.

Furthermore, the officers' conduct in this case, as argued earlier, is protected by the defense of "official immunity" under Texas state law. While analogous in some respects to qualified immunity under Federal law, official immunity differs in at least one major respect. Under Texas law, an individual defendant's official immunity inures to the benefit of his governmental employer. The employer, such as the City of San Diego in this case, cannot be held liable in *respondeat superior* for the conduct of an employee if his conduct was protected by official immunity. <u>Dewitt v. Harris County</u>, 904 S.W. 2d 650, 654 (Tex. 1995).

The City of San Diego is entitled to summary judgment on the plaintiffs' federal claims because the summary judgment record shows no violation of the plaintiffs' federal rights by either of the officers involved, and even if it did, there is no evidence to support a claim that any alleged violation of their Federal rights resulted from any policy of the City, including any supposed policy implied by inadequate training or inadequate hiring practices. The City is also entitled to summary

judgment on the plaintiffs' state law claims, if any, because: they do not fall within the limited waiver of governmental immunity effected by the Texas Tort Claims Act; and the individual officers' conduct is protected by official immunity, thus foreclosing *respondeat superior* liability of the City under state law.

**F.   Defendants Entitled to Summary Judgment on Plaintiffs' State Law Claims**

Although it is not clear if Plaintiffs are pleading additional state law tort claims, to the extent Plaintiffs are making such claims, Defendants are entitled to summary judgment as to Plaintiffs' state law claims of assault, battery, and intentional infliction of emotional distress.

**(1.)   Assault & Battery**

To successfully establish a claim of assault and battery, Plaintiffs must establish that the defendants either:

(a) intentionally, knowingly, or recklessly caused them bodily injury;

(b) intentionally or knowingly threatened them with imminent bodily injury; or

(c) intentionally or knowingly caused physical contact with her when he knew or should reasonably have believed that she would regard the contact as offensive or provocative.

*See* Childers v. A.S., 909 S.W.2d 282, 292-93 (Tex. App. -- Fort Worth 1995, no writ); DeLeon v. Hernandez, 814 S.W.2d 531, 533 (Tex. App. -- Houston [14th Dist.] 1991, no writ).

**(i.)   Officer Andrew De Leon**

Officer Andrew De Leon is entitled to summary judgment as he can disprove, as a matter of law, that he intentionally, knowingly, or recklessly caused Valadez any bodily injury. See Affidavit of Andrew De Leon attached as Exhibit C.

15

Even assuming arguendo that Andrew De Leon caused Valadez' injury, Andrew De Leon is entitled to official immunity as to Valadez' state law assault and battery claims. Texas law provides government officials with immunity from suit for matters arising from the performance of their discretionary duties, as long as they are acting in good faith and within the scope of their authority. Wren v. Towe, 130 F.3d 1154, 1160 (Tex. 1997); City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). Any injury to Valadez arose while Andrew De Leon, in good faith, performed a discretionary duty within the scope of his authority, when he arrested Valadez. Any injury to Valadez arose while Officer De Leon was performing his discretionary duty. Furthermore, any injury to Valadez was caused by Valadez' own combative and resistant behavior to the officer's attempt to handcuff her. Additionally, any contact between Valadez and Andrew De Leon was justified. The right to make an arrest necessarily carries with it the right to use some degree of physical coercion to effect the arrest. Graham at 396. Andrew De Leon only used that level force necessary to effect the arrest and therefore cannot be held liable for assault.

### (ii.) Officer Brenda De Leon

Officer Brenda De Leon is entitled to summary judgment as she can disprove, as a matter of law, that she intentionally, knowingly, or recklessly caused Valadez any bodily injury. Officer Brenda De Leon had no physical contact with Valadez. See Affidavit of Brenda De Leon attached as Exhibit B. Specifically, Officer Brenda De Leon did not participate in handcuffing Valadez. See the Affidavits of Officer Andrew De Leon and Officer Brenda De Leon attached as Exhibits C & B, respectively. Officer Andrew De Leon was the only officer that participated in handcuffing Valadez. Because Officer Brenda De Leon had no physical contact with Valadez, Valadez cannot establish any causal connection between any alleged injury and Officer Brenda De Leon.

16

Even assuming arguendo that Officer Brenda De Leon caused Valadez' injury, Officer Brenda De Leon is entitled to official immunity as to Valadez' state law assault and battery claims. Texas law provides government officials with immunity from suit for matters arising from the performance of their discretionary duties, as long as they are acting in good faith and within the scope of their authority. Wren v. Towe, 130 F.3d 1154, 1160 (Tex. 1997); City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). Any injury to Valadez arose while Officer Brenda De Leon, in good faith, performed a discretionary duty within the scope of her authority.

### (2.)     Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, Plaintiffs must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; and, (3) the defendant's actions caused the plaintiff severe emotional distress. Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993); Gonzales v. Willis, 995 S.W.2d 729, 734 (Tex. App. -- San Antonio, no pet. h.). The "intent" element requires that Plaintiffs demonstrate that the defendant(s) either intended to cause severe emotional distress or that severe emotional distress be the primary risk created by the defendant's conduct. Standard Fruit and Vegetable Co. v. Johnson, 985 S.W.2d 62, 63 (Tex. 1998). The "outrageous" element is meant to require behavior that is beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. Twyman, 855 S.W.2d at 621. "Severe emotional distress" is distress so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering.

### (a.)  Officer Andrew De Leon

Plaintiffs' state law tort claims against Officer Andrew De Leon must fail as a matter of law. First, Plaintiffs cannot establish that Officer Andrew De Leon acted either intentionally or recklessly.

17

There is no evidence to support any claim that Officer De Leon either intended to cause severe emotional distress or that severe emotional distress be created by his conduct. Second, Plaintiffs cannot establish that Officer Andrew De Leon acted in a manner that was "extreme and outrageous." Officer De Leon acted in a manner consistent with his training in handcuffing procedures. His act cannot be characterized as "beyond all possible bound of decency." Finally, Plaintiffs cannot establish that Officer De Leon's act caused them severe emotional distress.

Nonetheless, official immunity bars Plaintiffs' state law tort claims against Officer Andrew De Leon. As a police officer, Officer Andrew De Leon is immune from state tort liability for matters arising from his performance of discretionary duties in good faith and within the scope of his authority. Wren v. Towe, 130 F.3d 1154, 1160 (Tex. 1997); City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). The summary judgment record clearly establishes that Officer Andrew De Leon acted in good faith in all his interactions with each Plaintiff. Summary judgment is, therefore, proper as to any and all of Plaintiffs' state law tort claims against Officer Andrew De Leon.

### (b.) Officer Brenda De Leon

Officer Brenda De Leon is entitled to summary judgment as a matter of law as to any of Plaintiffs' state law claim of intentional infliction of emotional distress. Officer Brenda De Leon did not have any contact, physical or otherwise, with any Plaintiff. Because Officer Brenda De Leon had no contact with any Plaintiff, Plaintiffs cannot establish any causal connection between any alleged injury and Officer Brenda De Leon and she is entitled to summary judgment.

Even assuming arguendo that Officer Brenda De Leon caused an injury, Officer Brenda De Leon is entitled to official immunity as to any state law assault and battery claims. Texas law

18

By: _James F. McKibben_ w/ permission
by DJK

James F. McKibben, Jr.
State Bar No. 13713000
Federal I.D. No. 914

ATTORNEY-IN-CHARGE FOR DEFENDANTS
BRENDA DE LEON, ANDREW DE LEON, AND
THE CITY OF SAN DIEGO

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Motion for

Summary Judgment was served on opposing counsel, as indicated below, in accordance with the

Federal Rules of Civil Procedure, this 15th day of December, 2000, to wit:

**VIA CMRRR #7099 3220 0001 4297 9086**
Mr. Gray P. Scoggins, Esq.
*ATTORNEY AT LAW*
113 N. Reynolds
Alice, Texas 78332
*Attorney for Plaintiffs*

_James F. McKibben_ w/ permission
by DJK

James F. McKibben, Jr.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION - -

CATRINA VALADEZ, ALMA    )
AVILA AND ESMERALDA      )
CARRIZALES               )
                         )
VS.                      )  C. A. NO. C-00-101
                         )
CITY OF SAN DIEGO,       )
OFFICER BRENDA DE LEON   )
& OFFICER ANDREW DE LEON )

DEPOSITION OF BRENDA DE LEON
JULY 7, 2000

APPEARANCES:

COUNSEL FOR THE PLAINTIFFS:

GRAY P. SCOGGINS
Attorney at Law
113 N. Reynolds
Alice, Texas 78332

COUNSEL FOR THE DEFENDANTS:

MR. DAVID W. GREEN
Barger, Hermansen, McKibben
& Villarreal, L.L.P.
802 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401

ALSO PRESENT:  CATRINA VALADEZ,
               ANDREW DE LEON

REPORTED BY:  JENNIFER L. KARL

(COPY)

# AK/RET REPORTING, RECORDS & VIDEO, INC.

CERTIFIED COURT REPORTERS
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037  (800) 388-9037
FAX (361) 882-3355



1    got hired as an officer in Olton.

2        Q.   Okay.  What kind of training have you

3    received as a peace officer?  Where did you receive

4    your training as a peace officer?

5        A.   South Plains College, 580-hour Law

6    Enforcement Academy.

7        Q.   Okay.  Have you received any other training?

8        A.   Yes.

9        Q.   Okay.  What other training have you

10   received?

11       A.   We received child abuse, domestic violence,

12   DWI.  I am a standardized field sobriety

13   practitioner, drug schools, just abuse of force

14   schools, just a lot of different. . .

15       Q.   Okay.  Where did you receive that training,

16   those courses?

