UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District C
Southern District o' ' '
Fil r

**JAN 1 0 2001**

MICHAEL N. MILO i   JLL A.

| | | |
|---|---|---|
| CATRINA VALADEZ, | § | |
| ALMA AVILA AND | § | |
| ESMERALDA CARRIZALES | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-101 |
| | § | |
| CITY OF SAN DIEGO, | § | |
| OFFICER BRENDA DELEON & | § | |
| OFFICER ANDREW DELEON | § | |

### PLAINTIFF'S RESPONSE TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Plaintiffs, Catrina Valadez, Alma Avila and Esmeralda Carrizales and

requests the Court to DENY Brenda DeLeon, Andy DeLeon, and The City of San Diego's

(hereinafter "Movants") Motion for Summary Judgment.

### I. INTRODUCTION

1.      Plaintiffs sued Defendants under 42 U.S.C.A. 1983 and the Texas Tort Claims

Act, for violation of constitutionally protected rights and injuries arising from these violations as

shown in Plaintiff's Original Petition on file in this cause, which petition is incorporated by

reference for all purposes as if recited verbatim herein.

2.      Movants have filed an answer asserting a General Denial and a First Amended

Original Answer asserting affirmative defenses.

3.      Respondents filed and served this Response to Defendants' Motion for Summary

Judgment on Movants.

1

34.

CitiPDF - www.fsxio.com

4.      Movants filed a Motion for Summary Judgment on the grounds that:

A.      Plaintiffs Esmeralda Carrizales and Alma Avila have failed to allege any constitutional violation, so as to entitle them to recover under section 1983.

B.      That probable cause existed to believe that Plaintiff Catrina Valadez had committed the offence of disorderly conduct by language and or family violence.

C.      That Defendant Andrew DeLeon is entitled to summary judgement on plaintiff's 1983 claims because:

      1.      There was no violation of Catrina Valadez's Fourth Amendment right.

      2.      Andrew DeLeon is entitled to qualified Immunity which bars Plaintiff's claim.

D.      That Defendant Brenda DeLeon is entitled to summary judgement on Plaintiff's 1983 claims because:

      1.      There was no violation of Catrina Valadez's Fourth Amendment right.

E.      City of San Diego is entitled to summary judgement because:

      1.      There was no violation of a Federally protected right.

      2.      There is no evidence that any violation of a Federally protected right was caused by a policy or custom of the City.

F.      That the Defendants are entitled to Summary Judgement on Plaintiffs' State Law claims because:

      1.      Andrew DeLeon is entitled to official immunity as to the claims of assault and battery.

      2.      Brenda DeLeon had no physical contact with Plaintiff.

2

CitiPDF - www.fesito.com

3.     Claim for intentional infliction of emotional distress must fail as a matter of law against Andrew DeLeon because:

> A. Plaintiff cannot prove elements necessary to recover for claim.
>
> B. Andrew DeLeon is entitled to official immunity from state tort liability.

4. Brenda DeLeon is entitled to summery judgement as a matter of law as to issue of intentional infliction of emotional distress because:

> A. There was no contact physical or otherwise  between Brenda DeLeon and Plaintiff.
>
> B. Brenda DeLeon is entitled to official immunity as to state law intentional tort claims.

## II. SUMMARY JUDGEMENT STANDARD

5.     Pursuant to Rule 56(c)F.R.C.P., the party moving for summary judgment has a burden to show that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247,  106 Supreme Court 2505, 2509, 2510, 91 Lawyer's Ed. 2nd 202(9186).  The moving party must come forward with evidence that establishes "beyond peradventure" all of the essential elements of the claim or defense.  Fontenot v. UpJon Company, 780 Fed.2d 1190, 1994(5th Cir. 1986).  The moving party must show that there are no genuine disputes as to the issues asserted in the pleadings, that there is no genuine issue of material fact.  Anderson 477 U.S. at.256.  In this context "genuine" means that the evidence about the facts is that a reasonable jury could resolve the point in favor of the nonmoving party in material means and "material" means the fact is one that might affect the outcome of the suit under the governing law. Id. at 248; Celotex Corp v. Catrett, 477

3

U.S. 317, 323, 106 S.Ct. 2548 (1986). All of these considerations must be weighed in connection to the governing laws. Id. The governing laws for Plaintiffs' claims are the 42 USC § 1983 and the Texas Tort Claims Acts.

6.    The initial burden to prove that there is no genuine issue of material fact is upon the moving party solely. Id. It is only after this burden has been met that the nonmoving party must show some factual disagreements sufficient to deflect brevis deposition. Mestink v. General Electric Company, 950 F.2d 816, 822 (1st. Cir. 1991), Cert. denied _____U.S.____, 112 S.Ct. 2965 (1992). In determining the propriety of summary judgment, the courts must treat the nonmovants allegations as true, including any disputes as to the evidence or facts being resolved in favor of the nonmovant. Anderson, 477 U.S. at 255. In fact, as the court views the underlined facts it must draw all reasonable inferences in favor of the party opposing summary judgment. Matsustriata Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 578 (1986). Nonmovant need not prove the prima facie case to succeed, only provide the court with evidence raising issues of fact concerning each element of its prima facie case. Waltman v. International Paper Company, 875 F.2d 486 (5th Cir. 1989).

In support of Plaintiffs' Response to Defendant's Motion for Summary Judgment, Plaintiffs rely on the following exhibits:

- Brenda DeLeon's Offence Report which was produced pursuant to Defendants' First Request for Production No. 4, attached hereto as **Exhibit "A"**;

- Andy DeLeon III's Offence Report which was produced pursuant to Defendants' First Request for Production No. 4 attached hereto as **Exhibit "B"**;

- Affidavit of Catrina Valadez attached hereto as **Exhibit "C"**;

- Affidavit of Esmerald Carrizales attached hereto as **Exhibit "D"**;

4

- Affidavit of Tony Benavides attached hereto as **Exhibit "E"**;

- Excerpts from the deposition of Brenda DeLeon attached hereto as **Exhibit "F"**; and

- Excerpts from the deposition of Andy DeLeon III attached hereto as **Exhibit "G"**.

### III.  FACTUAL SUMMARY

7.      On November 4, 1999, Ruben James Valadez, Plaintiff Catrina Valadez' husband

filed a report with Defendant Brenda DeLeon, an officer with the San Diego Police Department that

his soon to be ex-wife had entered their home and destroyed some clothing and removed some items

of property from the house.  (See Exhibit "A" - Brenda DeLeon's Offence Report).  No suit for the

dissolution of the marriage was pending, nor were there any Temporary Restraining Orders,

Temporary Injunctions or Protective Orders in place.  (See Exhibit "C" - Affidavit of Catrina

Valadez and Exhibit "F" - Deposition of Brenda DeLeon, Page 20, Lines 15-24 and Page 21, Lines

2-5).

8.      According to the Offence Report prepared by Brenda DeLeon, Defendant Brenda

DeLeon went and picked up her husband who was also a police officer, to act as back up.  (See

Exhibit "A" - Brenda DeLeon's Offence Report).  They drove to the home of Esmeralda Carrizales,

where they were told Catrina Valadez was staying.  The officers asked to speak to Catrina Valadez,

Plaintiff Alma Avila said that she was inside and went in to get her.  When Catrina Valadez came

outside the officers told her they wanted to ask her some questions.  Catrina Valadez refused to

answer any questions and refused to leave her mothers property.  The officers persisted in their

attempts to questions Catrina Valadez and she got upset.  She again told the officers that she would

not answer any questions.  According to Brenda DeLeon's Offence Report, Catrina Valadez said "I

don't have to tell yall Shit", followed by "fuck this shit, yall always believe him".  When these

5

statements were made, the Defendants admit that she was on private property. (See Exhibit "A" -
Brenda DeLeon's Offence Report).

9.     Brenda DeLeon then informed Catrina Valadez that she was under arrest for
Disorderly conduct by language.  Catrina Valadez ran into her mothers home.  Officer Andrew
DeLeon entered the residence and began to physically drag her out of the house.  Esmeralda
Carrizales saw what was taking place and rushed to the aid of her daughter. (See Exhibit "D" -
Affidavit of Esmeralda Carrizales).  Andy DeLeon was not in uniform at the time of the arrest.  It
was not until several minutes into the incident that Esmeralda Carrizales was informed that he was
a police officer and that he was arresting her daughter. (See Exhibit "D" - Affidavit of Esmeralda
Carrizales).  When Esmeralda Carrizales asked why he was arresting Catrina Valadez he told her that
he was going to issue a warrant for her as well if she did not get out of the way. (See Exhibit "D" -
Affidavit of Esmeralda Carrizales).

10.     In the process of arresting Catrina Valadez she was injured on her arm.  She also
suffered emotional distress which resulted in her hospitalization.  Plaintiff Esmeralda Carrizales and
Plaintiff Alma Avila both reported that they suffered emotional distress for the incident and continue
to fear that the police will come back and harm them.  However, they never sought or received any
medical treatment for their injuries.  (See Exhibit "C" - Affidavit of Catrina Valadez).

11.     Tony Benavides the City Administrator at the time of this incident, conducted an
investigation of the Valadez incident. (See Exhibit "E" - Affidavit of Tony Benavides).  During his
investigation he found that the actions taken by the two officer violated the rights of Catrina Valadez.
He attempted to discipline one of the two officers and was stopped by the city council.  Tony
Benavides left his job with the city in frustration.  (See Exhibit "E" - Affidavit of Tony Benavides).

6

12.     After he left his job the Officer Brenda DeLeon and Andrew DeLeon tried to get even with him by harassing and pulling over his son.  Mr. Benavides complained to the city but no action was taken.  On or around December 27, 1999, his son and his mother were arrested by Brenda DeLeon and his mother was severely injured.    (See Exhibit "E" - Affidavit of Tony Benavides).

13.     Tony Benavides has testified that the city of San Diego has a policy of failing to discipline and properly train police officers who violated peoples rights and who engage in misconduct.  This policy lead to the incident with Catrina Valadez and to the later incident with his mother and son.

## IV.  CONTESTED ISSUES

14.     Plaintiffs by and through this Response are contesting the following issues of fact and law:

A.      That Plaintiffs Esmeralda Carrizales and Alma Avila  have failed to allege any constitutional violation, so as to entitle them to recover under section 1983.

B.      That probable cause existed to believe that Plaintiff Catrina Valadez had committed the offence of disorderly conduct by language and or family violence.

C.      That Defendant Andrew DeLeon is entitled to summary judgement on plaintiff's 1983 claims because:

    1.      There was no violation of Catrina Valadez' Fourth Amendment right.

    2.      Andrew DeLeon is entitled to qualified Immunity which bars Plaintiff's claim.

D.      That Defendant Brenda DeLeon is entitled to summary judgement on Plaintiff's 1983 claims because:

7

      1.  There was no violation of Catrina Valadez' Fourth Amendment right.

E.      Explanation of Excessive Force claim.

F.      That the City of San Diego is entitled to summary judgement because:

      1.      There was no violation of a Federally protected right.

      2.      There is no evidence that any violation of a Federally protected right was caused by a policy or custom of the City.

G.      Plaintiff State law claims.

## V. ARGUMENT AND AUTHORITY

**A.    Plaintiffs, Esmeralda Carrizales Alma Avila deny that they have failed to allege any constitutional violation, so as to entitle them to recover under 42 U.S.C. section 1983.**

15.    Plaintiffs deny that Esmeralda Carrizales and Alma Avila did not have their constitutional rights violated.  Specifically, Esmeralda Carrizales and Alma Avila's Fourth Amendment rights were violated by the Defendant, Andrew DeLeon's unlawful entry into their home to arrest Catrina Valadez.  The Fourth Amendment to the United States Constitution states:

> "The right of the people to be secure in their houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

The entry into the home of Esmeralda Carrizales and Alma Avila and the arrest of Catrina Valadez was without a warrant, therefore the inquiry as to whether a constitutional violation has occurred comes down to whether or not the Defendant's entry into the home and seizure of Catrina Valadez was unreasonable.  If the jury finds that the Defendant acted unreasonably then as the owner of the

8

property in question, Esmeralda Carrizales has standing under 1983 to file a claim because her right to be secure in her home against unreasonable searches has been violated. The issue of whether or not the arrest and entry into the home were reasonable will be addressed below.

**B.   Plaintiff denies that probable cause existed that she had committed the offences of disorderly conduct or family violence, as alleged by Defendants.**

16.   Disorderly conduct by language was the offense that Catrina Valadez was originally arrested for. Disorderly Conduct found in Title 9, Section 42.01 of the Texas Penal Code, makes it a crime for a person to intentionally or knowingly use abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace. Broken down into its essential elements the offence of Disorderly Conduct by language requires, first intentional or knowing use of abusive, profane, or vulgar language, second that the act occur in a public place, and third that the language by its very utterance tends to incite an immediate breach of the peace.

17.   Defendant relies upon the case of Nixon v. State, 928 S.W. 208 at 212 to support their position that the officer had probable cause to believe that an offence had occurred. In Nixon the arresting officers were confronting a suspect that they had observed trespassing when Nixon confronted the officers and began yelling and cursing at the officers. The act occurred in the back yard of a residence, however the officers testified that there were approximately 50 people present at the time, and the backyard in question was a high crime area frequented by gangs, drug dealers, and winos. The court held that there was probable cause to believe that the offence had occurred and that the nature of property whether public or private depended upon the circumstances. Id.