17       A.   Anywhere from Amarillo, Plainview, Lubbock,

18   El Paso, up north, West Texas.

19       Q.   Okay.  Is that something you did on your

20   own, or is that training that your employer sent you

21   to?

22       A.   Both.

23       Q.   Both, okay.  When did you start working in

24   San Diego?

25       A.   October of '99.

AK/RET REPORTING, INC.

9

1    Q.    While you have been employed with San Diego

2  PD, have you received any training?

3    A.    Yes, twice.

4    Q.    Okay.  What kind of training have you

5  received since you have been here?

6    A.    One of them was a border patrol class.  One

7  of them was a special investigative topic class.

8    Q.    Okay.  Where was that training held?

9    A.    Here.

10    Q.    In San Diego?

11    A.    Uh-huh.

12    Q.    Okay.  Other than your -- the education you

13  received or the training you received to become a

14  peace officer, what is your other, say, formal

15  education?

16    A.    Just high school.

17    Q.    Just high school.  Have you received any

18  college credit?

19    A.    No.

20    Q.    Okay.  Where did you go to high school?

21    A.    Plainview.

22    Q.    And did you graduate?

23    A.    No.

24    Q.    Okay.  How far did you go in high school?

25    A.    10th.

1   warrant.

2       Q.   Okay.   On November the 4th, 1999, did you

3   respond to a domestic disturbance?

4       A.   Yes.

5       Q.   Okay.   Who did you speak to?

6       A.   James Valadez.

7       Q.   Okay.   Who is James Valadez?

8       A.   He is an employee with the sheriff's office.

9       Q.   Okay.   Did you know him prior to responding

10  to it?

11      A.   Well, we worked with him.   I didn't know him

12  personally.

13      Q.   Okay.   But you had met him before?

14      A.   Yes.

15      Q.   Spoken to him before?

16      A.   Uh-huh.

17      Q.   What did he tell you when you showed up at

18  his house?

19      A.   He told me that his soon to be ex-wife had

20  broken into his home, that she did not live there.

21  She stayed there every once in a while and that she

22  had gone in there and cut everything up, threw

23  everything, broke everything, and he took me inside

24  the house and showed me the damage to the house and

25  all his clothes that was ruined.

AK/RET REPORTING, INC.

1     Q.   Okay.  So he told you that he was married?

2     A.   He didn't tell me he was married, but that's

3  what I assumed because he said it was his soon to be

4  ex-wife.

5     Q.   Okay.  And did he also tell you that he had

6  left some of her things outside for her to pick up?

7     A.   Yes.

8     Q.   Okay.  And your testimony today is he told

9  you that she did not live there?

10    A.   Right.

11    Q.   Okay.  Do you know why her things were there

12  if she was not living there?

13    A.   No.

14    Q.   Did you ask or inquire as to why her things

15  were there, if she was not living there?

16    A.   No.

17    Q.   Okay.  After speaking to Mr. Valadez, what

18  did you, what did you do then?

19    A.   I took the initial information, and I left

20  to speak with Catrina.

21    Q.   Okay.  At the time you left to go speak to

22  Catrina, did you believe that a crime had been

23  committed?

24    A.   Yes.

25    Q.   Okay.  What crime do you believe had been

1    committed at that time?

2        A.   Family violence because he had scratch marks

3    on his neck; and assuming that she didn't live there,

4    burglary, he wanted to file burglary, criminal

5    mischief on what I had observed in the house.  And he

6    told me he wanted his keys back since she had broken

7    into the house and taken the keys.  That's what I was

8    going to go do was just get the keys from her.

9        Q.   So at that time you believe you had probable

10   cause to believe she committed a burglary?

11       A.   No, I was going to take the initial report

12   and turn it into the district attorney and let him

13   figure it out.

14       Q.   Okay.  When, when you left the --

15   Mr. Valadez's home, did you, did you go get backup?

16       A.   Yes.

17       Q.   Okay.  Why did you feel that you needed

18   backup?

19       A.   Because I never go on domestics by myself.

20       Q.   Okay.  And were you planning on arresting

21   Mrs. Valadez --

22       A.   No.

23       Q.   -- at that time?

24       A.   No.

25       Q.   Okay.  What was your purpose in going and

AK/RET REPORTING, INC.

1  looking for Mrs. Valadez?

2      A.    To get her side of the story.

3      Q.    Okay.  Just to talk to her?

4      A.    Yes, and to try to get the keys back, if she

5  had them.

6      Q.    Okay.  Did you feel that you needed backup

7  just to speak to Mrs. Valadez?

8      A.    Yes.

9      Q.    Okay.  Why is that?

10     A.    Because on domestics you never know when

11  things are going to get out of hand.

12     Q.    Okay.  Now, when you were responding or

13  going to Mrs. -- to go see Mrs. Valadez, they were --

14  the parties were separated; is that correct?

15     A.    Right.

16     Q.    Okay.  But you still felt that there was a

17  chance for violence?

18     A.    Yes.

19     Q.    Okay.  Violence towards who?

20     A.    Towards me.

21     Q.    Okay.  Why did you feel that Mrs. Valadez

22  would, would react violently?

23     A.    Because Mr. Valadez said she was in that

24  state of mind.

25     Q.    Okay.  He said that she was in a violent

1   her from destroying any property?

2      A.   No.

3      Q.   Did he show you an order which would prevent

4   her from removing items from the home?

5      A.   No.

6      Q.   Okay.  If you -- tell me this:  If you

7   destroy your own property, assuming it's paid for, is

8   that a crime?

9      A.   If you destroy your own property?

10     Q.   Yes.

11     A.   No.

12     Q.   It is not a crime?

13     A.   No.

14     Q.   If you remove your own property from your

15   home, is that a crime?

16     A.   No.

17     Q.   Okay.  When you arrived at -- how did you

18   know where to look for Mrs. Valadez?

19     A.   Mr. Valadez gave me the address.

20     Q.   Okay.  And do you know what address you went

21   to?

22     A.   702 Palacios, I believe.

23     Q.   Okay.  When you arrived at 702 Palacios,

24   would you describe to me what happened?

25     A.   We drove up, and me and Officer Andy De Leon

1   exited the vehicle; and Alma Avila was standing

2   outside.  And Officer De Leon identified both of us

3   as police officers, San Diego Police Department, and

4   we asked to talk to Catrina.  She wanted to know what

5   was going on, and we told her we need to talk to

6   Catrina, and she called Catrina outside.  From the

7   moment Catrina stepped out of the house, she was

8   already cursing at us, telling us we were not going

9   to believe her, anyway; we were going to believe her

10  husband because we work with him.

11      Q.   Okay.  What did you say to Mrs. Valadez?

12      A.   We told her we were only there to get her

13  information and to try to get the keys back.  And she

14  said she didn't have the keys, she wasn't going to

15  give them to us, she didn't have them.  And she kept

16  cussing, and she was very irate.

17      Q.   Okay.  When -- was she under any legal

18  obligation to give you the keys if she did have them?

19      A.   No.

20      Q.   When you asked to speak to Ms. Valadez,

21  isn't it correct that she refused to answer your

22  question?

23      A.   Yes.

24      Q.   Okay.  What did you say to her when she told

25  you she was not going to answer any of your question?

1      Q.   Okay.  When she told y'all that, did that

2   make you angry?

3      A.   No.

4      Q.   You didn't get angry at that?

5      A.   No.

6      Q.   Did you consider that a breach of the peace?

7      A.   No.

8      Q.   Okay.  What was the statement that caused

9   you to place her under arrest for disorderly conduct?

10     A.   Just her saying, "Fuck y'all.  I am not

11  going to tell y'all anything.  You are not going to

12  believe me.  You are going to believe my fucking

13  husband because y'all fucking work with him."  She

14  was yelling loud, waving her hands up in the air,

15  just very irate.

16     Q.   Okay.  Why did you believe that that would

17  -- that to be a breach of the peace?

18     A.   Because things were getting out of control.

19     Q.   Okay.  If you had left the scene at that

20  point, do you think she would have just gone back

21  inside and calmed down?

22     A.   No.

23     Q.   Okay.  What did you think she was going to

24  do?

25     A.   Go back to Mr. Valadez's residence.

1     Q.   Did she tell you she was going to go back to

2 his residence?

3     A.   No.

4     Q.   Okay.  Had she left his residence of her own

5 accord?

6     A.   Yes.

7     Q.   Okay.  Was there any court order which would

8 prevent her from going back to Mr. Valadez's

9 residence?

10    A.   No.

11    Q.   Okay.  Earlier you testified that

12 Mr. Valadez had scratch marks and had appeared to

13 have been assaulted.  Could you tell me where in the

14 report I can find that?

15    A.   It is not.

16    Q.   Okay.  Why not?

17    A.   He didn't want to press charges.

18    Q.   Oh.  He didn't want to press charges?

19    A.   No.

20    Q.   Didn't he just accuse her of burglary?

21    A.   Yes.

22    Q.   Didn't he accuse her of criminal mischief?

23    A.   Yes.

24    Q.   Please explain to me what you mean by he

25 didn't want to press charges.

1      A.    He didn't admit to the scratch marks.

2      Q.    When you prepare an offense report, do you

3 put only what the victim admits to?

4      A.    No.

5      Q.    Okay.  Can you explain to me why you didn't

6 note the scratch marks in your report?

7      A.    I don't know.

8      Q.    Okay.  Have you ever heard of Miranda

9 warnings?

10     A.    Yes.

11     Q.    Could you tell me what they are?

12     A.    The warning -- the Miranda warning is what

13 you read to somebody accused of a crime.

14     Q.    What is the first one?

15     A.    You have the right to remain silent.

16     Q.    Okay.  Does that mean that somebody who is

17 accused of a crime does not have to answer any

18 question?