18.   The facts in our case are clearly different from those relied upon by the Court in

9

Nixon. First, at to the element of whether the property, where the offence occurred was public or private.   Defendant Brenda DeLeon makes a point of stating in her report that Catrina Valadez refused to get off her property and was therefore on her property when she made the alleged statements. (See Exhibit "A" - Brenda DeLeon's Offence Report).  This is substantiate by the report prepared by Defendant, Andy DeLeon who again makes a point of reporting that she refused to get off her property. (See Exhibit "B" - Andy DeLeon III's Offence Report).  It is clear from the report that Catrina Valadez and the officers put great importance on the fact that she was on private property and would not leave the private property. (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  In her deposition Catrina Valadez testified that the officers keep yelling at her to go to the street, which is why she ran into the house. (See Exhibit "C" - Affidavit of Catrina Valadez).   There was no evidence advanced by the defendants that the property in question was open to the public or that there was any one on the property other than the lawful owners. (See Exhibit "A" - Brenda DeLeon's Offence Report, Exhibit "B" - Andy DeLeon III's Offence Report and Exhibit "F" - Deposition of Brenda DeLeon, Page 23, Line 13).  Further both Brenda DeLeon and Andy DeLeon testified that the plaintiffs had the legal right to excluded the public from the property in question. (See Exhibit "F" - Deposition of Brenda DeLeon, Page 28, Line 17 and  Exhibit "G" - Deposition of Andy DeLeon III, Page 21, Line 19). In this case unlike the facts in Nixon there is no evidence that would change the nature of this property from private to public.

19.    The facts in Nixon are also different as to the whether the language used would constitute an immediate breech of the peace, as to make it an offence. Catrina Valadez, according to the offence report came out to speak to the officers.  The officer told her they wanted to ask her

10

some questions and she refused.  According to the offence report she said that "I don't have to tell you shit." (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  According to the offence report this statement was followed by the statement by Catrina Valadez "Fuck this shit, yall always believe him".  (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  There is no mention in the report that there were any bystanders or other persons driving by, nor is there any mention in either report of any other witnesses to the incident.  (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  The Offence report of both officers indicates that after the statement to the effect that 'they always believe him' they advised her that she was under arrest.  (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  There is no indication in the reports that any other factors entered into their decision to arrest her except for her statements.  (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report).  As in <u>Nixon</u>, in order for vulgar language to constitute the offence of Disorderly Conduct it must incite an immediate breach of the peace.  Both officers testified that they were not angered by the statements, nor were they incited by the language to breach the peace.  (See Exhibit "F" - Deposition of Brenda DeLeon, Page 25, Lines 3-7 & 18 and  Exhibit "G" - Deposition of Andy DeLeon III, Page 23, Line 2 and Page 24, Line 10).

20.    At his Deposition Andy DeLeon testified that he was worried about bystanders and claimed that there was a crowed beginning to gather.  However both his report and Breda DeLeon's Report are silent on this factor.  In fact, after being pressed as to the justification for the arrest, Brenda DeLeon testified that the reason Catrina Valadez was being arrested was actually because she had committed family violence.  (See Exhibit "F" - Deposition of Brenda DeLeon, Page 17, Line

11

2). She testified that she saw scratch marks on Ruben James Valadez which indicated that he had been assaulted. (See Exhibit "F" - Deposition of Brenda DeLeon, Page 17, Line 2). Again there was nothing in the Offence report about an assault. (See Exhibit "A" - Brenda DeLeon's Offence Report and Exhibit "B" - Andy DeLeon III's Offence Report). When questioned as to why something that important would be left out of a report, she testified that she did not put it in to the report because Mr. Valadez did not want to press charges, (See Exhibit "F" - Deposition of Brenda DeLeon, Page 26, Line 17) that Mr. Valadez would not admit to the assault, (See Exhibit "F" - Deposition of Brenda DeLeon, Page 27, Line 1) and finally that she did not know why she failed to put it in the report. (See Exhibit "F" - Deposition of Brenda DeLeon, Page 27, Line 7). None of the reasons advanced by Defendant Brenda DeLeon were are very credible.

21.    In addition, to the fact that the present story told by the Defendant is very different from the original reports prepared by the officers, Catrina Valadez has testified that she never cursed at or yelled at the officers until after she was placed under arrest. (See Exhibit "C" - Affidavit of Catrina Valadez). In addition, her testimony directly contradicts the testimony of the officers as to any allegation of family violence or that the was a crowd beginning to gather as a result of her contact with the Police. (See Exhibit "C" - Affidavit of Catrina Valadez).

22.    The Defendant's Motion for summary judgement should be denied as there is a question of fact as to whether the Defendants had probable cause to arrest her for either family violence or disorderly conduct.

**C.    There was in fact a violation of Catrina Valadez' Constitutional rights, and the Defendant Andrew DeLeon is not entitled to Qualified Immunity.**

23.    "Section 1983 is not itself a source of substantive rights but merely provides a method

12

for vindicating rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266 at 271(1994). Section 1983 of Title 24 of the United States Code creates a private right of action against any person who, under color of state law, deprives another person of any rights, privileges, or immunities secured by the constitution and laws of the United States. "Liability under Section 1983 may arise through inaction and nonfeasance as well as through action and malfeasance." 1997 WL 786246, at 3 (N.D.Tex1997) citing; See Doe v. Taylor Independent School District, 15 F.3d 443, 454 (5th Cir.) cert. denied, 513 U.S. 815(1994); See also Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)(police officer liable for failing to prevent summary punishment by another officer). Plaintiff's cause of action under 1983 is seeking redress for violation of her First, Fourth, Fifth, and Fourteenth Amendment rights. Briefly these are the right to free speech(1st), the right to be free from unreasonable Search and seizure (4th), the right against self incrimination (5th) and the right to equal protection and due process (14th).

24.     The Fourth amendment to the United States Constitution requires warrantless arrests to be based upon probable cause. United States V. Walker, 960 F.2d 409, 416 (5th Cir.), Cert. denied, 506 U.S. 967 (1992). "Probable cause exists when the facts and circumstances within the knowledge of the arresting officer are sufficient to cause a person of reasonable caution to believe that an offence has been or is being committed." Walker, 960 F.3d at 416. A warrantless arrest made without probable cause violates the arrestee's Fourth and Fourteenth Amendment rights. Bodzin v. City of Dallas, 768 F.2d 722, 724 (5th Cir. 1985); See also Thomas v. Kipperman, 846 F.2d 1009, 1011 (5th Cir. 1988).

25.     If the facts of Catrina Valadez' arrest occurred in the manner in which she has testified that they occurred or if they occurred as related by the Defendants in their Offence Report

then an illegal arrest did occur. An arrest for Disorderly Conduct or family violence would not be supported by probable cause. (See Exhibits "A" - Brenda DeLeon's Offence Report; Exhibit "B" - Andy DeLeon III's Offence Report; Exhibit "C" - Affidavit of Catrina Valadez and Exhibit "E" - Affidavit of Tony Benavides).

26.   Further, Plaintiff has alleged that the Defendants action in arresting Catrina Valadez stemmed in part from her speech and in part from her refusal to answer questions posed by the officers. The rights of free speech and right against self incrimination/ due process would therefore arguably have been violated.

27.   The next inquiry is whether her claims against the officers as individuals would be barred by an assertion of qualified immunity. In determining whether or not to an officer is entitled to qualified immunity the Court must first determine whether or not the Plaintiff has alleged a clearly established constitutional right under applicable constitutional standards. Siegert v. Gilley 500 U.S. 226, 233 (1991). If the Plaintiff has not alleged a clearly established constitutional right Defendant is entitled to Summary Judgment. Baker v. Putnal 75F.3d 190, 198 (5th Cir. 1996). Clearly the rights to be free from unreasonable search and seizure, the right to free speech and the right to due process are clearly established constitutional rights. Further these are rights which if violated are actionable under 42 USC §1983. *See* Balckburn v. Marshall City of, et.al., 42 F. 3d 925 (5th Cir. 1995) (*Plaintiff appealed from dismissal of section 1983 claim, 5th circuit reversed as to city, holding that retaliation by city for exercise of free speech is actionable*), Gauglitz v. City of Dallas et. al., 1997 WL 786246 (N.D.Tex. 1997) (*Illegal arrest is violation of fourth and fourteenth amendment rights.*).

28.   Once it is established that the Plaintiff has alleged a violation of a clearly established right, the Court must next look at whether the plaintiff can establish that the defendants' conduct was

not objectively reasonable under the circumstances. Anderson v. Creighton, 483 U.S. 635, 638 (1987). If the actions of the officers was objectively reasonable again summary judgment would be proper. However, it is important for the court to have a clear view as to what the facts of a situation are prior to making a determination of the whether or not the officers acted reasonably. Mangieri v. Clifton , 29 F.3d 1012, 1016 (5th Cir. 1994), also See Gauglititz v. City of Dallas et. al, 1997 WL 786246 at 7 (N.D. Tex 1997) (Holding that Summary Judgement not proper on issue of reasonableness of officers conduct in absence of a coherent view of the facts.).

29.     The facts and circumstances of Catrina Valadez' arrest are certainly in disputes. The facts as alleged by Catrina Valadez would make the officer action in arresting her clearly unreasonable. Further, even if the Plaintiffs' version of the facts was totally discounted, the defendants version of the events has not been consistent. The offence reports prepared by the officers are clearly different from the facts as they are now alleged in the summary judgment motion.

30.     The Defendants Motion For Summary Judgement should be denied as Plaintiffs have clearly alleged a violation of their constitutional rights and as there is a question of facts as to what actually transpired, summary judgement on the issue of immunity should not be granted.

**D.      That Defendant Brenda DeLeon is entitled to summary judgement on Plaintiff's 1983 claims because there was no violation of Catrina Valadez' Fourth Amendment right.**

31.     As addressed above there was a violation of Catrina Valadez' Fourth Amendment rights. Defendants are here contending that because Brenda DeLeon did not actually touch Catrina Valadez, she can not be held liable. "Liability under Section 1983 may arise through inaction and nonfeasance as well as through action and malfeasance." See Gauglititz v. City of Dallas et. al, 1997 WL 786246, at 3 (N.D.Tex.1997) citing; See Doe v. Taylor Independent School District, 15 F.3d 443, 454 (5th Cir.) cert. denied, 513 U.S. 815(1994); See also Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)(police officer liable for failing to prevent summary punishment by another officer).

Therefor an affirmative act on the part of an officer is not necessary for 1983 liability to attach. If Brenda DeLeon failed to prevent a constitutional violation from occurring she would likewise be liable.

32.     In addition, to the potential inaction on her part, Brenda DeLeon was also an active participant in this incident. According to both officer's offence reports the officer who decided to place Catrina Valadez under arrest was Brenda DeLeon and this was where the alleged violation of her Fourth Amendment rights began. It is true that the actual injury happened while Andrew DeLeon was in the process of placing the hand cuffs on her but it is our contention that Brenda DeLeon would be equally liable, if not more liable, because she initiated the illegal arrest.

**E.      Explanation of Excessive Force Claim.**

33.     Plaintiff's claim centers more on the under lying violation of her Fourth Amendment right and the other incidental violations which lead to her arrest. Plaintiff is in agreement with Defendant that the amount of force that was used to effect her arrest was not excessive, if the arrest itself was not illegal. Plaintiff's contention is that because the underlying arrest itself was illegal then the Defendants are liable for all injuries which arose from the illegal arrest. In the event the arrest is found to have been supported by probable cause, plaintiff not would be able to recover for the injury to her arm on the basis of excessive use of force.

**F.      The City of San Diego is not entitled to summary judgement because, there was a violation of a Federally protected right and there is evidence that any violation of a Federally protected right was caused by a policy or custom of the City.**

34.     As addressed earlier the plaintiff has evidence of constitutional violations. However, as clearly stated by the Defendant's in their motion, for the City to be liable the violation must be caused by a custom or policy of the city. Tony Benavides Jr. the former City Administrator of San Diego, Texas has testified concerning this policy or custom element. (See Exhibit "E" - Affidavit

16

CMPDF - www.fesite.com

of Tony Benavides).  His testimony is that the city of San Diego has a policy and or custom of

failing to discipline or train officers who engage in misconduct or violations of citizens rights.  His

testimony is that this lack of supervision and training is what cause the arrest in the Valadez case and

further that there were other incidents of police misconduct, which went unpunished.  "Conscious

indifference to widespread incompetence or misbehavior may be more than a matter of extreme

negligence and more than a failure to instruct or train.  If it is the deliberate police policy to demand

instant compliance, heedless of rights and risk, abuses---ie,.  Incompetence and misbehavior--will

occur when officers of varying judgment and stability encounter resistance." Languirand v. Hayden,

717 F.2d 220 (5th Cir. 1983) cert. denied 104 S.Ct. 2656 (1984) and Grandstaff et. al. v. City of

Borger et. al.,767 F.2d 161 (5th Cir. 1985).

     35.     As in the cited cases there appears to be a complete lack on the part of the Defendant

City to take any action to correct or train officers who are violating citizen rights.  As further proof

of municipal liability Tony Benavides has testified to several incidents of police misconduct.  Prior

incidents of Police misconduct tend to prove a pattern or custom and the accession to that custom

by the policy maker.  Grandstaff et. al. v. City of Borger et. al.,767 F.2d 161 (5th Cir. 1985).  Clearly

this is enough to establish municipal liability under any applicable standard.

                            Respectfully submitted,

                            GRAY P. SCOGGINS
                            Attorney at Law
                            63 N. King St.
                            Alice, Texas 78332
                            (361) 668-3536: Telephone
                            (361) 668-3576: Facsimile

                            Gray P. Scoggins
                            State Bar No.:00798494
                            Federal ID No.: 22125
                            Attorney for Plaintiffs

## <u>CERTIFICATE OF CONFERENCE</u>

Plaintiffs attorney conferred with Defendants attorney on January 8, 2001, counsel  was

unable to reach an agreement regarding Defendants' Motion For Summary Judgment.