19     A.    Right.

20     Q.    Is that what Mrs. Valadez did?

21     A.    Yes.

22     Q.    Okay.  Is that why you arrested Mrs. Valadez

23 because she refused to answer any questions?

24     A.    No.

25     Q.    Could you define disorderly conduct for me.

1    Q.   Okay.  Where exactly was she standing when

2  she -- I believe according to the report, she said,

3  "Fuck this shit."  Where was she standing when she

4  said that?

5    A.   At the end of the porch next to the street.

6    Q.   At the end of the porch?

7    A.   The walkway.

8    Q.   The walkway, okay.  When she said, "Fuck

9  this shit," why did you believe that you had just

10  witnessed a crime?

11    A.   Because there was an immediate breach of the

12  peace.

13    Q.   Okay.  Why did you feel that she was

14  inciting an immediate breach of the peace?

15    A.   She was causing a scene.  There was people

16  starting to stop and watch.  I needed to get her out

17  of there.

18    Q.   Okay.  Were you afraid of some action that

19  Mrs. Valadez would take, or were you afraid of some

20  action that the public would take?

21    A.   That her and her family.

22    Q.   Her and her family.

23    If -- I will give you a hypothetical here.  If I

24  answer my door and it's a particularly annoying

25  salesman standing there and I tell him to, "Fuck

1    Q.    Okay.   Do you know what the first amendment

2    is?

3    A.    Yes, not right offhand, though.

4    Q.    If I told you it was freedom of speech, you

5    realize that's in the constitution?

6    A.    Yes.

7    Q.    Okay.   Do you believe in the first

8    amendment?

9    A.    Yes.

10   Q.    Okay.   Did you chase Mrs. Valadez into her

11   home to arrest her?

12   A.    Not into her home, no.

13   Q.    Okay.   How far up to her home did you go?

14   A.    To the doorway.

15   Q.    To the front door?

16   A.    Uh-huh.

17   Q.    Okay.   How come you didn't enter the home?

18   A.    I was behind Officer Andy De Leon.

19   Q.    You were behind him?

20   A.    Yeah.

21   Q.    Okay.   So Officer Andy De Leon entered the

22   home?

23   A.    He grabbed her.   He stepped maybe one foot

24   in the house.

25   Q.    Okay.   But he did enter the home?

AK/RET REPORTING, INC.

1    A.    Yes.

2    Q.    Okay.  Do you believe that Andy De Leon had

3  the right to enter her home?

4    A.    Yes.

5    Q.    Okay.  And why is that?

6    A.    She had already been placed under arrest.

7    Q.    For what offense?

8    A.    Disorderly conduct.

9    Q.    In order to arrest somebody in their home,

10  what do you generally need?

11    A.    To arrest them in their home?

12    Q.    Uh-huh.

13    A.    After they are placed under arrest and they

14  run, nothing.

15    Q.    Okay.  Assuming they weren't placed under

16  lawful arrest, what would you need?

17    A.    An arrest warrant.

18    Q.    Okay.  Did anybody consent to Mr. De Leon

19  entering the home?

20    A.    No.

21    Q.    Okay.  Did they actually try to exclude

22  y'all from entering the home?

23    A.    Yes.

24    Q.    Okay.  When Andy De Leon entered the home,

25  what happened?

1    y'all have a warrant?

2        A.    No, sir.

3        Q.    Okay.  Did you ever hear Andy De Leon claim

4    to have a warrant?

5        A.    No, sir.

6        Q.    Did he ever inform Mrs. Carrizales that he

7    had a warrant?

8        A.    No, sir.

9        Q.    Okay.  You testified earlier that when Andy

10   entered the house he made the arrest or grabbed

11   Mrs. Valadez right inside the doorway?

12       A.    Right.

13       Q.    Okay.  He didn't go into the kitchen area?

14       A.    No.

15       Q.    Okay.  Okay.  Now, earlier I asked you why

16   you were fired.  Can you answer that for me?

17            MR. GREEN:  Okay.  I am going to also,

18   again, object that it is not relevant to any issue in

19   this case; but I am going to allow the witness to go

20   ahead and answer the question.

21       A.    Go ahead and answer it?

22       Q.    (BY MR. SCOGGINS)  Yes.

23       A.    Okay.  I arrested the -- he had just

24   resigned -- the city manager's son and mother.

25       Q.    Okay.  And why did you arrest his son?

AK/RET REPORTING, INC.

47

1

1       I, BRENDA DE LEON, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4                      _____
                      BRENDA DE LEON

5

   THE  STATE OF  TEXAS:
6

   COUNTY  OF  _____:
7

8       Before me, _____, on this day
personally appeared, BRENDA DE LEON, known to me (or
9   proved to me under oath or through _____)
(description of identity card or other document) to
10  be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that they
11  executed the same for the purposes and consideration
therein expressed.

12      Given under my hand and seal of office this
_____ day of _____, _____.
13

14

15                  _____
                      NOTARY PUBLIC IN AND FOR
16                     THE STATE OF _____

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

CATRINA VALADEZ,       §
ALMA AVILA AND       §
ESMERALDA CARRIZALES       §
      §
VS.       §       CIVIL ACTION NO. C-00-101
      §
CITY OF SAN DIEGO       §
OFFICER BRENDA DE LEON &       §
OFFICER ANDREW DE LEON       §

## AFFIDAVIT OF BRENDA DE LEON

STATE OF TEXAS       §
      §
COUNTY OF NUECES       §

BEFORE ME, the undersigned authority, on this day personally appeared BRENDA DE LEON, who, after being duly sworn upon oath, deposed and said:

"My name is BRENDA DE LEON. I am over the age of twenty-one, have never been convicted of a felony, and of sound mind and capable of making this affidavit. I have personal knowledge of the statements contained herein, and said statements are true and correct.

"I am currently employed with the Live Oak Police Department in Live Oak, Texas, (a suburb of San Antonio).

"On November 4, 1999, while employed as a police officer for the San Diego Police Department, at approximately 2:15 p.m., I was dispatched to 505 West Dix, San Diego, Texas 78384, in reference to a domestic disturbance. Upon arrival at this address, I met with Ruben James Valadez. Mr. Valadez stated to me that his "soon to be ex-wife" had broken into his home and torn up his clothes and taken several compact discs that belonged to him. On entering his residence, I observed

1



Mr. Valadez' clothes and underwear were cut up and thrown all over the house. There were also other things thrown about the house. Mr. Valadez stated that he had set all of Mrs. Valadez's things in trash bags on the front yard for her to pick up. Mr. Valadez stated that he desired that Mrs. Valadez return the keys to the trailer house. I also observed scratch marks on Mr. Valadez's neck. I asked him if Mrs. Valadez had made the scratch marks and he nodded his head affirmatively but did not admit it verbally.

"After obtaining this information from Mr. Valadez, I intended to speak with Mrs. Valadez and obtain basic information from her for my report. I attempted to obtain backup from another on duty officer. I requested backup for the call because domestic disturbance calls are one of the most dangerous types of calls an officer has to make, since the participants are usually upset and frequently assault or otherwise endanger the officer on the call. However, there were no available on duty officers to provide backup, so I requested officer Andrew De Leon, who was off duty at the time, go with me to talk to Mr. Valadez' wife, Catrina Valadez. To follow up the information that Mr. Valadez had provided, Andrew De Leon and I traveled to 702 Palacios in San Diego to speak with Catrina Valadez. I did not intend to arrest Catrina Valadez at this time.

"Upon arrival at 702 Palacios, Andrew De Leon identified both of us as police officers to Alma Avila, who was standing outside the residence. We asked to speak to Catrina Valadez. Ms. Avila called Catrina Valadez outside to speak with us. When Catrina Valadez stepped out of the residence, we told her that we were there to get information from her and to ask her to return the keys to the Dix Street trailer house. Mrs. Valadez was yelling at us. She told us that she wasn't going to answer any questions. Mrs. Valadez told us "I don't have to tell yall shit." She also said, "Fuck this shit, yall always believe him." During this confrontation, Alma Avila kept interrupting and yelling

2

at us also. She was told to go inside and that we would talk to her later. She did go inside, but I later noticed that she had come back outside again.

"Catrina Valadez continued throughout this confrontation to scream and curse at us. At the time that Mrs. Valadez was cursing at Andrew De Leon and me, she was in the front yard of the residence at 702 Palacios, near the curb of the street. At this time, other people were driving by the residence and slowing down, rolling their windows down and attempting to see what the disturbance was going on in the front yard. One of the cars that did so was an older, white car with two men in it. After they passed the first time I noticed them drive by again slowly. I was not able to turn around and keep an eye on them, because I was afraid to turn my attention away from Ms. Valadez.

"I also heard some people standing outside a nearby house on the other side of Palacios St. saying something in our direction, but I could not make out the words. The situation seemed to be escalating. I believed that the language being used by Mrs. Valadez as well as the volume with which she was cursing caused a breach of the peace. Based on Catrina Valadez' behavior and, based on my observation of the scratch marks on Mr. Valadez's neck, I believed that Catrina Valadez had assaulted Mr. Valadez and that there was a good chance that further domestic violence would occur between the two of them.

"After Mrs. Valadez was told that she was under arrest, she ran toward the residence. Andrew De Leon and I both chased her. I did not know what she was intending to do inside the residence. Andrew De Leon caught Ms. Valadez just inside the door of the mobile home and caught her by the arm. I stopped just outside the door. Inside the residence, near the door, Esmeralda Carrizales, Catrina Valadez' mother, grabbed Catrina Valadez by one arm and was pulling her in the opposite direction that Andrew De Leon was pulling her. I stayed just outside the door. I was

3

keeping an eye on Alma Avila, who had gone back inside by that time. Andrew De Leon told Esmeralda Carrizales several times to let go and that if she did not let go of Mrs. Valadez, she would be charged with interfering with officer duties.