For the aforementioned reasons the Defendants' Motion For Summary Judgment should

be denied.  Plaintiffs further moves the Court to order the payment to Plaintiffs by Defendants of

all just costs and expenses including attorney's fees incurred by reason of this response

proceedings.

Gray P. Scoggins

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument was served upon the following in accordance with the Federal Rules of Civil Procedure.

James F. McKibben, Jr.          CMRRR #7099 3220 0001 0887 1539
Attorney at Law
One Shoreline Plaza
800 N. Shoreline Blvd.
Suite 2000 North Tower
Corpus Christi, Texas 78401

SIGNED this 9th day of January, 2001.

Gray P. Scoggins

18

## SAN DIEGO POLICE DEPARTMENT
### OFFENSE REPORT

**INCIDENT #:**                                                                **CASE# 99-0651**

---

**OFFENSE:** BURGLARY OF HABITATION, CRIMINAL MISCHIEF, ESCAPE, AND RESISTING ARREST

**PC CLASS:** FELONY-2, FELONY-SJ, MISD.-A, MISD-A                **TYPE:**

**LOCATION:** 702 E. Palacios, San Diego, TX 78384

**DATE:** 11-04-99   **TIME:** 2:30 P.M.   **TYPE OF LOCATION:** Residence

| **VICTIM:** Valadez, Ruben James | | **DOB:** 7-14-74 |
|---|---|---|
| **ADDRESS:** 505 W. Dix, San Diego, TX 78384 | **PHONE #:** none | |
| **NAME:** | **CODE:** | **DOB:** |
| **ADDRESS:** | **PHONE #:** | |
| **NAME:** | **CODE:** | **DOB:** |
| **ADDRESS:** | **PHONE #:** | |

**NARRATIVE (details of report)**     On this date at approximately 2:15 P.M., I Officer B. DeLeon was dispatched to 505 W. Dix in reference to a domestic disturbance. Upon arrival, I made contact with Ruben James Valadez, W/M, DOB/ 7-14-74, who advised me that his soon to be ex-wife Catrina Valadez had broken into his home. Mr. Valadez stated that Mrs. Valadez had tore up all his clothes and underwear and put some clothes in the kitchen sink with bleach all over them. I went inside the residence and confirmed this. Mr. Valadez took me around the house and showed me what Mrs. Valadez had done. I saw all Mr. Valadez's clothes and underwear cut up and thrown all over the house. The whole house was trashed. There were things thrown everywhere. Mr. Valadez stated that a neighbor had seen Mrs. Valadez there and that Mrs. Valadez had been there a while. Mr. Valadez said that Mrs. Valadez had a set of keys to his home and that he wanted them back. Mr. Valadez said that he had put all Mrs. Valadez's things in bags and put them outside the residence (per Mrs. Valadez's request) so she could take them. Mr. Valadez further stated that Mrs. Valadez had stolen over 100 Compact Disks (CD's) and broken all of cologne bottles. I finished taking all of Mr. Valadez's information and went to pick up Officer Andy DeLeon to assist me as a back up unit since there was no one else available. Upon arrival at 702 E. Palacios, I told Mrs. Valadez's sister that I needed to speak to Catrina. Mrs. Valadez came outside and I told her that I was Officer Brenda DeLeon and Officer Andy DeLeon identified himself and told her that we were with the San Diego Police Department, (Officer Andy DeLeon had a black Police shirt and was displaying his badge and gun) and we need to ask her a few questions about what had occured earlier but she refused and told me she was not going to get off her property. Mrs. Valadez then became very irrate and started using foul language telling myself and Officer A. DeLeon, "I don't have to tell ya'll shit." Mrs. Valadez further stated, "Fuck this shit, ya'll always believe him." I then told Mrs. Valadez that she was under arrest for Disorderly Conduct (By using foul or vulgar language in public). At this point Mrs. Valadez stated that she was not going to jail. Mrs. Valadez then turned around and started running towards her mother's residence. Officer Andy DeLeon and I both yelled at Mrs. Valadez to stop, but she refused and continued to run. At this point Officer Andy DeLeon and I pursued Mrs. Valadez into the residence. Upon entering the front door of the residence, Mrs. Valadez's mother, Esmeralda Carrizales, W/F, DOB/ 02-19-56, grabbed and pulled Mrs. VAladez behind her

**EXHIBIT**
" _A_ "

and put her hand up to keep us from getting near her daughter.  Officer A.
DeLeon advised Ms. Carrizales that she needed to move or else she would be
filed on for Interfering with Public Duties.  Ms. Carrizales would not move
and kept asking us why her daughter was being arrested. Officer A. DeLeon
told her why her daughter was being arrested and told her again to move out
of the way. Ms. Carrizales finally let go of Mrs. Valadez and ran to the
phone. We then escorted Mrs. Valadez to the patrol car.  Mrs. Valadez was
placed in the back seat of the patrol unit behind the driver's seat.  I
then asked Mrs. Valadez for her full name and date of birth and she stated,
"I don't have to tell you a Fucking thing, you can find it yourself!"  I
then advised Mrs. Valadez that she was also being placed under arrest for
Failure to Identify to a Peace Officer.  At which point Mrs. Valadez
stated, "I don't give a Fuck!"  Officer A. DeLeon and I then went back to
the residence to get Ms. Carrizales's information. Ms. Carrizales would not
get off the phone and we stood at the doorway and kept telling her to get
off the phone so we could finish up our investigation and leave.  Ms.
Carrizales and Mrs. Valadez's sister were being very uncooperative. Deputy
Valdez from Duval County Sheriff's Department drove up to assist as Ms.
Carrizales came to the door. Ms. Carrizales looked at Deputy Valdez and
asked him who he was since he was in a Red Camaro and was dressed in
civilian clothes. Deputy Valdez said he was from the Sheriff's Department.
We told Ms. Carrizales that we were finished and as we turned to walk away,
the door was slammed behind us. I then transported Mrs. Valadez to the
Duval County Sheriff's Department. Upon arrival at the jail, Mrs. Valadez
was issued citations for Disorderly Conduct- By Language and Fail To ID. I
advised Mrs. Valadez that a report would be taken and turned over to the
District Attorney on all other charges. Mrs. Valadez signed her citations
and was released to her mother.

END OF REPORT

| SUSPECT NAME: Valadez, Catrina | | DOB: 7-3-80 |
|---|---|---|
| ADDRESS: 702 E. Palacios | | ARRESTED: No |
| SUSPECT NAME: | | DOB: |
| ADDRESS: | | ARRESTED: |
| DATE REPORTED: 11-4-99 | TIME REPORTED: 2:15 P.M.   CASE STATUS: Active | |
| REPORTING OFFICER: Brenda DeLeon   *Brenda DeLeon* | | BADGE #: 413 |

## SA DIEGO POLICE DEPARTMENT
## SUPPLEMENTAL REPORT

| OFFENSE: SEE REPORT #0651 | CASE NO: 0651 |
| --- | --- |
| VICTIM: VALADEZ, RUBEN JAMES | DATE: 11-04-99 |

**NARRATIVE (details of reports)** On this date at approximately 2:25 P.M., Officer Brenda DeLeon (Unit #413) came by my uncle's residence on the 500 block of W. Gravis, San Diego, TX to ask for my assistance. I, Officer Andy DeLeon (Unit #403) asked her what she had going and she stated that she had been dispatched to 505 W. Dix, San Diego, TX in reference to a domestic disturbance. Officer Brenda DeLeon advised that she had already made contact with the male half of the disturbance, Ruben James Valadez. She told me that Mr. Valadez was calm, but was very upset because Catrina Valadez had destroyed most of the things inside his residence, torn up all of his clothes, and stolen over 100 Compact Disks (CD's). I got in the unit with Officer B. DeLeon and advised dispatch that I would be enroute to back up Officer B. DeLeon with this call. We then drove to 702 E. Palacios, San Diego, TX to make contact with Mrs. Valadez. Upon arrival at 702 E. Palacios, San Diego, TX, we made contact with Mrs. Valadez's sister, unknown name at this point. Officer B. DeLeon and I both identified ourselves as Police Officers to prevent any confusion about me because I was in civilian clothes bearing my badge, off duty weapon in it's holster and also wearing a black "Specialist" Police shirt. Officer B. DeLeon then asked her if she was Catrina at which time she stated, "No, that's my sister and she is inside the house." Officer B. DeLeon then asked her if she could go and tell Catrina that we needed to speak to her and ask her a few questions about what had occurred. She went inside the residence and Catrina came out. Catrina's sister also came back outside while we spoke to Catrina. As Officer B. DeLeon attempted to ask Catrina some questions, her sister kept interrupting so I asked her to step back to her residence. Catrina's sister advised that she was a witness, so I told her that we would speak to her after we questioned Catrina. Officer B. DeLeon started to ask Catrina some questions about what had occurred earlier, but she refused to answer any questions and told Officer B. DeLeon that she was not getting off of her property. Mrs. Valadez then became very irrate and uncooperative, using foul and vulgar language stating to us, "I don't have to tell ya'll shit!" Mrs. Valadez further stated, "Fuck this shit, ya'll always believe him!" Officer B. DeLeon then told Catrina that she was under arrest for Disorderly Conduct (By using foul or vulgar language in public). Mrs. Valadez stated that she was not going to jail, turned around, and started running towards her mother's residence. Officer B. DeLeon and I both yelled at Catrina to stop, but she refused to stop and continued run. We then pursued Catrina into the residence. Upon entering the front door of the residence, Catrina's mother, Ms. Esmeralda Carrizales, W/F, DOB 02-19-56, grabbed and pulled Catrina, trying to pull Catrina out of my grasp and put Catrina behind her, putting her hand up to keep us from placing Catrina in cuffs. I then advised Ms. Carrizales that she needed to move or else she was going to be filed on for Interfering with Public Duties. Ms. Carrizales would not let us do our job and kept asking us why her daughter was being arrested. I then told Ms. Carrizales why her daughter was being placed under arrest and she needed to move out of the way. Ms. Carrizales finally let go of Catrina and ran to the phone. We then placed Cartrina in cuffs and escorted her to the patrol unit. Catrina was placed in the back seat behind the driver's seat. Officer B. DeLeon then asked Catrina for her full name and date of birth and she stated, "I don't have to tell you a Fucking thing, you can find it yourself!" Officer B. DeLeon then advised Catrina that she was also being placed under arrest for Failure to Identify to a Peace Officer, at which time Catrina stated, "I don't give a Fuck!" Officer B. DeLeon and I then went back to the residence to get Ms. Carrizales's information. Ms. Carrizales would not get off of the phone. We stood at the doorway and

**EXHIBIT**
" B "

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CATRINA VALADEZ, | § | |
| ALMA AVILA AND | § | |
| ESMERALDA CARRIZALES | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-101 |
| | § | |
| CITY OF SAN DIEGO, | § | |
| OFFICER BRENDA DE LEON & | § | |
| OFFICER ANDREW DE LEON | § | |

### <u>AFFIDAVIT OF CATRINA VALADEZ</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DUVAL | § |

When the police officer arrived at my mother's house they told my sister, Alma Avila, they wanted to speak to me. My sister called me outside and when I walked out on the porch, I saw two police officers outside of my mother's house. The Officers told me they wanted to ask me some questions. I refused to answer any questions. The officers yelled at me and I ran into my mother's house because I was afraid they would hurt me. While the officers were yelling at me the only people on the property was my family. I never saw any crowd of people gathering while I was talking to them.

The officers did not show us a warrant to search my mother's house or to arrest me when they followed me into my mother's house. I did not know what they were arresting me for and they would not tell me. Andrew De Leon kept saying that he had a warrant for my arrest. The Officer's grabbed me and hurt my arm while he was arresting me. I did not go to the doctor but it was sore for about week after the incident.

1


EXHIBIT
" C "

I later learned that the Police had been called by my husband Ruben James Valadez. He had told them that I had broken into our house and destroyed or taken some property. I was living with my husband at the time he made this allegation. I did not take or destroy any property in our home. We had gotten into a fight and he kicked me out of the house. I went back and got some of my personnel belongings and then left. There was no petition for divorce filed, nor were there any temporary restraining orders or injunctions in place.

I also later learned that the police claimed that I cussed at them and that I had assaulted my husband. Neither of these allegations are true. I did not assault my husband and I did not curse or yell at the officers, until after they had arrested me.

I was pregnant at the time of the incident. On the 19th day of that month, I started bleeding and had to go to the hospital. The doctor told me it could have been caused by a traumatic event. I believe this incident caused me to almost lose my baby.

Catrina C. Valadez

STATE OF TEXAS §
§
COUNTY OF JIM WELLS §

Sworn to and subscribed before me on January 9, 2001.

LINDA PERSINGER
MY COMMISSION EXPIRES
December 14, 2004

NOTARY PUBLIC
Notary Commission Expires: 12-14-04
Typed Name of Notary: Linda Persinger

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CATRINA VALADEZ, | § | |
| ALMA AVILA AND | § | |
| ESMERALDA CARRIZALES | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-101 |
| | § | |
| CITY OF SAN DIEGO, | § | |
| OFFICER BRENDA DE LEON & | § | |
| OFFICER ANDREW DE LEON | § | |

## AFFIDAVIT OF ESMERALDA CARRIZALES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DUVAL | § |

On November 4, 1999, I was taking a nap in my room around 2:15 o'clock p.m. when I heard my daughters scream. I woke up to find a man (Andy DeLeon) in my kitchen struggling with my youngest daughter (Catrina). I did not know who this man was. He was wearing jeans, t-shirt and a cap. As any mother would do, I tried to stop him and find out what was going on. I looked to the door and a female officer was standing on my porch. My other daughter (Alma) yelled they are trying to arrest her. Then I looked at the man and asked who are you and what is going on. He merely said, I have a warrant for her arrest. Since there was another officer there, I looked at Catrina, at this time, the man was still struggling with her. She was crying. I told him, let me talk to her. I turned and told Catrina calm down and go with them. I will be over there in a little while. Catrina calmed down and I told the man (who is an officer himself - off duty with no badge and did not identify himself to me.) all you have to do is talk to her. She is going to go

1

**EXHIBIT**
" D "

CUTEPDF - www.tevira.com

willingly.   He looked at me and said in his exact words, and you madam, I will issue a warrant

for your arrest for interfering.  So he took Catrina and threw her in the back of the car and told

her to shut up.  At that time, I got on the phone and called Judge Pearl Adams, she said she did

not know anything about this.  She asked for my daughter's name and said she would not know

anything until they bring her in and she knew the charges.  I then called the Sheriff's office and

spoke to Billy Escalante, Mr. Escalante advised me to talk to the officer's supervisor, whom is

the Mayor, Alfredo Cardenas.