"At the time that Catrina Valadez was arrested, Andrew De Leon was wearing blue jeans and a black and white police t-shirt. Both his badge and his gun were visible.

"At no time during the arrest of Catrina Valadez did I ever make physical contact with her. At no time did I make physical contact with Esmeralda Carrizales or Alma Avila. Neither Alma Avila nor Esmeralda Carrizales were arrested.

"After Mrs. Valadez was placed under arrest and escorted to the police car, I asked her for her full name and date of birth. She stated to me "I don't have to tell you a fucking thing, you can find it yourself." I then advised Mrs. Valadez that she was also being placed under arrest for failure to identify herself to a peace officer. Mrs. Valadez responded to this by stating "I don't give a fuck." I then transported Mrs. Valadez to the Duval County Sheriff's Department. There she was given citations for disorderly conduct-by language and for failure to identify herself to a police officer and released."

_Brenda De Leon_
BRENDA DE LEON

SWORN TO AND SUBSCRIBED BEFORE ME by BRENDA DE LEON on the _____

day of December, 2000.



NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires:_____

TAMARA GONZALES
Notary Public
STATE OF TEXAS
My Comm. Exp. May 13, 2002

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CATRINA VALADEZ, | § | |
| ALMA AVILA AND | § | |
| ESMERALDA CARRIZALES | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-101 |
| | § | |
| CITY OF SAN DIEGO | § | |
| OFFICER BRENDA DE LEON & | § | |
| OFFICER ANDREW DE LEON | § | |

## AFFIDAVIT OF ANDREW DE LEON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

BEFORE ME, the undersigned authority, on this day personally appeared ANDREW DE LEON, who, after being duly sworn upon oath, deposed and said:

"My name is ANDREW DE LEON. I am over the age of twenty-one, have never been convicted of a felony, and of sound mind and capable of making this affidavit. I have personal knowledge of the statements contained herein, and said statements are true and correct.

"I began working for the San Diego Police Department as an officer in October of 1999 and was employed in that capacity on November 4, 1999.

"On November 4, 1999, officer Brenda De Leon requested that I back her up during the second portion of a domestic disturbance call. Officer Brenda De Leon briefed me on what she was told by Mr. Valadez, with whom Officer Brenda De Leon had spoken in responding to the domestic disturbance call. I then traveled with Officer Brenda De Leon to 702 East Palacios in San Diego, Texas. That address is at the corner of Palacios and Springfield. Directly across Springfield from the

1

CutePDF - www.fbsite.com

mobile home is a junior high school. Alma Avila was standing outside the mobile home at that address when Officer De Leon and I arrived.  We both identified ourselves as police officers from the San Diego Police Department.  At the time I was wearing blue jeans and a black police "specialist" t-shirt. My gun and badge were visible.  We then requested that Ms. Avila ask Catrina Valadez to step outside so that we could obtain basic information from her regarding her husband's domestic disturbance call.

"Catrina Valadez came out of the mobile home and walked over to the edge of the street where we were. As Officer Brenda De Leon and I were attempting to ask Catrina Valadez questions concerning the domestic disturbance call, Alma Avila interrupted us several times in a loud and angry tone of voice.  I then told Alma Avila to go inside the residence and that I would talk to her after we had spoken with Catrina Valadez.  I did not threaten to arrest Alma Avila.  She went back into the mobile home but reappeared later on the porch.

"When Catrina Valadez came out of the residence, Ms. Valadez refused to answer any questions. She was screaming and cursing at us and refused to calm down and answer our questions. During the course of her screaming and cursing at us she said, "I don't have to tell y'all shit" and "Fuck this shit, y'all always believe him."  When Catrina Valadez made these statements, she was screaming at the top of her lungs.   At the time that Catrina Valadez made these statements, automobiles were passing by on Palacios Street in front of the residence. The cars would slow down and the occupants would roll down their windows to see what the commotion was.  There were also people on the other side of Palacios Street outside their home observing the scene. That group of people included at least two, and perhaps three, adults and two small children. I could hear that they were making statements, calling in our direction, but I could not tell what they were saying since

2

Catrina Valadez was screaming so loudly. Two other adults at a residence on the same side of Palacios as the mobile home had come outside and were watching the scene.

"Catrina Valadez continued to scream curse words at us and to refuse to answer questions. I was concerned that the situation was escalating and about to get out of control and decided to arrest Catrina Valadez for disorderly conduct. I told her I was placing her under arrest, at which point she stated that she was not under arrest and ran toward the residence. Both Officer Brenda De Leon and I chased Catrina Valadez to the residence. I caught her just inside the doorway of the residence by grabbing her left arm with my right hand. By that time, Alma Avila had gone back into the house but was standing nearby. Inside the residence, Esmeralda Carrizales, Catrina Valadez' mother, grabbed Catrina Valadez' other arm and began pulling on that arm. Ms. Carrizales was yelling at me and refusing to let go of Catrina Valadez' arm. I told Esmeralda Carrizales several times that she was interfering with police duties, and if she did not stop, I would arrest her. Mrs. Carrizales eventually stopped pulling on Catrina Valadez' arm, and I pulled her away from the door. She continued to offer some resistance by attempting to pull away from me, but stopped physical resistance after I placed her in handcuffs. Catrina Valadez was escorted to the police unit.

In affecting the arrest of Catrina Valadez and placing her in handcuffs, the only force I used was to grab her arm and hold her while placing her in handcuffs. I used no more force than I reasonably believed to be necessary in order to effect the arrest. I did not intend to cause any injury to Catrina Valadez. Officer Brenda De Leon had no physical contact with Catrina Valadez during the arrest. Neither I nor Brenda De Leon had any physical contact with Alma Avila or Esmeralda C Carrizales and neither of them were arrested.

3

"After Catrina Valadez was placed in handcuffs, she was escorted to the police unit.  In the police unit, Officer Brenda De Leon attempted to obtained Catrina Valadez' full name and date of birth.  Catrina Valadez told Officer Brenda De Leon "I don't have to tell you a fucking thing, you can find it yourself."  At that point, Officer Brenda De Leon informed Catrina Valadez that she was also under arrest for failure to identify to peace officer.  Catrina Valadez was then transported to the Duval County Jail."

_____
ANDREW DE LEON

SWORN TO AND SUBSCRIBED BEFORE ME by ANDREW DE LEON on the _14_
day of _December_ 2000.

_____
NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires:_____

TAMARA GONZALES
Notary Public
STATE OF TEXAS
My Comm Exp. May 13, 2002

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ, ALMA    )
AVILA AND ESMERALDA      )
CARRIZALES               )
                         )
VS.                      )  C. A. NO. C-00-101
                         )
CITY OF SAN DIEGO,       )
OFFICER BRENDA DE LEON   )
& OFFICER ANDREW DE LEON )

DEPOSITION OF ANDREW DE LEON
JULY 7, 2000

APPEARANCES:

COUNSEL FOR THE PLAINTIFFS:

GRAY P. SCOGGINS
Attorney at Law
113 N. Reynolds
Alice, Texas 78332

COUNSEL FOR THE DEFENDANTS:

MR. DAVID W. GREEN
Barger, Hermansen, McKibben
    & Villarreal, L.L.P.
802 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401

ALSO PRESENT:   CATRINA VALADEZ,
                BRENDA DE LEON

REPORTED BY:   JENNIFER L. KARL

(COPY)

# Ak/Ret Reporting, Records & Video, Inc.



**CERTIFIED COURT REPORTERS**
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037  (800) 388-9037
FAX (361) 882-3355

1      A.    At the Hispanic Law Enforcement Academy,

2   Lubbock, Texas.

3      Q.    And are you a certified peace officer?

4      A.    That's correct.

5      Q.    Okay.  What other training have you received

6   as a peace officer?

7      A.    Various training.  Some I can think of off

8   the top of my head, special investigative topics,

9   child abuse, domestic violence, standardized field

10  sobriety testing, use of force, just some of the ones

11  I have been trained.

12     Q.    Okay.  What kind of formal education do you

13  have?

14     A.    Just high school.

15     Q.    Just high school?

16     A.    Yes, sir.

17     Q.    Did you graduate from high school?

18     A.    Yes, sir.

19     Q.    Okay.  Did you start your job with the City

20  of San Diego in October?

21     A.    I believe so, yes, sir.

22     Q.    Okay.  The same time your wife did?

23     A.    I believe I started approximately a week

24  before her or two weeks before her, something like

25  that.

Case 2:00-cv-00101   Document 29   Filed in TXSD on 12/15/2000   Page 48 of 88

1    A.    No, not off the top of my head.

2    Q.    Okay.  And tell me, tell me what

3  transpired.  How did you get involved in this

4  particular case?

5    A.    Officer Brenda De Leon came to me while I

6  was having lunch at my uncle's house and pretty much

7  briefed me just on what she had and how she couldn't

8  get a hold of anybody else to backup.  And at that

9  point she asked me if I wanted to go.  I said, "Yes,

10  I will go with you."  So therefore we went to -- she

11  explained that Mr. Valadez advised her of the address

12  where his -- Ms. Catrina -- Ms. Carrizales would be,

13  so that's where we went.

14    Q.    Okay.  When you say that Brenda De Leon

15  briefed you, what did she tell you?

16    A.    She briefed me on more or less what had

17  occurred according to Mr. Valadez, and she also

18  informed me that she did observe his own property,

19  his clothing torn up, the rest of the house ransacked

20  and scratches on his neck, which she advised that

21  when she questioned him about that, he made her feel

22  like Catrina had done the scratches on his neck.

23    Q.    Okay.  So she told you about observing

24  injuries on Mr. Valadez?