The same two officers came back to my door and wanted to know my name and date of

birth to issue the warrant.  Alma asked them what Catrina was being charged with and Officer

Andy DeLeon told her to get in the house, it was none of her business or else he would arrest her

too.  Catrina, was not read her rights.  They did not have a warrant.

I then phoned Mary Davis Valadez the Justice of Peace.  Mrs. Valadez was in a

conference.  I told Alma, lets go talk to the Mayor.  The Mayor, told us this was not right, he said

it is not like she killed somebody.  He told us, he would look into it.  We went home.  We were

both scared and crying.  I was afraid they would lock Alma up too.  Since this man (Andy) was

very rude and telling us we didn't know the laws.

I was writing a note to my boys letting them know I wouldn't be home when they got out

of school, when the phone rang and it was Catrina from the courthouse and told me to go pick

her up.  I went, I was still crying and the two officers were outside with Catrina and the man

(Andy) tried to talk to me and I wouldn't turn, so he told her "explain to her" and we will go by

later to talk to her.  Around 6:00 or 6:30 o'clock p.m. that day,  Tony Benavides, City Manager

came by to take a statement on the complaint I had on the officers.  He wrote everything down

2

and told me they are having a City Council meeting on November 10, 1999, and he would bring it up at the meeting and assured me, this will not be swept under the rug. I also, told him Catrina's arm is bruised. Mr. Benavides never looked at her arm. I also, sustained a small scratch on my arm.

Mr. Benavides, told me the officers wanted to come by and talk to me, I told him, I did not want to talk to them. Mr. Benavides told me "I will make sure they don't come over" and they didn't.

_Emeralda Carrizales_
Emeralda Carrizales

STATE OF TEXAS                    §
                                 §
COUNTY OF JIM WELLS               §

Sworn to and subscribed before me on January 9, 2001.

_Linda Pusinger_
NOTARY PUBLIC
Notary Commission Expires: 12-14-04
Typed Name of Notary: Linda Persinger

LINDA PERSINGER
MY COMMISSION EXPIRES
December 14, 2004

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ,                    §
ALMA AVILA AND                      §
ESMERALDA CARRIZALES                §
                                    §
VS.                                 §      CIVIL ACTION NO. C-00-101
                                    §
CITY OF SAN DIEGO,                  §
OFFICER BRENDA DE LEON &            §
OFFICER ANDREW DE LEON              §

## AFFIDAVIT OF ANTONIO BENAVIDES, JR.

STATE OF TEXAS          §
                        §
COUNTY OF NUECES        §

I Antonio Benavides, Jr. began my tenure as City Administrator for the City of San Diego

on or around March 1, 1999.  My official duties with the City of San Diego ended with my

resignation of my position that became effective on or about November 19, 1999.

When I began my tenure in this office, I found that the community was dissatisfied with

prior performances of the Police Department.  The community was distrustful and indifferent

towards the Department because of the perceived corruption within Duval County.  In my

opinion the community viewed the San Diego Police Department as being somewhat shady and

incompetent.

From the beginning, it was standard practice to have staff meetings with all Police

Department personnel to discuss issues that were important to the City and Staff.  I conducted all

of the meetings and as result I was able to get an excellent insight into the inner workings of the

1


EXHIBIT
" _E_ "

CVisPDF - www.fesiso.com

Police Department. Based upon my work with the department and the community, I soon

realized that there was a problem with how our police officers were doing their job and how they

were treating the public.

      I had received several complaints about officers who were abusing there authority and

engaging in conduct that violated the rights of the citizens of San Diego. There were numerous

examples of officers engaging in illegal searches, illegal arrests, and using more force than

necessary to do there job. As an example of one of the constitutional violations that I observed.

The City of San Diego has a curfew ordinance that clearly states that anyone under the age of 18

can not be out on the streets past ten o'clock at night. A car with three individuals was cruising

and was pulled over by two City Officers. The Officers explained to these individuals why they

were being pulled over. All three individuals produced identification (TDL) clearly showing that

they were old enough to be out at this hour. Instead of releasing the individuals the Officers then

began to search the vehicle and the individuals, which in my opinion was a violation of the

Fourth Amendment.

      When I brought this up for discussion in the staff meeting, I was met with arrogance and

defiance by a majority of the Officers. I also mentioned to them that I had consulted with two

different Attorneys (one of whom was a former County Attorney) and both had come to the same

conclusion that the search was illegal. The atmosphere at this meeting was one in which the

Officers believed that they were right and were defiant to any suggestions by me or any other

person.

      This takes me to the Carrizales incident. I first heard about the incident from Mayor

Alfredo E. Cardenas. He asked me to visit with him at his office at the Duval County Picture

2

where he informed me that he had received a complaint from Esmeralda Carrizales and Catrina Valadez. The Mayor briefed me on the situation and then directed me to conduct a complete investigation.

I began the investigation with the interviewing of Officers Andy and Brenda De Leon. Their version of the encounter goes as follows. The Officers explained to me that they had received a call from the County Dispatcher about a disturbance on Dix Street (north side of town). They arrived at the residence and found a trailer home in shambles. Clothing was scattered all over the lot and the residence seemed to have been ransacked. They also mentioned that they had interviewed the complainant ( Mr. James Valadez). Mr. Valadez was claiming that Mrs. Catrina Valadez who happened to be his girlfriend did all of this. The Officers then proceeded to go to the Carrizales residence on Reforma ( south side of town) to interview Mrs. Catrina Valadez. Upon reaching the residence both Officers got down from the Patrol Car and proceeded to knock at the front door. Mrs. Catrina Valadez answered the door and proceeded to go outside to speak to both Officers. Somewhere during the conversation Mrs. Catrina Valadez decides to terminate the conversation and runs into her home. Both officers follow and arrest the young lady.

I then proceeded to interview Mrs. Catrina Valadez and her mother at their residence where they had a completely different version of the events. Both women explained to me that Mrs. Catrina Valadez did go outside to speak to both Officers and that she had terminated the conversation. She went on to say that both Officers burst into the home and began to wrestle with Catrina Valadez. It was at this time that Mrs. Carrizales entered the room where Officer Andy De Leon met her with hostility. Mrs. Carrizales alleges that this Officer used profanity and

3

vulgar language while even threatening her by stating that once they were finished with her daughter that they would be back for her. Needless to say, I found both women very disturbed or distraught about the entire incident.

My next step was to relate the findings to Mayor Cardenas. The Mayor was still very upset about the entire incident. He then directed me to continue with the investigation and to get to the bottom of it.     I re-interviewed both officers where I made several inquiries about their judgement. I then began to question why they had arrested Mrs. Catarina Valadez. They informed me that she had committed a crime in front of them, so therefore, they could pursue the suspect into her home without a warrant to enter the property. I then asked them to tell me what crime she had committed in front of them and they replied that she had directed vulgar language towards them. I did not believe that this warranted an arrest, because she was on her property and thus within her rights. Secondly, I mentioned to them that they should have investigated the matter further before committing themselves to course of action. They should have interviewed neighbors at the Dix residence before going over to the Carrizales residence to begin with. Officer Andy Del Leon then made the comment that  these people were nothing but scum bags and trash and that he did not have to listen to what I was telling him.

As a result of this incident, I tried to get rid of Brenda De Leon.  Ms. De Leon complained to Council-member Roel Vela who in turn tried to prevent me from firing her. The action of Council-member Roel Vela was typical of the response I got any time I tried to take any kind of disciplinary action against an officer in the department. Around this time, I left my job with the city because I got tired of trying to do a good job and being stopped by the city council for political or personal reasons.

4

After my resignation Andrew and Brenda De Leon continued to hold a grudge against me and my family. The people who suffered the most were my family. My son was pulled over repeatedly and harassed. No amount of complaints to the city helped.

On or around December 27, 1999, both my mother and my son were arrested by Brenda De Leon. In the process my mother was seriously injured. The Mayor terminated officer Brenda De Leon, but within 2 weeks she was rehired by the city because of political pressure from the city council.

In my opinion, there is an unwritten policy and/or custom in San Diego of refusing to discipline or train officers who violate citizens rights. I saw this while I was the city administrator. The citizens who suffered were never those with any political power. They were the young, the poor, and those without a political voice. Time and again I saw members of the city council use their power over the police to get what they wanted.

The incident involving Catrina Valadez was a result of this policy. Her husband Ruben James Valadez was a dispatcher with the sheriff's department, his mother is also a Justice of the Peace. The police were following this unwritten policy of taking action to assist the politically connected, without regard to the rights of the citizens involved.

_____

Antonio Benavides, Jr.

5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ, ALMA          )
AVILA AND ESMERALDA            )
CARRIZALES                     )
                               )
VS.                            )   C. A. NO. C-00-101
                               )
CITY OF SAN DIEGO,             )
OFFICER BRENDA DE LEON         )
& OFFICER ANDREW DE LEON       )

DEPOSITION OF BRENDA DE LEON
JULY 7, 2000

APPEARANCES:

COUNSEL FOR THE PLAINTIFFS:

GRAY P. SCOGGINS
Attorney at Law
113 N. Reynolds
Alice, Texas 78332

COUNSEL FOR THE DEFENDANTS:

MR. DAVID W. GREEN
Barger, Hermansen, McKibben
    &  Villarreal, L.L.P.
802 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401

ALSO PRESENT:  CATRINA VALADEZ,
               ANDREW DE LEON

REPORTED BY:  JENNIFER L. KARL

(ORIGINAL)

Ak/Ret Reporting, Records & Video, Inc.

CERTIFIED COURT REPORTERS
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037  (800) 388-9037
FAX (361) 882-3355

EXHIBIT

" F "

CA NO. _C.-00-101_

_trina Valadez, Alma,_
_ila, and Esmeralda_
                    _Carrizales_                           * IN THE _____ DIST. COURT

VS.                                                        * _____ COUNTY, TX

_Ty of San Diego, et al_                                  * IN THE UNITED STATES DISTRICT COURT
                                                          * FOR THE _Southern_ DIST. OF _____
                                                          *           _CC_
                                                          *                              DIVISION
                                                          *

IPULATIONS FOR THE DEPOSITION OF _Brenda DeLeon, Andy DeLeon &_ _Dr. Raymon._
                                                                               _Tanguma_

_en on_ __7/7/00__ _by_ __Gray P. Scoggins__

e attorneys for all parties present stipulate and agree as follows to the checked items:

eposition taken pursuant to:

✓ _____ Notice _____ Agreement _____ Court Order

amination and Signature by the Witness:

___ Original deposition delivered to _____ as the custodial attorney.
Ak/Ret Reporting, Inc. released of any further responsibility.

✓ Original deposition delivered to __Mr. McKibben__ to be signed and returned
to Ak/Ret Reporting, Inc., within __30__ days from date of delivery. Original deposition sealed
and delivered to _____ _Mr. Scoggins_ _____ as the custodial attorney.

In the event that the original deposition transcript has not been signed by the time of trial or any
hearing, the undersigned original or a certified copy of the transcript may be used as signed.

___ Signature waived. Original deposition delivered to _____
as the custodial attorney.

bjections:

___ Reserve all until the time of trial.

___ Make all at time of the taking of the deposition or all will be waived.

✓ Reserve all objections, except as to the form of the questions or the responsiveness of the answers
until the time of trial, which objections are waived if not made at the taking of the deposition.

✓ Make objections in accordance with the Rules of Civil Procedure (Texas/Federal)

xhibits:

___ Attach original exhibits to the original transcript.

___ Attach copies of the original exhibits to the original transcript. Original exhibits in the possession of
_____

8/11

2

with transcripts of
responsible for the

Deposition

en

Defendant

<pre>
 1                        I N D E X

 2
                                              PAGE
 3
     Examination
 4      By Mr. Scoggins                           4

 5                   EXHIBIT INDEX

 6   EXHIBIT NUMBER                            PAGE
        1    San Diego Police Dept.,
 7           Offense Report, Dated 11/4/99      23

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

AK/RET REPORTING, INC.

3

1      Deposition and answers of BRENDA DE LEON, who

2   resides in Bexar County, Texas, taken herein by the

3   counsel for the Plaintiffs, before JENNIFER L. KARL,

4   a Certified Court Reporter in and for the State of

5   Texas, on the 7th day of July, 2000, between the

6   hours of 10:10 a.m. and 11:28 a.m., in the offices of

7   City Hall, 404 S. Mier, San Diego, Texas in

8   accordance with the Federal Rules of Civil Procedure

9   and the agreements hereinafter set forth.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AK/RET REPORTING, INC.

1    trained in or taught about?

2         A.    Anything from burglary to just all The Penal

3    Code, CCP.

4         Q.    So you are -- part of your training is to

5    become familiar with The Penal Code of Texas; is that

6    correct?