25    A.    Yes, sir.

AK/RET REPORTING, INC.

15

1      Q.    What did you tell her?

2      A.    I advised her, as I always do when I make

3   contact with somebody, I was Officer Andy De Leon;

4   and she introduced herself as Officer Brenda De Leon.

5      Q.    Okay.   Did you go onto the property at that

6   time?

7      A.    No, sir.

8      Q.    Okay.   Why not?

9      A.    I was comfortable at the road talking to

10   her.

11      Q.    Okay.   What did you tell her to do?   What

12   did you tell her?   That's probably a better

13   question.

14      A.    Tell her sister?

15      Q.    Yes.

16      A.    We asked her to -- if Catrina Carrizales was

17   there, and if she could have her step outside.   We

18   had a few questions to ask her.

19      Q.    Okay.   I believe we're talking about Alma

20   Avila?

21      A.    I believe so, yes, sir.

22      Q.    What was her response?

23      A.    I don't remember.

24      Q.    Okay.   You don't recall?

25      A.    No, sir.

AK/RET REPORTING, INC.

1    A.   Officer Brenda De Leon did ask her -- who

2  are you -- are you talking about Alma, or are you

3  talking about Catrina?

4    Q.   Catrina.

5    A.   Catrina, yes.

6    Q.   Okay.  So she took over the --

7    A.   Actually, we both did because Alma was

8  interfering with her questions, so that I believe at

9  that time I asked her to step away or step back

10  inside or something having to do with that.

11    Q.   Okay.  Well, tell me, how was Alma

12  interfering with her questions.

13    A.   Because we were talking to Catrina.  We were

14  not speaking to Alma.  We didn't ask her to respond

15  to any of our questions at that time.

16    Q.   Okay.  You said she was interfering.  How

17  did she interfere?

18    A.   Interrupting.  Is that a better word?

19    Q.   You tell me.

20    A.   Interrupting.

21    Q.   Because she was interrupting you?

22    A.   Yes, sir.

23    Q.   Okay.  Was she interrupting, asking y'all

24  questions, or how, how was she interpreting?

25    A.   I believe so.

1    Q.   Okay.  Do you recall what questions she was

2    asking?

3    A.   No, sir.

4    Q.   Did she appear to be concerned about y'all's

5    presence there at the home?

6    A.   What's your definition of concerned?

7    Q.   Was she -- did she appear to be alarmed at

8    y'all's presence there at the home?

9            MR. GREEN:  Are you talking about Alma

10   or somebody else?

11           MR. SCOGGINS:  Alma.

12   A.   I guess she was wondering why we were

13   there.

14   Q.   (BY MR. SCOGGINS)  Okay.  Is that what she

15   was asking y'all?

16   A.   I believe so, yes, sir.

17   Q.   Okay.  Did you ever tell her why you were

18   there?

19   A.   I believe what I told her was we needed to

20   speak to Catrina, and I would speak to her after we

21   had got done speaking with Catrina.

22   Q.   Okay.  Did you threaten to arrest Alma at

23   that time?

24   A.   No, sir.

25   Q.   Okay.  When -- did Brenda De Leon ask or

Case 2:00-cv-00101   Document 29   Filed in TXSD on 12/15/2000   Page 52 of 88

1    tell Mrs. Valadez that she wanted to ask her some

2    questions?

3        A.    Can you say that one more time, please?

4        Q.    Sure.   Did Brenda De Leon tell Mrs. Valadez

5    that she needed to ask her some questions?

6        A.    I believe so, yes, sir.

7        Q.    Okay.   What was Mrs. Valadez's response?

8        A.    Well, she was irate since the point in time

9    she came out of the house, so basically her responses

10   were lots of the "F" word, and she wasn't going to

11   answer any questions, that we were on his side.

12   That's vaguely what I remember.

13       Q.    Okay.   Now, based on your training as a

14   peace officer, does a citizen have the right to

15   refuse to answer any questions?

16       A.    Yes, sir.

17       Q.    Okay.   What are you supposed to do when a

18   suspect refuses to answer any questions?

19       A.    Just get their names and dates of birth.

20       Q.    Okay.   And basically walk away?

21       A.    Question them later, yes, sir.

22       Q.    Okay.   If you believe the crime has been

23   committed, go seek a warrant?

24       A.    Yes, sir.

25       Q.    Okay.   Can you tell me why that wasn't done

AK/RET REPORTING, INC.

1   in this case?

2       A.   For the simple fact that in our opinion as

3   police officers and per the law of family violence,

4   that we felt she would, indeed, go back and commit

5   future domestic violence, so, therefore, we are bound

6   by law that we shall make an arrest.

7       Q.   Okay.  So you actually arrested Catrina

8   Valadez to prevent further acts of family violence?

9       A.   Along with the disorderly conduct.

10      Q.   Okay.  Can you show me -- I believe you have

11  got a copy of the report in front of you?

12      A.   Sure.

13      Q.   Can you tell me where in the report it

14  states that you arrested Mrs. Valadez to prevent any

15  further acts of family violence?

16      A.   I don't believe it states in here.

17      Q.   Okay.  What it does state in the report is

18  that you arrested her for disorderly conduct of her

19  language; is that correct?

20      A.   Let me read the report.  Yes, sir.

21      Q.   Okay.  Would you tell me what disorderly

22  conduct by language is?

23      A.   Being vulgar in a public place, inciting a

24  breach of the peace, an immediate breach of the

25  peace.

AK/RET REPORTING, INC.

1    Q.   Okay.  Where was Mrs. Valadez standing when

2  you allege she committed the offense of disorderly

3  conduct by language?

4    A.   On the curb.

5    Q.   On the curb?

6    A.   On the curb.  Well, just on the walkway,

7  just next to the curb, next to the roadway.

8    Q.   Okay.  So she was actually on her mother's

9  property?

10   A.   She owned the property, yes, sir.

11   Q.   Okay.  And is that public or private

12 property where she was standing?

13   A.   It could be both.

14   Q.   It could be both?

15   A.   Yes, sir.

16   Q.   Okay.  Does a residential property owner

17 have the right to exclude the public from its front

18 yard?

19   A.   Yes, sir.

20   Q.   Okay.  Would that make it public property or

21 private property?

22   A.   At that point it would be private property.

23   Q.   Okay.  Now, you stated that a further

24 element of disorderly conduct by language is inciting

25 an immediate breach of the peace; is that correct?

AK/RET REPORTING, INC.

1     A.    That's correct.

2     Q.    Why did you feel that Mrs. Valadez was

3  inciting an immediate breach of the peace?

4     A.    Because there was people passing by, rolling

5  down their windows, seeing what the commotion was,

6  and there was people across the street that I can

7  remember, and it appeared that they were getting a

8  little rowdy themselves.

9     Q.    These other people?

10    A.    Right.

11    Q.    Okay.  Do you recall what Mrs. Valadez's

12  exact words were which caused you to believe that she

13  had committed the offense of disorderly conduct by

14  language?

15    A.    No, not in her exact words.

16    Q.    Okay.  Did the word fuck enter into that?

17    A.    I believe so.

18    Q.    Okay.  To whom was the comment -- and I am

19  reading from -- let me see here.  I am reading from

20  your report.  "I don't have to tell you a fucking

21  thing."  Wait, let me see.

22    All right.  To whom was the comment, "I don't

23  have to tell y'all shit," directed?

24    A.    That was directed to myself and Officer

25  Brenda De Leon.

AK/RET REPORTING, INC.

1     Q.   Okay.  Did that comment make you angry?

2     A.   No, sir.

3     Q.   Okay.  In your capacity as a peace officer,

4 have you ever had a suspect use, use language like

5 that before?

6     A.   Yes, sir.

7     Q.   Okay.  Is that type of language pretty

8 common on the streets?

9     A.   It all depends on who you are speaking to.

10    Q.   Okay.  But in your capacity as a police

11 officer, you do on occasion have contact with people

12 who speak in that manner; is that correct?

13    A.   On occasion, yes, sir.

14    Q.   Okay.  Do you arrest everybody that speaks

15 in that manner?

16    A.   No, sir.

17    Q.   Okay.  Now in your report it further states

18 that Mrs. Valadez said, "Fuck this shit; y'all always

19 believe him."  To whom was that comment directed?

20    A.   Assuming her husband or James Valadez.

21    Q.   Okay.  And he was -- was he present at the

22 scene?

23    A.   No, sir.

24    Q.   Okay.  But based upon that, that comment,

25 you believed that she had committed the offense of

AK/RET REPORTING, INC.

25

1      Q.     Okay.   So y'all were not planning on

2   arresting her at that time?

3      A.     No, sir.

4      Q.     When -- after Mrs. Valadez committed what

5   you believed to be a crime, what, what happened?

6      A.     At which point are you speaking of?

7      Q.     After you as an officer believed that you

8   had observed a crime being committed.

9      A.     Observed.

10     Q.     Observed.

11     A.     Okay.

12     Q.     What happened?

13     A.     At that point she was placed under arrest.

14     Q.     Okay.   How was she placed under arrest?

15     A.     I told her, "You are under arrest."

16     Q.     Okay.   You told her?

17     A.     I believe it was me, yes, sir.

18     Q.     Okay.   Then what happened?

19     A.     She said, "No, I am not," and she takes off

20   running inside the house.

21     Q.     Okay.   So she ran back into the home?

22     A.     Yes, sir.

23     Q.     And that was after you informed her that she

24   was under arrest?

25     A.     That's correct, yes, sir.

AK/RET REPORTING, INC.

1  Q. Okay. What did you do after she ran back

2 inside the home?

3  A. I ran after her.

4  Q. Okay. Were you able to catch her?

5  A. Yes, sir.

6  Q. Where did you catch her?

7  A. Just inside the doorway, I believe.

8  Q. Okay. What happened after you had grabbed

9 her?