7         A.    Right.

8         Q.    Okay.  Do they teach you as part of your

9    training the difference between, say, a crime and a

10   civil action?

11        A.    Yes.

12        Q.    Okay.  Do they teach you arrest procedures?

13        A.    Yes.

14        Q.    Okay.  Do they -- do you remember receiving

15   any training on either arrest or search warrants?

16        A.    Yes.

17        Q.    Okay.  Do you know if you can arrest

18   somebody without a warrant?

19        A.    Yes, you can.

20        Q.    Okay.  When can you arrest somebody without

21   a warrant?

22        A.    Whenever an offense has been committed in

23   front of an officer or when an officer believes there

24   is going to be further family violence or something

25   to happen.

AK/RET REPORTING, INC.

1      Q.    Okay.  Now, can you tell me what a -- an

2   arrest or search warrant is?

3      A.    A search warrant is to search somebody's

4   property.  An arrest warrant is something you have in

5   hand to take somebody into custody.

6      Q.    Who issues a warrant?

7      A.    A judge.

8      Q.    A judge.  Can you as a peace officer issue a

9   warrant?

10     A.    No.

11     Q.    What do you have to do in order to secure a

12  warrant?

13     A.    Get an affidavit.

14     Q.    Okay.  Does the affidavit -- what does the

15  affidavit have to show?

16     A.    Probable cause.

17     Q.    Okay.  Do you know -- let me ask it this

18  way:  When can you as a peace officer enter

19  somebody's home to make an arrest?

20     A.    Whenever they run from you, after you place

21  them under arrest.

22     Q.    Okay.  Is there any other qualifications to

23  that?

24     A.    If there is an offense being committed

25  inside of the house, yes, you can go in without a

Case 2:00-cv-00761   Document 34   Filed in TXSD on 01/10/2001   Page 39 of 92

1    warrant.

2         Q.    Okay.    On November the 4th, 1999, did you

3    respond to a domestic disturbance?

4         A.    Yes.

5         Q.    Okay.    Who did you speak to?

6         A.    James Valadez.

7         Q.    Okay.    Who is James Valadez?

8         A.    He is an employee with the sheriff's office.

9         Q.    Okay.    Did you know him prior to responding

10   to it?

11        A.    Well, we worked with him.    I didn't know him

12   personally.

13        Q.    Okay.    But you had met him before?

14        A.    Yes.

15        Q.    Spoken to him before?

16        A.    Uh-huh.

17        Q.    What did he tell you when you showed up at

18   his house?

19        A.    He told me that his soon to be ex-wife had

20   broken into his home, that she did not live there.

21   She stayed there every once in a while and that she

22   had gone in there and cut everything up, threw

23   everything, broke everything, and he took me inside

24   the house and showed me the damage to the house and

25   all his clothes that was ruined.

1    Q.   Okay.  So he told you that he was married?

2    A.   He didn't tell me he was married, but that's

3    what I assumed because he said it was his soon to be

4    ex-wife.

5    Q.   Okay.  And did he also tell you that he had

6    left some of her things outside for her to pick up?

7    A.   Yes.

8    Q.   Okay.  And your testimony today is he told

9    you that she did not live there?

10   A.   Right.

11   Q.   Okay.  Do you know why her things were there

12   if she was not living there?

13   A.   No.

14   Q.   Did you ask or inquire as to why her things

15   were there, if she was not living there?

16   A.   No.

17   Q.   Okay.  After speaking to Mr. Valadez, what

18   did you, what did you do then?

19   A.   I took the initial information, and I left

20   to speak with Catrina.

21   Q.   Okay.  At the time you left to go speak to

22   Catrina, did you believe that a crime had been

23   committed?

24   A.   Yes.

25   Q.   Okay.  What crime do you believe had been

1    committed at that time?

2        A.    Family violence because he had scratch marks

3    on his neck; and assuming that she didn't live there,

4    burglary, he wanted to file burglary, criminal

5    mischief on what I had observed in the house.  And he

6    told me he wanted his keys back since she had broken

7    into the house and taken the keys.  That's what I was

8    going to go do was just get the keys from her.

9        Q.    So at that time you believe you had probable

10   cause to believe she committed a burglary?

11       A.    No, I was going to take the initial report

12   and turn it into the district attorney and let him

13   figure it out.

14       Q.    Okay.  When, when you left the --

15   Mr. Valadez's home, did you, did you go get backup?

16       A.    Yes.

17       Q.    Okay.  Why did you feel that you needed

18   backup?

19       A.    Because I never go on domestics by myself.

20       Q.    Okay.  And were you planning on arresting

21   Mrs. Valadez --

22       A.    No.

23       Q.    -- at that time?

24       A.    No.

25       Q.    Okay.  What was your purpose in going and

1    looking for Mrs. Valadez?

2         A.    To get her side of the story.

3         Q.    Okay.  Just to talk to her?

4         A.    Yes, and to try to get the keys back, if she

5    had them.

6         Q.    Okay.  Did you feel that you needed backup

7    just to speak to Mrs. Valadez?

8         A.    Yes.

9         Q.    Okay.  Why is that?

10        A.    Because on domestics you never know when

11   things are going to get out of hand.

12        Q.    Okay.  Now, when you were responding or

13   going to Mrs. -- to go see Mrs. Valadez, they were --

14   the parties were separated; is that correct?

15        A.    Right.

16        Q.    Okay.  But you still felt that there was a

17   chance for violence?

18        A.    Yes.

19        Q.    Okay.  Violence towards who?

20        A.    Towards me.

21        Q.    Okay.  Why did you feel that Mrs. Valadez

22   would, would react violently?

23        A.    Because Mr. Valadez said she was in that

24   state of mind.

25        Q.    Okay.  He said that she was in a violent

1    state of mind?

2        A.    Right.

3        Q.    Okay.  Have you ever heard of the term

4    community property?

5        A.    Yes.

6        Q.    What is community property?

7        A.    Property that married couples accumulate

8    together while they are married.

9        Q.    Okay.  So your understanding of community

10   property is basically any items that the respective

11   spouses buy or is acquired during marriage?

12       A.    Right.

13       Q.    Okay.

14             MR. GREEN:   I will object to the form

15   of the question.

16       Q.    (BY MR. SCOGGINS)  Now, isn't it true that

17   Mr. Valadez told you that he was married?

18       A.    He did not say he was married.

19       Q.    Okay.  Did he describe the assailant as his

20   soon to be ex-wife?

21       A.    Right.

22       Q.    Okay.  Did you take from that statement that

23   he was, in fact, married?

24       A.    No.

25       Q.    You did not?

1 A. No.

2 Q. Okay. What did you take from that

3 statement?

4 A. That maybe they were common law because he

5 didn't say that they were legally married.

6 Q. Okay. Would it make a difference?

7 A. No.

8 Q. Okay. Is it true that he described the, the

9 person who supposedly committed this offense as his

10 wife?

11 A. His soon to be ex-wife.

12 Q. Okay. Do you know if the status of soon to

13 be ex-wife is recognized under Texas law?

14 A. No.

15 Q. When you responded to this domestic dispute,

16 did Mr. Valadez show you a protective order?

17 A. No.

18 Q. Okay. Did he show you any other court

19 order?

20 A. No.

21 Q. Okay. Did he show you any, any order which

22 would prohibit Catrina Valadez from entering his

23 home?

24 A. No.

25 Q. Did he show you an order which would prevent

1    her from destroying any property?

2        A.   No.

3        Q.   Did he show you an order which would prevent

4    her from removing items from the home?

5        A.   No.

6        Q.   Okay.  If you -- tell me this:  If you

7    destroy your own property, assuming it's paid for, is

8    that a crime?

9        A.   If you destroy your own property?

10       Q.   Yes.

11       A.   No.

12       Q.   It is not a crime?

13       A.   No.

14       Q.   If you remove your own property from your

15   home, is that a crime?

16       A.   No.

17       Q.   Okay.  When you arrived at -- how did you

18   know where to look for Mrs. Valadez?

19       A.   Mr. Valadez gave me the address.

20       Q.   Okay.  And do you know what address you went

21   to?

22       A.   702 Palacios, I believe.

23       Q.   Okay.  When you arrived at 702 Palacios,

24   would you describe to me what happened?

25       A.   We drove up, and me and Officer Andy De Leon

1     Q.   Did she tell you she was going to go back to

2 his residence?

3     A.   No.

4     Q.   Okay.  Had she left his residence of her own

5 accord?

6     A.   Yes.

7     Q.   Okay.  Was there any court order which would

8 prevent her from going back to Mr. Valadez's

9 residence?

10    A.   No.

11    Q.   Okay.  Earlier you testified that

12 Mr. Valadez had scratch marks and had appeared to

13 have been assaulted.  Could you tell me where in the

14 report I can find that?

15    A.   It is not.

16    Q.   Okay.  Why not?

17    A.   He didn't want to press charges.

18    Q.   Oh.  He didn't want to press charges?

19    A.   No.

20    Q.   Didn't he just accuse her of burglary?

21    A.   Yes.

22    Q.   Didn't he accuse her of criminal mischief?

23    A.   Yes.

24    Q.   Please explain to me what you mean by he

25 didn't want to press charges.

1    A.    He didn't admit to the scratch marks.

2    Q.    When you prepare an offense report, do you

3    put only what the victim admits to?

4    A.    No.

5    Q.    Okay.  Can you explain to me why you didn't

6    note the scratch marks in your report?

7    A.    I don't know.

8    Q.    Okay.  Have you ever heard of Miranda

9    warnings?

10   A.    Yes.

11   Q.    Could you tell me what they are?

12   A.    The warning -- the Miranda warning is what

13   you read to somebody accused of a crime.

14   Q.    What is the first one?

15   A.    You have the right to remain silent.

16   Q.    Okay.  Does that mean that somebody who is

17   accused of a crime does not have to answer any

18   question?

19   A.    Right.

20   Q.    Is that what Mrs. Valadez did?

21   A.    Yes.

22   Q.    Okay.  Is that why you arrested Mrs. Valadez

23   because she refused to answer any questions?

24   A.    No.

25   Q.    Could you define disorderly conduct for me.

1          A.    One of them is using abusive or profane

2    language in a public place causing immediate breach

3    of the peace.

4          Q.    Okay.  Do you know what the definition of a

5    public place is?

6          A.    Yes.

7          Q.    What is that?

8          A.    Anywhere, as long as it is not inside your

9    residence.

10          Q.    Okay.  So you can't own the front yard?

11          A.    I don't know.

12          Q.    You don't know?

13          A.    No.

14          Q.    Okay.  Do you know if a residential property

15    owner can legally exclude the general public from his

16    front yard?

17          A.    Yes.

18          Q.    Okay.  Would that make it public property or

19    private property?

20          A.    I don't know.

21          Q.    You don't know, okay.  And you testified

22    earlier that Mrs. Valadez was in the front yard --

23          A.    Right.

24          Q.    -- at the time she made these statements?

25          A.    Right.

AK/RET REPORTING, INC.

1    Q.    Okay.  Where exactly was she standing when

2  she -- I believe according to the report, she said,

3  "Fuck this shit."  Where was she standing when she

4  said that?

5    A.    At the end of the porch next to the street.

6    Q.    At the end of the porch?

7    A.    The walkway.

8    Q.    The walkway, okay.  When she said, "Fuck

9  this shit," why did you believe that you had just

10  witnessed a crime?

11    A.    Because there was an immediate breach of the

12  peace.

13    Q.    Okay.  Why did you feel that she was

14  inciting an immediate breach of the peace?

15    A.    She was causing a scene.  There was people

16  starting to stop and watch.  I needed to get her out

17  of there.

18    Q.    Okay.  Were you afraid of some action that

19  Mrs. Valadez would take, or were you afraid of some

20  action that the public would take?

21    A.    That her and her family.

22    Q.    Her and her family.

23    If -- I will give you a hypothetical here.  If I

24  answer my door and it's a particularly annoying

25  salesman standing there and I tell him to, "Fuck

AK/RET REPORTING, INC.

1    off," would I be guilty of disorderly conduct?

2        A.   No.

3        Q.   Okay.  Why not?

4        A.   Because it is not an immediate breach of the

5    peace.  There is not other people around.  It is not

6    in public.

7        Q.   Okay.  Let's say there was a parade walking

8    down the street, the same situation, I tell the

9    salesman to, "Fuck off," am I guilty of disorderly

10   conduct?

11       A.   If you're inside your residence, no.

12       Q.   Let's say I step out on my porch because he

13   won't leave.

14       A.   If there is other people around, yes.

15       Q.   Okay.  So you would arrest me for disorderly

16   conduct?

17       A.   Yes.

18       Q.   What if I told him to please leave?

19       A.   No.

20       Q.   Okay.  Is it the word "fuck" that you

21   believe causes that to be a crime?

22       A.   Not just that word, no.

23       Q.   Okay.  Well, what is it?

24       A.   Anything that causes immediate breach of the

25   peace.

AK/RET REPORTING, INC.

1      Q.    Okay.  Do you know what the first amendment

2  is?

3      A.    Yes, not right offhand, though.

4      Q.    If I told you it was freedom of speech, you

5  realize that's in the constitution?

6      A.    Yes.

7      Q.    Okay.  Do you believe in the first

8  amendment?

9      A.    Yes.

10     Q.    Okay.  Did you chase Mrs. Valadez into her

11  home to arrest her?

12     A.    Not into her home, no.

13     Q.    Okay.  How far up to her home did you go?

14     A.    To the doorway.

15     Q.    To the front door?

16     A.    Uh-huh.

17     Q.    Okay.  How come you didn't enter the home?

18     A.    I was behind Officer Andy De Leon.

19     Q.    You were behind him?

20     A.    Yeah.

21     Q.    Okay.  So Officer Andy De Leon entered the

22  home?