10  A. Her mother started jerking her other arm.

11  Q. Okay. Was the mother saying anything?

12  A. Yes, sir, "Leave her alone," something to

13 that effect, "leave her alone."

14  Q. Okay. Did she ask you who you were?

15  A. I don't remember.

16  Q. Okay.

17  A. I don't believe so.

18  Q. Did she ask you what you were doing there?

19  A. I don't remember.

20  Q. Okay. Did you ever threaten to arrest

21 Mrs. Carrizales?

22  A. Which is?

23  Q. Mrs. Valadez's mother.

24  A. That's correct.

25  Q. Okay. What did you threaten to arrest her

1    for?

2        A.    What?   For interfering with people with

3    public duties.

4        Q.    Okay.   At some point did she stop

5    interfering with your ability to effect an arrest?

6        A.    Yes, sir.

7        Q.    Okay.   When was that?

8        A.    After telling her several times I was going

9    to arrest her.

10       Q.    Okay.   Did you ever inform Mrs. Valadez's

11   mother that you had a warrant for Mrs. Valadez?

12       A.    No, sir.

13       Q.    Okay.   Did you ever threaten to get a

14   warrant for Mrs. Carrizales, her mother?

15       A.    For Ms. -- yes, sir.

16       Q.    Okay.   Now, you were not in uniform; is that

17   correct?

18       A.    That's correct.

19       Q.    Okay.   How were you actually dressed?

20       A.    I believe I recall having blue jeans on and

21   a black and white, predominantly black and white,

22   police T-shirt.

23       Q.    Okay.   Now, what does the T-shirt say on

24   front?

25       A.    I believe it is the one that says,

1    him the same thing, would I be guilty of disorderly

2    conduct at that point?

3                MR. GREEN:  Same objection as to

4    relevancy and the hypothetical not being relevant to

5    this case.

6        A.    It just all depends on the circumstances.

7    It is not a yes or no question.

8        Q.    (BY MR. SCOGGINS)  So it depends upon the

9    circumstances as to whether or not those facts would

10   constitute a crime; is that correct?

11       A.    That's correct.

12       Q.    Okay.  What are some of the circumstances

13   you would look at?

14       A.    Who else was around in the area, if it's

15   going to incite an immediate breach of the peace.

16       Q.    Now, you have testified that you did enter

17   the home of Mrs. Carrizales in order to effect this

18   arrest; is that correct?

19       A.    That's correct.

20       Q.    Okay.  Now, why did you believe you had the

21   right to enter her home?

22       A.    Because it -- when I advised her that she

23   was under arrest, she was now under arrest also for

24   evading.

25       Q.    Okay.  Generally speaking, if you're going

AK/RET REPORTING, INC.

1    Q.    What do you need to do in order to secure a

2    warrant?

3    A.    You need to take a copy of the report, get

4    an affidavit, and take it before a judge.

5    Q.    Okay.  And get a judge to sign off on it?

6    A.    Yes, sir.

7    Q.    Okay.  When you entered the home of -- where

8    did you grab Mrs. Valadez, or how did you grab

9    Mrs. Valadez?

10    A.    I believe I grabbed her by the arm.

11    Q.    Okay.  Did you grab her on the upper arm,

12    lower arm?

13    A.    I don't recall, sir.

14    Q.    Okay.  Now, were you attempting to put cuffs

15    on her in the home?

16    A.    I was attempting to arrest her, yes, if

17    that's what you're asking.

18    Q.    Okay.  Were you going to try to cuff her

19    inside or outside, or what was the plan?

20    A.    Whereever I got a hold of her.

21    Q.    Okay.  When you got a hold of her in the

22    home?

23    A.    That's correct.

24    Q.    Okay.  So the purpose in holding her was to

25    put cuffs on her?

39

1    I, ANDREW DE LEON, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4    _____
ANDREW DE LEON

5

THE STATE OF TEXAS:
6
COUNTY OF _____:
7
    Before me, _____, on this day
8    personally appeared, ANDREW DE LEON, known to me (or
proved to me under oath or through _____)
9    (description of identity card or other document) to
be the person whose name is subscribed to the
10   foregoing instrument and acknowledged to me that they
executed the same for the purposes and consideration
11   therein expressed.

12   Given under my hand and seal of office this
_____ day of _____, _____.
13

14

15   _____
NOTARY PUBLIC IN AND FOR
16   THE STATE OF _____

17

18

19

20

21

22

23

24

25

AK/RET REPORTING, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ, ET AL          *
                                *
VS.                             *          CAUSE NO. C-00-101
                                *
CITY OF SAN DIEGO, ET AL        *


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
ALMA AVILA
JULY 6, 2000

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL DEPOSITION OF ALMA AVILA, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on the 6th day of July, 2000, from 2:02 p.m. to
2:22 p.m., before CAROL R. HOBLIT, CSR in and for the
State of Texas, reported by machine shorthand, at the
San Diego City Hall, 404 S. Mier, San Diego, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached hereto.


ORIGINAL

# Ak/Ret Reporting, Records & Video, Inc.

CERTIFIED COURT REPORTERS
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037  (800) 388-9037
FAX (361) 882-3355



14

1    you to jail, too."

2            So she was on the phone and then they

3    stood there on the porch and I stood at the door, and

4    she was saying to him:  It seems like everybody in San

5    Diego has their own lawyer or something like that.  And

6    then he said that that was okay, because they had a

7    better lawyer than everyone in the town.

8            And then so when my mom came back, he got

9    her name, her address, her driver's license, and by that

10   time this other officer, Bruno Vasquez, drove up and he

11   came over to the porch and we were trying to tell him

12   that we didn't understand what they were doing, because

13   there was no warrant, they didn't read her her rights.

14   And he then said, well, that they were right and we were

15   wrong and then he left.  He asked them if that was it,

16   and he left.

17       Q.   All right.  And did they drive away with your

18   sister then?

19       A.   Yes.

20       Q.   Was your mother pulling on your sister's arm

21   when Officer Andy De Leon was trying to put handcuffs on

22   her?

23       A.   No.

24       Q.   Did you hear your sister curse at the officers

25   at all?

1      Q.   Okay.  What did you-all tell the mayor your

2   sister had done prior to the officers coming to your

3   house?

4      A.   We told him we didn't know, that they would not

5   tell us.

6      Q.   So as far as you knew --

7      A.   All we knew was she was thrown out of her

8   house, we picked her up -- Well, I picked her up, we

9   were at my mom's, and then all this happened.

10      Q.   And that's what you told the mayor?

11      A.   Yes.

12      Q.   All right.  And then after you picked your

13   sister up at the jail, did you have anymore contact with

14   the officers or the mayor or city manager or anybody

15   about all this?

16      A.   Not me, my mom did.

17      Q.   Have you personally talked to anybody that

18   works for the city or is an official of the city at any

19   time after you-all picked your sister up at the jail?

20      A.   No.

21      Q.   Did you know Officer Andy and Brenda De Leon

22   before this occurred?

23      A.   No.

24      Q.   And did you see the officers do anything -- Did

25   you ever see Officer Brenda De Leon touch your sister?

AK/RET REPORTING, INC.

17

1    A.    Not her.

2    Q.    You saw Officer Andy De Leon touch your sister?

3    A.    Yes.

4    Q.    Okay.  And was he, I think you said, holding

5    and pulling on her?

6    A.    Yes, he was forcing her, trying to force her

7    out of the house.

8    Q.    Okay.  Did you see him ever strike her with a

9    club or his fist or anything like that?

10   A.    No.

11   Q.    He was just trying to pull her and push her out

12   of the house?

13   A.    Yes.

14   Q.    Did you see him put the handcuffs on her?

15   A.    No.

16   Q.    Do you know whether or not they ever put

17   handcuffs on her?

18   A.    I don't know.

19   Q.    You have said in your answers to

20   interrogatories here that Andy De Leon used excessive

21   force against your sister.

22   A.    Yes.

23   Q.    What did you mean by excessive force?

24   A.    Just pulling her and pushing her and there was

25   a wall in the kitchen, and I mean, all that didn't have

AK/RET REPORTING, INC.

18

1    to happen.

2         Q.    Okay.  And you listed several people as knowing

3    some of the facts, but I take it as far as Dr. Tanguma,

4    you haven't talked to him about this at all?

5         A.    No.

6         Q.    Did you talk to Mayor Alfredo Cardenas, besides

7    what you told me about?

8         A.    Not again, just that one time.

9         Q.    Okay.  Did you ever talk to Bruno Vasquez

10   except for that time in your front yard?

11        A.    Just that time.

12        Q.    What about the police chief, Adan Gonzales?

13        A.    No.

14        Q.    So the only police officer that went in the

15   house was Andy De Leon, correct?

16        A.    Yes.

17        Q.    And you never heard anyone use any bad

18   language?

19        A.    No.

20        Q.    And the officers didn't strike your sister with

21   a fist or a club or anything at all?

22        A.    No.

23        Q.    You said that you yourself have had fear,

24   headaches, nausea, nervousness and feel insecure since

25   this incident.  Have you gone to see a doctor or anybody

19

1    about this?

2        A.    No.

3        Q.    Do you have a family doctor you go to when you

4    have an illness?

5        A.    No.

6        Q.    If you had the flu or something like that, who

7    would you go see?

8        A.    I wouldn't.

9        Q.    What personal property did the officers use in

10   this incident that you think was improper?

11               MR. SCOGGINS:  Objection, form.  You need

12   to go ahead and answer, if you know.  If you don't

13   know --

14       Q.    (By Mr. McKibben)  Can you answer it?

15       A.    Can you say that again?

16       Q.    Yes, ma'am.  In your answers to

17   interrogatories, you say that the officers caused

18   personal injury by use of personal property.  Would you

19   tell me what personal property you were talking about?