23     A.    He grabbed her.  He stepped maybe one foot

24  in the house.

25     Q.    Okay.  But he did enter the home?

AK/RET REPORTING, INC.

1    A.    Yes.

2    Q.    Okay.  Do you believe that Andy De Leon had

3 the right to enter her home?

4    A.    Yes.

5    Q.    Okay.  And why is that?

6    A.    She had already been placed under arrest.

7    Q.    For what offense?

8    A.    Disorderly conduct.

9    Q.    In order to arrest somebody in their home,

10 what do you generally need?

11    A.    To arrest them in their home?

12    Q.    Uh-huh.

13    A.    After they are placed under arrest and they

14 run, nothing.

15    Q.    Okay.  Assuming they weren't placed under

16 lawful arrest, what would you need?

17    A.    An arrest warrant.

18    Q.    Okay.  Did anybody consent to Mr. De Leon

19 entering the home?

20    A.    No.

21    Q.    Okay.  Did they actually try to exclude

22 y'all from entering the home?

23    A.    Yes.

24    Q.    Okay.  When Andy De Leon entered the home,

25 what happened?

1    A.    Mrs. Carrizales, the mother, Andy had

2  grabbed her by the arm.  He had one foot on the door,

3  one foot on the porch.  He had grabbed Catrina, and

4  the mother grabbed her other arm and started pulling

5  her in the opposite direction towards inside the

6  house.

7    Q.    Okay.  Did you ever hear -- or let me ask it

8  this way:  Did you ever threaten to arrest Catrina's

9  mother?

10   A.    Yes.

11   Q.    You did?

12   A.    Officer Andy De Leon did.

13   Q.    Okay.  What were his exact words?

14   A.    That if she did not let go of Catrina, that

15  she was going to get an arrest warrant for her for

16  interfering with peace officer duties.

17   Q.    Okay.  Did he say he was going to issue a

18  warrant?

19   A.    Yes.

20   Q.    Okay.  Did -- how was Andy De Leon dressed

21  at the time he entered the home?

22   A.    He was in blue jeans, a black and white

23  police shirt.  He had his badge and his gun on his

24  belt, shoulder.

25   Q.    Okay.  When you say, "a black and white

35

1    December of 1999?

2        A.    Yes.

3        Q.    Okay.  Why were you fired?

4        A.    Nothing to do with this case.

5        Q.    I am asking you why you were fired.

6        A.    For an incident with the city manager's

7    son.

8        Q.    Okay.  Did that incident also involve a

9    Sylvia Benavides?

10       A.    Yes.

11       Q.    Okay.  Tell me what happened in the incident

12   involving Sylvia Benavides.

13             MR. GREEN:  I am going to object to

14   these involving Sylvia Benavides as being irrelevant

15   to this case.

16             MR. SCOGGINS:  I ask that she answer

17   the question.

18             MR. GREEN:  I am going to instruct the

19   witness not to answer it.

20       A.    I am not going to answer.

21             MR. SCOGGINS:  It has a direct

22   bearing.  I will come back to it.

23       Q.    (BY MR. SCOGGINS)  How long were you

24   terminated?

25       A.    For just a few days.

AK/RET REPORTING, INC.

1    Q.   Okay.  How did you get your job back?

2    A.   The new city manager.

3    Q.   Hired you back?

4    A.   Uh-huh.

5    Q.   Who was it that actually fired you?

6    A.   The mayor, the old mayor.

7    Q.   The old mayor.  Do you recall what offenses

8    you charged Catrina Valadez with?

9    A.   The two that she got arrested for was

10   disorderly conduct and failure to identify.

11   Q.   Well, in the police report it states that

12   she was arrested or the offense is burglary of a

13   habitation, criminal mischief, escape, and resisting

14   arrest; is that correct?

15   A.   Right.

16   Q.   Do you know what the status of those charges

17   are?

18   A.   No.

19   Q.   Have you ever checked with the DA to see if

20   he sought indictments in those cases?

21   A.   We checked with him, but we haven't got

22   anything back.

23   Q.   Okay.  To the best of your knowledge,

24   nothing has happened because of those charges?

25   A.   Right.

AK/RET REPORTING, INC.

1    Q.    Do you know why?

2    A.    No.

3    Q.    How many other felony arrests have you made

4  while you have been working for the City of San

5  Diego?

6    A.    I don't know.

7    Q.    You don't know?

8    A.    Huh-uh.

9    Q.    Is it more than one?

10   A.    Yes.

11   Q.    Has the DA indicted anyone based on a felony

12  arrest that you have made?

13   A.    I am not sure.

14   Q.    You're not sure?

15   A.    Huh-uh.

16   Q.    How many people have you arrested for

17  disorderly conduct by language?

18   A.    I don't know.

19   Q.    Is it more than one?

20   A.    Yes.

21   Q.    More than five?

22   A.    Yes.

23   Q.    More than 10?

24   A.    I am not sure.

25   Q.    So between five and 10?

1      A.      Maybe.

2      Q.      Okay.  Do you recall the names of any of

3   those people?

4      A.      No.

5      Q.      Were you told by anyone with the City of

6   San Diego that if you heard somebody curse that you

7   should arrest them?

8      A.      No.

9      Q.      Okay.  At the time you arrested Catrina

10   Valadez, did you know that she was pregnant?

11      A.      No.

12              MR. SCOGGINS:  Let me take about a

13   five-minute break.

14              MR. GREEN:  Okay.

15                  (A break was taken.)

16      Q.   (BY MR. SCOGGINS)  I have got a few

17   follow-up questions, and then I am going to ask you

18   about the area that you didn't -- or you refused to

19   answer awhile ago.  First, did --

20              MR. GREEN:  Actually, for the record I

21   had instructed her not to answer it based upon my

22   objection of relevancy.

23              MR. SCOGGINS:  Okay.

24      Q.   (BY MR. SCOGGINS)  Now, the -- just for

25   clarification, when y'all arrested Mrs. Valadez, did

1    y'all have a warrant?

2        A.    No, sir.

3        Q.    Okay.  Did you ever hear Andy De Leon claim

4    to have a warrant?

5        A.    No, sir.

6        Q.    Did he ever inform Mrs. Carrizales that he

7    had a warrant?

8        A.    No, sir.

9        Q.    Okay.  You testified earlier that when Andy

10   entered the house he made the arrest or grabbed

11   Mrs. Valadez right inside the doorway?

12       A.    Right.

13       Q.    Okay.  He didn't go into the kitchen area?

14       A.    No.

15       Q.    Okay.  Okay.  Now, earlier I asked you why

16   you were fired.  Can you answer that for me?

17             MR. GREEN:  Okay.  I am going to also,

18   again, object that it is not relevant to any issue in

19   this case; but I am going to allow the witness to go

20   ahead and answer the question.

21       A.    Go ahead and answer it?

22       Q.    (BY MR. SCOGGINS)  Yes.

23       A.    Okay.  I arrested the -- he had just

24   resigned -- the city manager's son and mother.

25       Q.    Okay.  And why did you arrest his son?

AK/RET REPORTING, INC.

40

1    A.    For reckless driving and disorderly conduct.

2    Q.    Okay.  Was that disorderly conduct by

3    language?

4    A.    Yes, sir.

5    Q.    What was it that -- I believe the son's name

6    is also Tony?

7    A.    Yes, the third.

8    Q.    What did you -- what did Tony say that

9    caused you to arrest him for disorderly conduct?

10    A.    He jumped out of the vehicle.  When I asked

11    him for his driver's license and insurance and he

12    said, "You're fucking harassing me because of who my

13    fucking father is.  Fuck you.  I am not going to

14    answer anything or give you anything."  And he didn't

15    want to give me his driver's license or insurance.

16    And there was witnesses.  There was people.

17    Q.    Okay.  Who were the witnesses to this?

18    A.    They have the statements with the report.

19    There was a young guy that was walking by and some

20    other people that were passing by.

21    Q.    Did you prepare a report of your arrest of

22    Tony Benavides?

23    A.    Yes.

24    Q.    Okay.  Who would have that report now?

25    A.    Probably the chief or -- since that was only

AK/RET REPORTING, INC.

1    Class C, probably just municipal court.

2        Q.    Okay.   Now, you stated that you also

3    arrested Sylvia Benavides?

4        A.    Yes.

5        Q.    Would you tell me what happened?

6        A.    After I took Mr. Benavides to jail, I came

7    back.   The wrecker driver couldn't find the location

8    where the truck was, so I escorted him to the truck.

9    He was loading up the truck on the wrecker, and

10   Sylvia Benavides pulled up, which is Tony Benavides's

11   -- little Tony's grandmother.

12       Q.    Okay.

13       A.    She gets out and she is, like, "Why did you

14   arrest him?  You know who he is.  You shouldn't have

15   arrested him.  I am taking the truck."  I said, "Are

16   you the owner?"  She said, "No."  I said, "You are

17   not taking the truck.  It is being impounded."  And

18   she started threatening me.  She said she was going

19   to get me off duty.  She knew where I lived, what I

20   drove.  She was going to take care of me her own way,

21   and she started to walk off.  And I told her if she

22   was threatening me.  She said, "Take it however you

23   want."  So I went up to her so she wouldn't walk

24   away.  She turned around, and she punched me; and

25   that's when she just started swinging at me, and I

1    arrested her.

2        Q.    Okay.  How old a woman is Sylvia Benavides?

3        A.    I am not sure.  She's maybe late fifties or

4    early sixties.  I am not sure.

5        Q.    You -- Tony Benavides had left his job as

6    city manager prior to this incident?

7        A.    Just prior, I believe.

8        Q.    Okay.  Had you ever had any conflict with

9    Tony Benavides, Senior?

10       A.    The father, yes.

11       Q.    Okay.  What did that involve?

12       A.    Him interfering with police business.

13       Q.    Okay.  How did he interfere with police

14   business?

15       A.    By trying to go take statements from people;

16   and if he is not a police officer, he can't do that,

17   doing his own investigations and. . .

18       Q.    Was that in relation to the Valadez case?

19       A.    That was one.

20       Q.    Huh?

21       A.    That was one.

22       Q.    That was one?

23       A.    Uh-huh.

24       Q.    Okay.  There was other incidents where he

25   went and took statements from people?

AK/RET REPORTING, INC.

1      A.    That was the only one I knew of.

2      Q.    Okay.  So your testimony here today is that

3  Tony Benavides had gone and taken some statements

4  from -- in relation to this case?

5      A.    Right.

6      Q.    Okay.  Did Tony -- or the city manager, did

7  he confront you about this incident, the Valadez

8  incident?

9      A.    Yes.

10      Q.    Okay.  What did he tell you?

11      A.    He gave us a copy of the statement he took;

12  and we tried to explain that, you know, it was

13  incorrect.  He didn't take our statement.  He didn't

14  hear our side.  He said if I wasn't competent enough

15  as a woman to do my job without backup that he wasn't

16  going to hire me full-time.

17      Q.    Okay.  Did he threaten to take disciplinary

18  action against you or Tony -- I mean, excuse me, your

19  husband?

20      A.    No.

21      Q.    He did not threaten to take disciplinary

22  action?

23      A.    No, not that I remember.

24      Q.    Okay.  Do you know if he presented or went

25  to the city council over the Valadez incident?

1    A.   He said he was, but I am not sure.

2    Q.   Okay.  You are not sure if he did or not?

3    A.   No.

4    Q.   But he represented that he was going to go

5 to the city council?

6    A.   Yes.

7    Q.   Did the City of San Diego take any action

8 against you based on the Valadez incident?

9    A.   No.

10    Q.   Okay.  Did -- was there ever a city council

11 meeting where the Valadez incident was discussed?

12    A.   That one -- the city council meeting I

13 believe after the incident happened, I mean, he told

14 Andy to show up with his report on the Carrizales

15 case that night.  He talked to the city council in

16 executive session --

17    Q.   Okay.

18    A.   -- but we weren't in here.

19    Q.   Okay.  And Tony Benavides, Senior, left his

20 employment shortly after that?

21    A.   Yes.

22    Q.   Okay.  Did it make you angry that Tony

23 Benavides, Senior, was, as you put it, interfering in

24 police work?

25    A.   It didn't make me angry, no.

AK/RET REPORTING, INC.

45

1    Q.   It didn't make you angry?

2    A.   No.

3    Q.   Prior to you arresting Tony Benavides,

4    Junior, had you ever had any contact with him before?

5    A.   No.

6    Q.   You had never arrested him or --

7    A.   No.

8    Q.   Had you ever cited him for any offense?

9    A.   No, not that I can remember.

10   Q.   Okay.  When you arrested Catrina Valadez,

11   was it her -- was it the language she used that

12   caused that arrest?

13   A.   Yes.

14   Q.   It was, okay.  So you didn't, didn't arrest

15   her for, let's see, making a noise in excess of 85

16   decibels?

17   A.   No.

18   Q.   Okay.

19              MR. SCOGGINS:  I will pass.

20              MR. GREEN:  We reserve our questions

21   until the time of trial.

22

23

24

25

AK/RET REPORTING, INC.

46

CHANGES AND SIGNATURE

PAGE LINE          CHANGE                    REASON

9-7 _____ no special investigative topics - San Diego took Class Prior to
9-3 _____ one class _____ took that class prior wasn't sure when taken
26-17 ____ I forgot to put it in there - did not understand Question
27-1 ____ The expression on his face led me to believe he had actually
_____ been assaulted by Catrina. - did not understand question
28-8 __ Anywhere as long as it is open to the public. - did not understand
32-23 ___ No - _____ After I thought about it no one actually
_____ prevented us or told us to get out.
36-15 ___ At the end of the police report, it states mrs Valadez
_____ was Not arrested on these charges, but it would
_____ be turned over to the DA. She was arrested for
_____ Disorderly Conduct, Fail To Identify, Escape and Resisting.
Reason- Scoggins did not read the police report thoroughly
45-13 __ No it was her overall demeanor - didn't understand
_____ question

AK/RET REPORTING, INC.