20       A.    I don't know.

21       Q.    I take it you haven't been to see a doctor or

22   psychologist or priest or anybody to talk about this

23   fear and nauseousness problem you have?

24       A.    No.

25       Q.    Do you still have a problem or is it pretty

20

1    much over?

2        A.    Yes.

3        Q.    Huh?

4        A.    It's not over.

5        Q.    I'm sorry?

6        A.    It's not over.

7        Q.    What problems are you having today?

8        A.    Just scared, nervous.

9        Q.    You're scared?

10       A.    It's hard to sleep at night, just want this to

11   be over with.

12       Q.    Are you upset about the lawsuit pending; is

13   that what you want to be over with?

14       A.    I just don't think that they did their job

15   right and they're still working as police officers.

16       Q.    So you think you're going to feel upset unless

17   they get fired as police officers?

18       A.    I don't understand what you mean.  Like if

19   that's going to make me feel better, no, because what

20   has already happened to us has happened.

21       Q.    So you just don't think it's right for them to

22   have jobs as police officers based on them arresting

23   your sister?

24       A.    I don't understand how they have their jobs the

25   way they conducted themselves.  I mean, you don't

21

1   struggle with someone in their home -- I don't know what

2   the laws are, but I had -- at one point I asked him

3   that -- I told him that I thought it was like a domestic

4   dispute, and he told me that I didn't know anything

5   about the law, that he could recite everything about it

6   so I am just unaware of the law.

7        Q.   But basically you think it was not fair what

8   they did and that they shouldn't be allowed to work

9   anymore as police officers?

10       A.   Yes.

11       Q.   And as far as your fear and nausea, it's just

12  over the fact that you think this wasn't fair the way

13  this ended up?

14       A.   Yes.

15       Q.   Were you ever aware of your sister ever being

16  arrested on any other occasion?

17       A.   Her husband one time said something about her

18  taking his gun and they, I think, came and arrested her

19  for that --

20       Q.   Were you there at that time?

21       A.   -- but I was not there.

22       Q.   Okay.

23       A.   That's just something that was told to me.

24       Q.   Okay.  What about your mother, are you ever

25  aware of her being arrested for anything?

AK/RET REPORTING, INC.

24

1          I, ALMA AVILA, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4          _____
                        ALMA AVILA
5

6

7   THE STATE OF TEXAS:
    COUNTY OF Jim Wells :
8
           Before me, Alma Avila          , on this day
9   personally appeared ALMA AVILA, known to me (or proved
    to me under oath or through TX DL       ) (description of
10  identity card or other document) to be the person whose
    name is subscribed to the foregoing instrument and
11  acknowledged to me that they executed the same for the
    purposes and consideration therein expressed.
12
           Given under my hand and seal of office this 25th
13  day of   July      , 2000.

14

15

16  _____
    NOTARY PUBLIC IN AND FOR
17  THE STATE OF _____

18                    LINDA PERSINGER
                      NOTARY PUBLIC
19                    State of Texas
                      Comm. Exp. 12-14-2000
20

21

22

23

24

25

─────────────────────────────────────
              AK/RET REPORTING, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ, ET AL         *
                               *
VS.                            *        CAUSE NO. C-00-101
                               *
CITY OF SAN DIEGO, ET AL       *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
ESMERALDA CARRIZALES
JULY 6, 2000

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ESMERALDA CARRIZALES, produced
as a witness at the instance of the Defendants, and
duly sworn, was taken in the above-styled and numbered
cause on the 6th day of July, 2000, from 10:55 a.m. to
11:10 a.m., before CAROL R. HOBLIT, CSR in and for the
State of Texas, reported by machine shorthand, at the
San Diego City Hall, 404 S. Mier, San Diego, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached hereto.

ORIGINAL

# Ak/Ret Reporting, Records & Video, Inc.

CERTIFIED COURT REPORTERS
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037   (800) 388-9037
FAX (361) 882-3355



9

A.    Andy De Leon.

Q.    Okay.  You understand this is Officer Brenda De Leon sitting next to me?

A.    Yes, sir.

Q.    Had you known either Andy or Brenda De Leon before this?

A.    No, sir.

Q.    And you said he was struggling with her.  Did he appear to be trying to arrest her?

A.    Well, I'm not sure how they come about arresting, whether it's struggling or -- they usually have their hands behind their backs and this was not like that.

Q.    You think he was trying to put her hands behind her back?

A.    It looked more like pulling her like towards the door, trying to get her outside.

Q.    And did you grab her and try to help hold her in the house?

A.    I got in between both of them because I didn't know who he was, so -- and he wasn't dressed as an officer.

Q.    Okay.  What about Officer Brenda De Leon, was she anywhere about?

A.    She was outside on the porch.

10

Q.   Okay.  And did you see her while you were

holding onto your daughter?

A.   After he told me that he had a warrant for her

arrest, I looked to the door and I saw her and that's

when I realized that, you know, he was an officer.

Q.   Okay.

A.   And then I told him, "Well, let me talk to

her."  I told him, "All you have to do is talk to her."

So I turned around and I talked to her and

I told her, "Catrina, just go with them.  I will go over

there and we'll work things out."

And so she calmed down and then I told

him, I told him, "You see, all you have to do is talk to

her and she'll go willingly."

And then he turned around and pointed a

finger at me and said, "And you, ma'am, I will issue a

warrant for your arrest for interfering."

Q.   Okay.  But he didn't do that.

A.   No.

Q.   And when you let go, did they take Catrina out

and put her in the police car?

A.   I went back inside.  I mean, I went to my room

and got on the phone and I called several people to find

out what was going on.  My other daughter was watching

the rest, when they put her in the car.

11

1    Q.   Okay.  But you didn't go out front at all?

2    A.   No.

3    Q.   You were on the porch?

4    A.   On the porch, yes --

5    Q.   You went on the porch but --

6    A.   -- when Officer Bruno came by.

7    Q.   Okay.  Was your daughter already in the police

8    car then?

9    A.   Yes.

10   Q.   Did you ever use any profanity towards the

11   officers at all?

12   A.   No, sir.

13   Q.   Do you think you were interfering with the

14   officer's attempt to arrest your daughter, Catrina?

15   A.   Well, I didn't know who he was.

16   Q.   Are you saying if you had known he was a police

17   officer you wouldn't have tried to pull her away?

18   A.   I'm not sure.

19   Q.   Okay.  All right.  And you feel like you were

20   personally upset over observing your daughter being

21   arrested?

22   A.   Yes, sir.

23   Q.   Did either one of the officers ever touch you

24   at all?

25   A.   No.

1    Q.   When you went to pick her up, was Officer Andy

2  De Leon and Officer Brenda De Leon standing outside the

3  courthouse?

4    A.   Yes, sir.

5    Q.   Did they try to talk to you?

6    A.   Yes, sir.

7    Q.   And you didn't talk to them?

8    A.   No, sir.

9    Q.   And did the city manager, Benavides, come by

10  and take a statement from you?

11    A.   Yes, sir.

12    Q.   What did he tell you?

13    A.   Well, he more or less, just wrote everything

14  down.

15    Q.   Did you ever talk to him after that time?

16    A.   No, sir.

17    Q.   You said in your interrogatories that you

18  sustained a small scratch on your arm.  How did that

19  happen?

20    A.   It was probably in the struggle.

21    Q.   But I thought you told me that neither one of

22  the officers touched you.

23    A.   Well, when they were struggling and I went in,

24  well, I guess he didn't touch me, but I was there.

25    Q.   You think your daughter scratched your arm?

16

1     A.   I don't know.

2     Q.   Have you ever been arrested?

3     A.   Yes, I think I have, but it was not -- dropped,

4     the charges.

5     Q.   Okay.  And what were you arrested for?

6     A.   Disorderly conduct.

7     Q.   And when was that?

8     A.   I don't remember the dates.

9     Q.   Was it more than ten years ago?

10    A.   Yes, sir.

11    Q.   Have you ever been arrested for anything else

12    besides that?

13    A.   I don't remember, not --

14    Q.   Are you currently getting medical treatment for

15    diabetes?

16    A.   Yes, sir.

17    Q.   Tell me what your problems are that you feel

18    like you suffer from as a result of seeing your daughter

19    get arrested?

20    A.   Well, I wake up and there's this strange man

21    struggling with her, and then I find out he's an officer

22    who's supposed to be protecting us, and from then on I

23    just -- I've been afraid like when I see a policeman, I

24    get scared, I don't know what to expect.

25    Q.   Okay.  Any other problems you can tell me

21

1         I, ESMERALDA CARRIZALES, have read the
     foregoing deposition and hereby affix my signature that
2    same is true and correct, except as noted above.

3

4    _____
          ESMERALDA CARRIZALES

5

6

7    THE STATE OF TEXAS:
     COUNTY OF _Jim Wells_:
8
          Before me, _Esmeralda Carrizales_, on this day
9    personally appeared ESMERALDA CARRIZALES, known to me
     (or proved to me under oath or through _TX DL_____)
10   (description of identity card or other document) to be
     the person whose name is subscribed to the foregoing
11   instrument and acknowledged to me that they executed the
     same for the purposes and consideration therein
12   expressed.