47

1    I, BRENDA DE LEON, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3                          *Brenda DeLeon*

4                          BRENDA DE LEON

5

THE  STATE  OF  TEXAS:
6
COUNTY  OF  *Duval* :
7
     Before me, *Brenda DeLeon*, on this day
8    personally appeared, BRENDA DE LEON, known to me (or
proved to me under oath or through _____)
9    (description of identity card or other document) to
be the person whose name is subscribed to the
10   foregoing instrument and acknowledged to me that they
executed the same for the purposes and consideration
11   therein expressed.

12   Given under my hand and seal of office this
__*5th*__ day of *September*, *2000*.

13

14

15   _____
     NOTARY PUBLIC IN AND FOR
16   THE STATE OF __*Texas*__

17

18

19

20

21

22

23

24

25

AK/RET REPORTING, INC.

THE STATE OF TEXAS:
COUNTY  OF  NUECES:

I, JENNIFER L. KARL, Certified Court Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition of BRENDA DE LEON, the witness hereinbefore named, was, at the time named, taken by me in Stenograph, the said witness having been by me first duly cautioned and sworn upon her oath to tell the truth, the whole truth, and nothing but the truth, and later transcribed from Stenograph to typewriting under my supervision.

I further certify that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Subscribed and sworn to this the 12th day of July, 2000.

_____
JENNIFER L. KARL
Certified Court Reporter

Certification Number: 5063
Date of Expiration: 12/31/00
Business Address:
    AK/RET REPORTING, INC.
    880 Tower II
    Corpus Christi, Texas 78478

COSTS: ___244.65_____

DUE AND OWING FROM PLAINTIFFS

AK/RET REPORTING, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATRINA VALADEZ, ALMA        )
AVILA AND ESMERALDA          )
CARRIZALES                   )
                             )
VS.                          )   C. A. NO. C-00-101
                             )
CITY OF SAN DIEGO,           )
OFFICER BRENDA DE LEON       )
& OFFICER ANDREW DE LEON     )


DEPOSITION OF ANDREW DE LEON
JULY 7, 2000


APPEARANCES:


        COUNSEL FOR THE PLAINTIFFS:

                GRAY P. SCOGGINS
                Attorney at Law
                113 N. Reynolds
                Alice, Texas 78332

        COUNSEL FOR THE DEFENDANTS:

                MR. DAVID W. GREEN
                Barger, Hermansen, McKibben
                     &  Villarreal, L.L.P.
                802 N. Shoreline Blvd.
                Suite 2000, North Tower
                Corpus Christi, Texas 78401

        ALSO PRESENT:  CATRINA VALADEZ,
                       BRENDA DE LEON

        REPORTED BY:  JENNIFER L. KARL

                (ORIGINAL)

# Ak/Ret Reporting, Records & Video, Inc.

CERTIFIED COURT REPORTERS
880 TOWER II
555 N. CARANCAHUA
CORPUS CHRISTI, TEXAS 78478
(361) 882-9037  (800) 388-9037
FAX (361) 882-3355

EXHIBIT
"_G_"

CA NO. C.-00-101

Catrina Valadez, Alma
Avila, and Esmeralda
____ Carrizales
VS.

City of San Diego, et al

            *    IN THE _____ DIST. COURT

            *    _____ COUNTY. TX

            *    IN THE UNITED STATES DISTRICT COURT

            *    FOR THE Southern DIST. OF _____

            *           CC      DIVISION

STIPULATIONS FOR THE DEPOSITION OF Brenda DeLeon, Andy DeLeon & Dr. Raymo Tanguma

taken on 7/7/00 by Gray P. Scoggins

The attorneys for all parties present stipulate and agree as follows to the checked items:

Deposition taken pursuant to:

✓ _____ Notice _____ Agreement _____ Court Order

Examination and Signature by the Witness:

_____ Original deposition delivered to _____ as the custodial attorney. Ak/Ret Reporting, Inc. released of any further responsibility.

✓ Original deposition delivered to Mr. McKibben _____ to be signed and returned to Ak/Ret Reporting, Inc., within 30 _____ days from date of delivery. Original deposition sealed and delivered to Mr. Scoggins _____ as the custodial attorney.

In the event that the original deposition transcript has not been signed by the time of trial or any hearing, the undersigned original or a certified copy of the transcript may be used as signed.

_____ Signature waived. Original deposition delivered to _____ as the custodial attorney.

Objections:

_____ Reserve all until the time of trial.

_____ Make all at time of the taking of the deposition or all will be waived.

✓ Reserve all objections, except as to the form of the questions or the responsiveness of the answers until the time of trial, which objections are waived if not made at the taking of the deposition.

✓ Make objections in accordance with the Rules of Civil Procedure (Texas/Federal)

Exhibits:

_____ Attach original exhibits to the original transcript.

_____ Attach copies of the original exhibits to the original transcript. Original exhibits in the possession of _____

8/11

2

I N D E X

                                                    PAGE

Examination
  By Mr. Scoggins                                     4

                    EXHIBIT INDEX

EXHIBIT NUMBER                                       PAGE
   1      San Diego Police Dept.,
          Supplemental Report, Dated 11/4/99   12

AK/RET REPORTING, INC.

Case 2:00-cv-00101   Document 34   Filed in TXSD on 01/10/2001   Page 71 of 92

1    Deposition and answers of ANDREW DE LEON, who

2   resides in Bexar County, Texas, taken herein by the

3   counsel for the Plaintiffs, before JENNIFER L. KARL,

4   a Certified Court Reporter in and for the State of

5   Texas, on the 7th day of July, 2000, between the

6   hours of 11:30 a.m. and 12:17 a.m., in the offices of

7   City Hall, 404 S. Mier, San Diego, Texas in

8   accordance with the Federal Rules of Civil Procedure

9   and the agreements hereinafter set forth.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AK/RET REPORTING, INC.

11

1      A.    No, not off the top of my head.

2      Q.    Okay.  And tell me, tell me what

3  transpired.  How did you get involved in this

4  particular case?

5      A.    Officer Brenda De Leon came to me while I

6  was having lunch at my uncle's house and pretty much

7  briefed me just on what she had and how she couldn't

8  get a hold of anybody else to backup.  And at that

9  point she asked me if I wanted to go.  I said, "Yes,

10  I will go with you."  So therefore we went to -- she

11  explained that Mr. Valadez advised her of the address

12  where his -- Ms. Catrina -- Ms. Carrizales would be,

13  so that's where we went.

14      Q.    Okay.  When you say that Brenda De Leon

15  briefed you, what did she tell you?

16      A.    She briefed me on more or less what had

17  occurred according to Mr. Valadez, and she also

18  informed me that she did observe his own property,

19  his clothing torn up, the rest of the house ransacked

20  and scratches on his neck, which she advised that

21  when she questioned him about that, he made her feel

22  like Catrina had done the scratches on his neck.

23      Q.    Okay.  So she told you about observing

24  injuries on Mr. Valadez?

25      A.    Yes, sir.

AK/RET REPORTING, INC.

Case 2:00-cv-00101   Document 34   Filed in TXSD on 01/10/2001   Page 73 of 92

1      Q.   Okay.

2           MR. SCOGGINS:   Let me mark that as an

3 exhibit.

4           (Deposition Exhibit No. 1

5           marked for identification.)

6      Q.   (BY MR. SCOGGINS)   Okay.   Let me ask you if

7 you can identify that document for me.

8      A.   Sure.   This is my supplement to her initial

9 report.

10      Q.   Okay.   Just go ahead and hang on to it for

11 just a second.   Can you tell me where in that

12 document it states that Brenda De Leon informed you

13 that she observed any kind of injuries to

14 Mr. Valadez?

15      A.   Okay.   Give me a second to look it over.

16      Q.   Sure.

17      A.   Okay.   I don't believe it's in here.

18      Q.   Okay.   Now, is that something you would

19 generally include in a report?

20      A.   Yes, sir.

21      Q.   Okay.   And why is that?

22      A.   Because you have got to just basically put

23 what both sides tell you into the report.

24      Q.   Okay.   Now, the purpose of an offense report

25 -- and correct me if I am wrong -- is to memorialize

1    what happened, what you were told and what you

2    observed; is that correct?

3        A.    Yes, sir.

4        Q.    Okay.  And one reason would be for testimony

5    later on in case they went to trial; is that correct?

6        A.    That's correct, yes, sir.

7        Q.    Okay.  And would you consider evidence of

8    bodily injury to be something that needed to be

9    included in a report?

10       A.    Yes, sir.

11       Q.    Okay.  When you spoke to Brenda De Leon, did

12   she inform you that the alleged perpetrator was

13   Mr. Valadez's wife?

14       A.    No, sir, I believe the way she explained it

15   was -- well, soon to be ex-wife, which --

16       Q.    What did you take that to mean?

17       A.    Presuming they are still married.

18       Q.    Okay.  Would -- did she tell you or inform

19   you that there was any kind of court order or

20   protective order that she had been shown?

21       A.    No, sir.

22       Q.    Okay.  Do you know the difference between a

23   criminal act and a civil action?

24       A.    Pretty much, yes, sir.

25       Q.    Okay.  Are you aware of what community

1　property is, the definition of community property?

2　　A.　Yes, sir.

3　　Q.　Okay.　Would you mind -- just go ahead and

4　tell me what your definition of community property

5　is.

6　　A.　My definition of community property, that

7　would be property attained --

8　　　　　　MR. GREEN:　First of all, I am going to

9　object to the form of the question in asking him to

10　give a legal conclusion.

11　　Q.　(BY MR. SCOGGINS)　Go ahead and answer it,

12　if you can.

13　　A.　Okay.　Property basically gained while

14　people -- two people are married.

15　　Q.　Okay.　When Brenda De Leon told you what she

16　had seen and what she observed, did you believe that

17　a crime had taken place?

18　　A.　Yes, sir.

19　　Q.　Okay.　Okay.　What happened when you arrived

20　-- I think it was -- was it 202 Palacios?

21　　A.　I believe it is 702 Palacios.

22　　Q.　702 Palacios.　What happened when you

23　arrived?

24　　A.　When we arrived, we made contact with

25　Catrina's sister -- I can't recall her name.

1      Q.    What did you tell her?

2      A.    I advised her, as I always do when I make

3  contact with somebody, I was Officer Andy De Leon;

4  and she introduced herself as Officer Brenda De Leon.

5      Q.    Okay.  Did you go onto the property at that

6  time?

7      A.    No, sir.

8      Q.    Okay.  Why not?

9      A.    I was comfortable at the road talking to

10 her.

11     Q.    Okay.  What did you tell her to do?  What

12 did you tell her?  That's probably a better

13 question.

14     A.    Tell her sister?

15     Q.    Yes.

16     A.    We asked her to -- if Catrina Carrizales was

17 there, and if she could have her step outside.  We

18 had a few questions to ask her.

19     Q.    Okay.  I believe we're talking about Alma

20 Avila?

21     A.    I believe so, yes, sir.

22     Q.    What was her response?

23     A.    I don't remember.

24     Q.    Okay.  You don't recall?

25     A.    No, sir.

1    Q. Okay. Did she, in fact, go in and get

2  Mrs. Valadez?

3    A. Yes, sir.

4    Q. Okay. What did you say to Mrs. Valadez when

5  you saw her?

6    A. I don't remember at this time.

7    Q. If you need to refer to the report, feel

8  free.

9    A. Sure.

10    I don't believe I told her anything, sir.

11    Q. Okay. Who did tell her?

12    A. Officer Brenda De Leon.

13    Q. Okay. Do you recall what Brenda De Leon

14  said?

15    A. Not off the top of my head. I can read the

16  report and let you know.

17    Q. Okay. Let me ask you this: Is everything

18  contained in this report true and correct?

19    A. That's -- yes, sir.

20    Q. Okay. Now, earlier you testified that you

21  basically introduced yourself and said that you were

22  a police officer; is that correct?

23    A. That is correct.

24    Q. After you made that introduction, did Brenda

25  De Leon take over from there?

AK/RET REPORTING, INC.

1  in this case?

2     A.   For the simple fact that in our opinion as

3  police officers and per the law of family violence,

4  that we felt she would, indeed, go back and commit

5  future domestic violence, so, therefore, we are bound

6  by law that we shall make an arrest.

7     Q.   Okay.  So you actually arrested Catrina

8  Valadez to prevent further acts of family violence?

9     A.   Along with the disorderly conduct.

10     Q.   Okay.  Can you show me -- I believe you have

11  got a copy of the report in front of you?

12     A.   Sure.

13     Q.   Can you tell me where in the report it

14  states that you arrested Mrs. Valadez to prevent any

15  further acts of family violence?

16     A.   I don't believe it states in here.

17     Q.   Okay.  What it does state in the report is

18  that you arrested her for disorderly conduct of her

19  language; is that correct?

20     A.   Let me read the report.  Yes, sir.

21     Q.   Okay.  Would you tell me what disorderly

22  conduct by language is?

23     A.   Being vulgar in a public place, inciting a

24  breach of the peace, an immediate breach of the

25  peace.

AK/RET REPORTING, INC.

1     Q.   Okay.  Where was Mrs. Valadez standing when

2  you allege she committed the offense of disorderly

3  conduct by language?

4     A.   On the curb.

5     Q.   On the curb?

6     A.   On the curb.  Well, just on the walkway,

7  just next to the curb, next to the roadway.