13        Given under my hand and seal of office this 25th
     day of _July_____, 2000.
14

15

16   _____
     NOTARY PUBLIC IN AND FOR
17   THE STATE OF _____

18

19        LINDA PERSINGER
          NOTARY PUBLIC
20        State of Texas
          Comm. Exp. 12-14-2000

21

22

23

24

25

               AK/RET REPORTING, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


CATRINA VALADEZ, ET AL          *
                                *
VS.                             *     CAUSE NO. C-00-101
                                *
CITY OF SAN DIEGO, ET AL        *



*******************************************************

ORAL DEPOSITION OF
CATRINA VALADEZ
JULY 6, 2000

*******************************************************



ORAL DEPOSITION OF CATRINA VALADEZ, produced as a
witness at the instance of the Defendants, and duly
sworn, was taken in the above-styled and numbered
cause on the 6th day of July, 2000, from 10:00 a.m. to
10:48 a.m., before CAROL R. HOBLIT, CSR in and for the
State of Texas, reported by machine shorthand, at the
San Diego City Hall 404 S. Mier, San Diego, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached hereto.


ORIGINAL

---

# Ak/Ret Reporting, Records & Video, Inc.

**CERTIFIED COURT REPORTERS**
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037   (800) 388-9037
FAX (361) 882-3355



1    Q.   In the back seat of the police car?

2    A.   Yes.

3    Q.   Who put handcuffs on you?

4    A.   Andy.

5    Q.   Did they do anything to hurt you while they

6 were putting the handcuffs on you?

7    A.   They twisted my arm.

8    Q.   Twisted your arm?

9    A.   Uh-huh.

10   Q.   Okay.  Were the handcuffs -- Did the handcuffs

11 cut on your wrist or anything?

12   A.   They bruised.

13   Q.   They bruised your wrists where they were?

14   A.   Yes.

15   Q.   Did you pull against the handcuffs?

16   A.   Sort of.

17   Q.   Did they tell you if you pull against them they

18 would tighten down more?

19   A.   No.

20   Q.   Did you ever cuss at the officers?

21   A.   Yes.

22   Q.   What do you remember you said to the officers?

23   A.   They asked me for -- They asked me who I was

24 and for me to give my date of birth, and I told them,

25 "You-all F. know who I am since you-all are taking me

23

1  in."

2  Q.  Okay.  Anything else?

3  A.  I think that was about it.

4  Q.  Do you think you said anything of a cuss word

5  to them before they told you they were going to arrest

6  you?

7  A.  No.

8  Q.  And what happened when you were taken in?

9  A.  They -- She started to -- Like when they are

10  going to put you in jail, filling out all that

11  paperwork, and then they let me go.

12  Q.  Okay.  During the time that they were placing

13  handcuffs on you, were your mother and sister there?

14  A.  Uh-huh.  Yes.

15  Q.  Did they do or say anything to the officers

16  about why they were arresting you?

17  A.  I'm pretty sure, but I don't know.

18  Q.  Where were you?

19  A.  They had taken me to the car.  They put me in

20  the car and they went back inside.

21  Q.  Okay.  Where was it -- Where were you when they

22  put the handcuffs you?

23  A.  On the porch.

24  Q.  Okay.  And at the time the handcuffs were put

25  on you, were your mother and sister out there on the

Case 2:00-cv-00101   Document 29   Filed in TXSD on 12/15/2000   Page 82 of 88

1    cuffs on you, correct?

2        A.    Yes.

3        Q.    And you didn't know him and had never met him

4    before that day?

5        A.    No.

6        Q.    Did Brenda ever touch you during any of this?

7        A.    Yeah, she is the one that escorted me to the

8    car.

9        Q.    Okay.  Was there anything about that that hurt

10   you at all?

11       A.    No.

12       Q.    What about the gentleman with the sheriff's

13   office, Bruno, did he ever touch you or anything at all?

14       A.    No, he got there after I was already put in the

15   car.

16       Q.    Okay.  Who was driving the police car?

17       A.    Brenda.

18       Q.    Okay.  When you-all went from your mother's

19   house to the jail, was there anybody in the car besides

20   you and Brenda?

21       A.    Mr. De Leon.

22       Q.    I'm sorry?

23       A.    Mr. De Leon.

24       Q.    Okay.  So she drove and he rode in the car,

25   too?

31

1    Q.   Did you ever talk to the mayor, Alfredo

2    Cardenas, at the time?

3    A.   No.

4    Q.   And you never talked to Antonio Benavides, the

5    former city manager?

6    A.   No.  Yes, I gave him a statement.

7    Q.   Okay.  You gave him a statement?

8    A.   Yes.

9    Q.   Did he talk to you anything at all about it?

10   A.   No, he just wrote down.

11   Q.   Have you talked to him at any time since you

12   gave him a statement?

13   A.   No.

14   Q.   And you haven't talked to Bruno Vasquez since

15   this happened?

16   A.   No.

17   Q.   And he actually observed the incidents that

18   happened on Palacios Street, right?

19   A.   Yes.  .

20   Q.   Okay.  Do you know if he ever went to 505 West

21   Dix or not?

22   A.   No, I don't know.

23   Q.   When you told the officers you were refusing to

24   answer any questions, did they yell at you?

25   A.   No.

1    Q.    They didn't yell at you when you went back in

2    the house?

3    A.    No.

4    Q.    And when the officer grabbed your arm to arrest

5    you, did that hurt your arm?

6    A.    Yes.

7    Q.    Did you take pictures of the bruise on your

8    arm?

9    A.    Yes.

10   Q.    Was that from the officer grabbing you or from

11   putting -- or from the cuffs on your arm?

12   A.    From the officer grabbing my arm.

13   Q.    You listed some places where you got

14   medications.  Were those in connection with your

15   pregnancy?

16   A.    Excuse me?

17   Q.    You listed that you have in the past gotten

18   medicines or prescriptions filled at HEB and Wal-Mart in

19   Alice and at La Hacienda in San Diego.

20   A.    Uh-huh.

21   Q.    Were those in connection with your pregnancy or

22   is that in any way in connection with your --

23   A.    Pregnancy.

24   Q.    Okay.  That's with your pregnancy?

25   A.    Yes.

39

1          I, CATRINA VALADEZ, have read the foregoing
    deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4                        _____
                                CATRINA VALADEZ
5

6

7    THE STATE OF TEXAS:
    COUNTY OF  Duval   :
8
            Before me,  Catrina Valadez  , on this day
9    personally appeared CATRINA VALADEZ, known to me (or
    proved to me under oath or through _____)
10   (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
11   instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
12   expressed.

13          Given under my hand and seal of office this 7th
    day of  August  , 2000.
14

15

16   [SEAL: Notary Public, State of Texas     Una Day Redner
    My Commission Expires 03-17-02]            NOTARY PUBLIC IN AND FOR
17                                             THE STATE OF  03/17/02

18

19

20

21

22

23

24

25

                    AK/RET REPORTING, INC.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **CATRINA VALADEZ,** | § | |
| **ALMA AVILA AND** | § | |
| **ESMERALDA CARRIZALES** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. C-00-101** |
| | § | |
| **CITY OF SAN DIEGO** | § | |
| **OFFICER BRENDA DE LEON &** | § | |
| **OFFICER ANDREW DE LEON** | § | |

## AFFIDAVIT OF DAVID KLEIN

**BEFORE ME,** the undersigned official, on this day appeared David J. Klein, an attorney with Barger, Hermansen, McKibben & Villarreal, L.L.P., who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

1.  My name is David J. Klein.  I am over 21 years of age, have never been convicted of a crime of moral turpitude and I am competent to make this affidavit.  I am an attorney with Barger, Hermansen, McKibben & Villarreal, L.L.P. who assisted in the preparation of Defendants City of San Diego, Andrew De Leon, and Brenda De Leon's, Motion for Summary Judgment and I am personally familiar with the documents that comprise the record herein.

2.  The following are true and correct copies of the purported documents and are attached as Exhibits to Defendants' Motion for Summary Judgment:

    - Excerpts from Deposition of Brenda De Leon attached hereto as **Exhibit A**;

    - Affidavit of Brenda De Leon attached hereto as **Exhibit B**;

    - Affidavit of Andrew De Leon attached hereto as **Exhibit C**;

    - Excerpts from Deposition of Andrew De Leon attached hereto as **Exhibit D**;



- Excerpts from the deposition of Alma Avila attached hereto as **Exhibit E**;

- Excerpts from the deposition of Esmeralda Carrizales attached hereto as **Exhibit F**;

- Excerpts from Deposition of Catrina Valadez attached hereto as **Exhibit G**;



David J. Klein

SUBSCRIBED AND SWORN TO BEFORE ME this the 15<u>th</u> day of December, 2000.

ALFRED G. MORALES
Notary Public
STATE OF TEXAS
My Comm Exp. 11-08-2003

Notary Public, in and for
The State of Texas

My commission expires:

<u>11-08-2003</u>

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **CATRINA VALADEZ,** | § | |
| **ALMA AVILA AND** | § | |
| **ESMERALDA CARRIZALES** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. C-00-101** |
| | § | |
| **CITY OF SAN DIEGO** | § | |
| **OFFICER BRENDA DE LEON &** | § | |
| **OFFICER ANDREW DE LEON** | § | |

## ORDER GRANTING DEFENDANTS CITY OF SAN DIEGO, ANDREW DE LEON AND BRENDA DE LEON'S MOTION FOR SUMMARY JUDGMENT

On this _____ day of December, 2000, came to be heard in the above entitled and numbered cause the Motion for Summary Judgment filed by Defendants the City of San Diego, Andrew De Leon, and Brenda De Leon. Having considered the pleadings, the Motion for Summary Judgment, and the response of Plaintiffs to Defendants' Motion for Summary Judgment, it appears to this Court that the Defendants' Motion should in all things be GRANTED.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED, that Defendants' Motion for Summary Judgment, is GRANTED and complaint against Defendants City of San Diego, Andrew De Leon, and Brenda De Leon is dismissed with prejudice.

SIGNED this _____ day of December, 2000.

_____
UNITED STATES DISTRICT JUDGE