8     Q.   Okay.  So she was actually on her mother's

9  property?

10    A.   She owned the property, yes, sir.

11    Q.   Okay.  And is that public or private

12  property where she was standing?

13    A.   It could be both.

14    Q.   It could be both?

15    A.   Yes, sir.

16    Q.   Okay.  Does a residential property owner

17  have the right to exclude the public from its front

18  yard?

19    A.   Yes, sir.

20    Q.   Okay.  Would that make it public property or

21  private property?

22    A.   At that point it would be private property.

23    Q.   Okay.  Now, you stated that a further

24  element of disorderly conduct by language is inciting

25  an immediate breach of the peace; is that correct?

AK/RET REPORTING, INC.

1    A.    That's correct.

2    Q.    Why did you feel that Mrs. Valadez was

3    inciting an immediate breach of the peace?

4    A.    Because there was people passing by, rolling

5    down their windows, seeing what the commotion was,

6    and there was people across the street that I can

7    remember, and it appeared that they were getting a

8    little rowdy themselves.

9    Q.    These other people?

10   A.    Right.

11   Q.    Okay.  Do you recall what Mrs. Valadez's

12   exact words were which caused you to believe that she

13   had committed the offense of disorderly conduct by

14   language?

15   A.    No, not in her exact words.

16   Q.    Okay.  Did the word fuck enter into that?

17   A.    I believe so.

18   Q.    Okay.  To whom was the comment -- and I am

19   reading from -- let me see here.  I am reading from

20   your report.  "I don't have to tell you a fucking

21   thing."  Wait, let me see.

22   All right.  To whom was the comment, "I don't

23   have to tell y'all shit," directed?

24   A.    That was directed to myself and Officer

25   Brenda De Leon.

AK/RET REPORTING, INC.

1    Q.    Okay.  Did that comment make you angry?

2    A.    No, sir.

3    Q.    Okay.  In your capacity as a peace officer,

4    have you ever had a suspect use, use language like

5    that before?

6    A.    Yes, sir.

7    Q.    Okay.  Is that type of language pretty

8    common on the streets?

9    A.    It all depends on who you are speaking to.

10    Q.    Okay.  But in your capacity as a police

11    officer, you do on occasion have contact with people

12    who speak in that manner; is that correct?

13    A.    On occasion, yes, sir.

14    Q.    Okay.  Do you arrest everybody that speaks

15    in that manner?

16    A.    No, sir.

17    Q.    Okay.  Now in your report it further states

18    that Mrs. Valadez said, "Fuck this shit; y'all always

19    believe him."  To whom was that comment directed?

20    A.    Assuming her husband or James Valadez.

21    Q.    Okay.  And he was -- was he present at the

22    scene?

23    A.    No, sir.

24    Q.    Okay.  But based upon that, that comment,

25    you believed that she had committed the offense of

AK/RET REPORTING, INC.

1   disorderly conduct by language?

2        A.    Not necessarily just the comment --

3        Q.    Okay.

4        A.    -- the way she used the comment.

5        Q.    The way she used the comment?

6        A.    Right, she was yelling and screaming at the

7   top of her lungs.

8        Q.    Okay.  But you felt that comment was going

9   to incite an immediate breach of the peace?

10       A.    Not only the comment, as I just briefly

11  stated.

12       Q.    Okay.  It was the tone?

13       A.    The tone and the comment, yes, sir.

14       Q.    Okay.  Did Mrs. Valadez ever tell you or

15  Mrs. De Leon that she was planning on going back to

16  -- I believe it was 505 Dix, her husband's home?

17       A.    I don't believe so.

18       Q.    Okay.  And did she ever take any action

19  which showed an intent to go back to 505 Dix?

20       A.    Did she ever take any action?

21       Q.    Yes.

22       A.    No, sir.

23       Q.    Okay.  What were y'all planning to, to do

24  upon arrival at the 702 East Palacios address?

25       A.    Just get basic information for a report.

AK/RET REPORTING, INC.

1      Q.   Okay.  So y'all were not planning on

2    arresting her at that time?

3      A.   No, sir.

4      Q.   When -- after Mrs. Valadez committed what

5    you believed to be a crime, what, what happened?

6      A.   At which point are you speaking of?

7      Q.   After you as an officer believed that you

8    had observed a crime being committed.

9      A.   Observed.

10     Q.   Observed.

11     A.   Okay.

12     Q.   What happened?

13     A.   At that point she was placed under arrest.

14     Q.   Okay.  How was she placed under arrest?

15     A.   I told her, "You are under arrest."

16     Q.   Okay.  You told her?

17     A.   I believe it was me, yes, sir.

18     Q.   Okay.  Then what happened?

19     A.   She said, "No, I am not," and she takes off

20    running inside the house.

21     Q.   Okay.  So she ran back into the home?

22     A.   Yes, sir.

23     Q.   And that was after you informed her that she

24    was under arrest?

25     A.   That's correct, yes, sir.

AK/RET REPORTING, INC.

1    Q.   Okay.  What did you do after she ran back
2    inside the home?
3    A.   I ran after her.
4    Q.   Okay.  Were you able to catch her?
5    A.   Yes, sir.
6    Q.   Where did you catch her?
7    A.   Just inside the doorway, I believe.
8    Q.   Okay.  What happened after you had grabbed
9    her?
10   A.   Her mother started jerking her other arm.
11   Q.   Okay.  Was the mother saying anything?
12   A.   Yes, sir, "Leave her alone," something to
13   that effect, "leave her alone."
14   Q.   Okay.  Did she ask you who you were?
15   A.   I don't remember.
16   Q.   Okay.
17   A.   I don't believe so.
18   Q.   Did she ask you what you were doing there?
19   A.   I don't remember.
20   Q.   Okay.  Did you ever threaten to arrest
21   Mrs. Carrizales?
22   A.   Which is?
23   Q.   Mrs. Valadez's mother.
24   A.   That's correct.
25   Q.   Okay.  What did you threaten to arrest her

1   for?

2       A.      What?   For interfering with people with

3   public duties.

4       Q.      Okay.   At some point did she stop

5   interfering with your ability to effect an arrest?

6       A.      Yes, sir.

7       Q.      Okay.   When was that?

8       A.      After telling her several times I was going

9   to arrest her.

10      Q.      Okay.   Did you ever inform Mrs. Valadez's

11  mother that you had a warrant for Mrs. Valadez?

12      A.      No, sir.

13      Q.      Okay.   Did you ever threaten to get a

14  warrant for Mrs. Carrizales, her mother?

15      A.      For Ms. -- yes, sir.

16      Q.      Okay.   Now, you were not in uniform; is that

17  correct?

18      A.      That's correct.

19      Q.      Okay.   How were you actually dressed?

20      A.      I believe I recall having blue jeans on and

21  a black and white, predominantly black and white,

22  police T-shirt.

23      Q.      Okay.   Now, what does the T-shirt say on

24  front?

25      A.      I believe it is the one that says,

1    Q.    What do you need to do in order to secure a

2  warrant?

3    A.    You need to take a copy of the report, get

4  an affidavit, and take it before a judge.

5    Q.    Okay.  And get a judge to sign off on it?

6    A.    Yes, sir.

7    Q.    Okay.  When you entered the home of -- where

8  did you grab Mrs. Valadez, or how did you grab

9  Mrs. Valadez?

10    A.    I believe I grabbed her by the arm.

11    Q.    Okay.  Did you grab her on the upper arm,

12  lower arm?

13    A.    I don't recall, sir.

14    Q.    Okay.  Now, were you attempting to put cuffs

15  on her in the home?

16    A.    I was attempting to arrest her, yes, if

17  that's what you're asking.

18    Q.    Okay.  Were you going to try to cuff her

19  inside or outside, or what was the plan?

20    A.    Whereever I got a hold of her.

21    Q.    Okay.  When you got a hold of her in the

22  home?

23    A.    That's correct.

24    Q.    Okay.  So the purpose in holding her was to

25  put cuffs on her?

1      A.    That's correct.

2      Q.    Okay.  And did you, in fact, put cuffs on

3  her?

4      A.    We did, yes, I did.  Yes, sir.

5      Q.    After this offense or this, this incident,

6  did you ever have any discussions with the city

7  manager concerning what happened?

8      A.    Yes, sir, I did.

9      Q.    Okay.  And what did he tell you?

10     A.    I don't recall.

11     Q.    Okay.  Do you recall him being pleased or

12  displeased over the incident?

13     A.    Due to the fact that he is not a police

14  officer, he was displeased because he don't know the

15  circumstances and why we do what we do.

16     Q.    Okay.  Did the city manager threaten to take

17  any kind of disciplinary action against you?

18     A.    Well, it just all depends on which

19  particular time you are talking about.  He met with

20  us, like, three or four times that evening.

21     Q.    He had what?

22     A.    He met with us three or four times that

23  evening.

24     Q.    Okay.  Well, let's just talk about all three

25  of them.

AK/RET REPORTING, INC.

1     A.    I don't remember him mentioning anything

2    about any disciplinary action, other than I believe

3    he mentioned something to the effect that there could

4    be something come out of it.

5     Q.    Okay.  Did he tell you that he had taken

6    statements from Mrs. Valadez and her family?

7     A.    I don't recall, not initially, no, sir.

8     Q.    Did you get angry with Mr. Benavides, the

9    then city manager, over what he told you concerning

10   this incident?

11     A.    No, sir.

12     Q.    Okay.  Do you recall whether there was a

13   city council meeting concerning the Valadez incident?

14     A.    I don't recall.

15     Q.    Okay.  Was any disciplinary action taken

16   against either yourself or Brenda De Leon because of

17   this incident?

18     A.    I believe there was a -- there was an oral

19   reprimand by Mr. Tony Benavides, Junior; and if I

20   recall correctly, I believe I found a written

21   reprimand, which I refused to sign in written order.

22     Q.    And who was the written reprimand prepared

23   by?

24     A.    Mr. Tony Benavides, Junior.

25     Q.    The city manager?

1   someone's right to free speech?

2       A.   As long as it don't cause any breach of the

3   peace.

4       Q.   Okay.  Were you ever informed by anybody in

5   the department that if you heard somebody cursing

6   that you should place them under arrest?

7       A.   No, sir.

8       Q.   Okay.  Did you know Ruben James Valadez

9   prior to this incident?

10      A.   I met Ruben James Valadez prior to this

11  incident, yes, sir.

12      Q.   Okay.  How did you meet him?

13      A.   He works for the sheriff's department.  I

14  was introduce to him.

15      Q.   Okay.  And he is a dispatcher?

16      A.   That's correct, yes, sir.

17      Q.   Okay.  Did his -- let's see.  Let me

18  rephrase that.  Did the fact that you knew him prior

19  to this incident have anything to do with placing his

20  soon to be ex-wife --

21      A.   I don't think that's the right question.

22      Q.   Okay.

23      A.   I am a police officer.  I treat everybody

24  equally.

25      Q.   Okay.  So it did not have anything to do

38

1                          CHANGES AND SIGNATURE

2

3       PAGE LINE            CHANGE                   REASON   attorney

4       5 - 13   No, I'm a Car Sales Consultant and  - didn't under-

5       _____  I am still a reserve police officer.  stand answer

6       9-1      SPAG Law Enforcement Academy  -   court reporter
                                                        mistake

7       27- 2    Interfering with public duties  -  court reporter
                                                        mistake

8       33-14    because he didn't know  -   court reporter put
                                                 don't instead of didn't

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

                        AK/RET REPORTING, INC.

39

1    I, ANDREW DE LEON, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3                    _Andrew DeLeon_____
4                    ANDREW DE LEON

5
THE STATE OF  TEXAS:
6
COUNTY OF _Duval_____:
7
Before me, _Andrew DeLeon___, on this day
8    personally appeared, ANDREW DE LEON, known to me (or
proved to me under oath or through _____)
9    (description of identity card or other document) to
be the person whose name is subscribed to the
10   foregoing instrument and acknowledged to me that they
executed the same for the purposes and consideration
11   therein expressed.

12      Given under my hand and seal of office this
_5th_ day of _September____, _2000_.
13

14
        ┌─────────────────────┐
15      │  ★  MARGIE LOPEZ     │   _Margie Lopez_____
        │     MY COMMISSION EXPIRES │   NOTARY PUBLIC IN AND FOR
16      │     November 12, 2001 │   THE STATE OF ____Texas
        └─────────────────────┘
17

18

19

20

21

22

23

24

25

                    AK/RET REPORTING, INC.

THE STATE OF TEXAS:
COUNTY OF NUECES:

I, JENNIFER L. KARL, Certified Court Reporter in
and for the State of Texas, do hereby certify that
the facts stated by me in the caption hereto are
true; that the foregoing deposition of ANDREW DE
LEON, the witness hereinbefore named, was, at the
time named, taken by me in Stenograph, the said
witness having been by me first duly cautioned and
sworn upon his oath to tell the truth, the whole
truth, and nothing but the truth, and later
transcribed from Stenograph to typewriting under my
supervision.

I further certify that the above and foregoing
deposition as set forth in typewriting is a full,
true, and correct transcript of the proceedings had
at the time of taking said deposition.

I further certify that I am neither attorney or
counsel for, nor related to or employed by any of the
parties to the action in which this deposition is
taken, and further that I am not a relative or
employee of any attorney or counsel employed by the
parties hereto, or financially interested in the
action.

Subscribed and sworn to this the 12th day of
July, 2000.

_____
JENNIFER L. KARL
Certified Court Reporter

Certification Number: 5063
Date of Expiration: 12/31/00
Business Address:
    AK/RET REPORTING, INC.
    880 Tower II
    Corpus Christi, Texas 78478

COSTS: __206.75_____

DUE AND OWING FROM PLAINTIFFS